UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MARK CHRISTIANS, | 4:20-CV-04083-LLP |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART THE DOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART PLAINTIFF'S SECOND MOTION TO AMEND, AND RULING ON MISCELLANEOUS MOTIONS |
| DARRIN YOUNG, in his individual capacity; DAN SULLIVAN, in his official capacity; TROY PONTO, Deputy Warden SDSP, individual and official capacity; JESSICA COOK, Associate Warden SDSP/Jameson, individual and official capacity; BRENT FLUKE, Warden MDSP, individual and official capacity; REBECCA SCHIEFFER, Associate Warden MDSP, individual and official capacity; ALEX REYES, Associate Warden MDSP, individual and official capacity; CODY HANSON, Unit Manager Jameson, individual and official capacity; SETH HUGHES, Unit Manager Jameson, individual and official capacity; NANCY CHRISTENSEN, Unit Manager MDSP, individual and official capacity; DEREK EKEREN, Unit Coordinator Jameson, individual and official capacity; DEB EILERS, Unit Coordinator MDSP, individual and official capacity; LAURIE STRATMAN, Unit Coordinator MDSP, individual and official capacity; JULIE STEVENS, Case Manager MDSP, individual and official capacity; JARRED ANDERSON, KELLY BUCHHOLZ, CBM/Summit Food Services Worker MDSP, individual and official capacity; JOHN TRIEWEILER, Summit District Manager, individual and official capacity; KEVIN TRIERWEILER, Site Manager Jameson, individual and official capacity; PAMELA THOMAS, Executive Chef, Summit Corrections, individual and official capacity; UNNAMED SUMMIT LICENSED DIETITIAN(S), individual and official capacity; DIETARY ASSISTANTS, individual and | |

1

official capacity; DIRECTORS OF
OPERATIONS, individual and official capacity;
DISTRICT MANAGERS, individual and
official capacity; FOOD SERVICE
DIRECTORS, individual and official capacity;
ASSISTANT FOOD SERVICE DIRECTORS,
individual and official capacity; FOOD
SERVICE WORKERS, individual and official
capacity; JUSTIN BARTHEL, Director of
Dietary Summit, individual and official capacity;
CRAIG MOUSEL, Property Officer, SDSP,
individual and official capacity; MIKE
LEIDHOLT, South Dakota Secretary of
Corrections, individual and official capacity;
KELLIE WASKO, official capacity,
PECHOUS, Unit Coordinator, individual and
official capacity; GENIE BIRCH, Program
Manager, individual and official capacity;
GREASMAN, Correctional Officer, individual
and official capacity; DAWN ALUMBAUGH,
Correctional Officer, individual and official
capacity; BARNETCHE, Correctional Officer,
individual and official capacity; MARJAMA,
Correctional Officer, individual and official
capacity; WINTERS, Correctional Officer,
individual and official capacity; PADILLA,
Correctional Officer, individual and official
capacity; MULLINS, Correctional Officer,
individual and official capacity; HULSCHER,
Correctional Officer, individual and official
capacity; DRISKIE, Former Deputy Warden,
individual capacity; BECKER, Lieutenant,
individual and official capacity; HETTIG,
Lieutenant, individual and official capacity;
PERRET, Lieutenant, individual and official
capacity; BETH, Summit Supervisor, individual
and official capacity, SUMMIT FOOD
SERVICE, individual and official capacity,

Defendants.

Plaintiff, Mark Christians, is an inmate at the South Dakota State Penitentiary ("SDSP").

He filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Doc. 1. Pending before the Court is

a motion for summary judgment filed by defendants Darin Young, Doug Clark,[1] Troy Ponto, Jessica Cook, Brent Fluke, Rebecca Schieffer, Alex Reyes, Cody Hanson, Seth Hughes, Nancy Christensen, Derek Ekeren,[2] Deb Eilers, Laurie Stratman, Julie Stevens, Craig Mousel, Dr. Mary Carpenter, Dr. Shamin Sultana, Dr. Karissa Zimmer, Amber Gitchel, Rachel Depree, and Mike Leidholt[3] (the "DOC Defendants"). Doc. 98. Christians opposes this motion. Doc. 117. Also pending before the Court is Christians' motion to file a second amended complaint, which defendants oppose. Docs. 79, 87, 92. Christians and the DOC Defendants have filed motions regarding discovery. Docs. 76, 80, 81, 89, 127. Christians has also filed an objection to this Court's order dismissing Lieutenant Maddox from the lawsuit, a motion for appointment of counsel, and a motion for the appointment of an expert. Docs. 75, 77, 110. For the following reasons, this Court grants in part and denies in part the DOC Defendants' motion for summary judgment.

## I.       The DOC Defendants' Motion for Summary Judgment

### A.       Factual Background

---

[1] Christians brings claims against Doug Clark, the former SDSP Warden, in his official capacity. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." The current SDSP Warden is Dan Sullivan, who is automatically substituted for Clark on the official capacity claims. Because Christians only sues Clark in his official capacity, Clark is dismissed from this lawsuit.

[2] Defendants' motion does not name Derek Ekeren as a party moving for summary judgment. Doc. 98 at 1. This Court presumes that defendants intended to file a motion for summary judgment on behalf of all DOC defendants. The motion also names Adam Maddox, who was dismissed from this lawsuit on September 27, 2021. *See id.*; Doc. 69.

[3] Christians brings claims against Mike Leidholt, the former South Dakota Secretary of Corrections, in his individual and official capacity. The current Secretary of Corrections is Kellie Wasko, who is automatically substituted for Leidholt on the official capacity claims.

The Court recites the relevant facts in the light most favorable to Christians because the DOC Defendants move for summary judgment. Where facts relevant to the remaining claims are disputed,[4] both parties' averments are included.

### 1.    Food Quality and Caloric Intake

Christians brings an Eighth Amendment conditions of confinement claim against the DOC Defendants, alleging that he lost over 90 pounds from March 2017 to August 13, 2018, because of inadequate nutrition while incarcerated in the SD DOC prison system. Doc. 26 ¶ 36. The DOC retained "a private, independent consultant to perform an independent review of [their] prison food service program" in 2017. Doc. 104 ¶ 13 (alteration in original) (quoting Doc. 99-78 at 3). Barbara Wakeen of Correctional Nutrition Consultants, Ltd., was chosen to perform the review. *Id.* ¶ 16. Wakeen reviewed the menus at the Mike Durfee State Prison ("MDSP") and noted that MDSP Menus were the same as SDSP menus except for a difference in sourcing for bread. *Id.* ¶¶ 17, 19. Christians disputes this finding, arguing that because the Summit defendants informed him in a discovery response that no nutritional analyses exist, Wakeen could not evaluate caloric or nutritional values for menus. Doc. 120 ¶ 17; *see also* Doc. 118 at 35 ("Summit Defendants state that they are not in the possession of any materials relating to a 'nutrient analysis[.]' ").

---

[4] The DOC Defendants argue that Christians has failed to comply with the Local Rules in his Response to Defendants' Statement of Undisputed Material Facts. Doc. 128 at 10-11. Local Rule 56.1.B requires a party opposing a motion for summary judgment to respond to a statement of undisputed material facts "with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1(B). The DOC Defendants argue that Christians has failed to make appropriate citations to the record. Doc. 128 at 10-11. Christians' response does fail to include citations to entries in the record by number, but it does cite to these entries. *See, e.g.,* Doc. 120 ¶ 20 (citing to affidavits submitted by other inmates). Thus, although Christians' citations are not as clear as they could be, he is not in violation of Local Rule 56.1(B).

The executive summary of that report, which appears to be drafted by DOC officials,[5] noted that "South Dakota menus are high in sodium content and must be reduced" but concluded that "[t]he food service program and food quality is overall good." *See* Doc. 104 ¶ 20 (quoting Doc. 99-78 at 4). The executive summary also states that food integrity existed within the DOC and that "the [DOC] overall provides a quality, nutritious low-cost meal to inmates." *Id.* (quoting Doc. 99-78 AT #). Christians disagrees with this assessment, calling the food "unpalatable" and alleging that portions of fruit and meat are below USDA guidelines. Doc. 120 ¶¶ 13, 20.

A second review of the DOC food service program was conducted in 2019. *See* Doc. 104 ¶ 21. The 2019 Site Visit Report does not indicate who conducted the evaluation, and Christians contends that it was not independent but instead conducted by the DOC Director of Operations. *See* Doc. 99-79; Doc. 120 ¶ 21. The DOC Defendants allege that the 2019 evaluation concluded that "most or all of the SDDOC facilities are NCCHC [National Commission on Correctional Health Care] accredited and NCCHC Standards reference serving a nutritionally adequate diet for that main population." Doc. 104 ¶ 22 (alteration in original) (quoting Doc. 99-79 at 7). They further allege that the SDDOC diet "incorporates the American Heart Association diet and lifestyle recommendations and the USDA Dietary Guidelines." *Id.* (quoting Doc. 99-79 at 7).

This appears to be a mischaracterization of the 2019 evaluation. *See* Doc. 99-79 at 7-8. Although this language does appear in the 2019 evaluation, it is taken from a paragraph analyzing medical and specialty diets within SDDOC facilities. *See id.* The paragraph notes how the SDDOC and Summit combined the diabetic, heart healthy, and high fiber diets into one diet and how the Bland diet encompasses 12 different dietary restrictions, including intolerances,

---

[5] The executive summary explains that an independent consultant was hired to review "*our* prison food service program." Doc. 99-78 at 3 (emphasis added).

allergies, and food preferences. *Id.* at 7. The 2019 evaluation then explains the NCCHC

standards referenced above by the DOC Defendants. *Id.* at 7-8. The 2019 evaluation further notes

that "[t]he main population menus meet some of these criteria. If menus were aligned further

with some of these nationally recognized standards, recommendations and guidelines, perhaps

the number and types of medical diets could be simplified, thus simplifying the diet operations

for food service and medical." *Id.* at 8. It also notes that this would result in "positive cost

savings impact for food service and inmate health care while optimizing inmate health care

needs." *Id.*

In context, the 2019 evaluation is explaining that the SDDOC may be able to provide

fewer medical diets and streamline food service operations if the main population menus better

matched the NCCHC standards. *Id.* at 7-8. The 2019 evaluation summarized the "many diets and

diet combinations" as "costly in terms of labor, food, and all involved disciplines, and not

consistent with NCCHC Standards or nationally recognized practices for healthy outcomes." *Id.*

at 8. The 2019 evaluation also notes the lack of fresh fruit, vegetables, and salads, concluding

that "fresh fruit can be of a security concern and a cost impact as well but should be a workable

outcome with all disciplines collaborating." *Id.*

Christians alleges in his complaint that his diet while at MDSP and SDSP was and is

approximately 1750 calories per day and that the recommended calorie total for a man of his

height, weight, age, and activity level is approximately 3000 calories per day. Doc. 26 ¶ 40. He

alleges that this discrepancy caused his weight loss. *See id.* He also alleges that he documented

his inadequate caloric intake through multiple grievances that he filed and through five months

of detailed food journal entries. Doc. 120 ¶ 12. The DOC Defendants note that Wakeen's 2017

evaluation stated that the average daily calorie count at MDSP was 2,760, which was 65 calories

fewer than the SDSP main population menu. Doc. 104 ¶ 25 (citing Doc. 99-78 at 7). That evaluation also stated that the recommended calorie amount for "the adult reference male" was 2,757 calories. *Id.* (quoting Doc. 99-78 at 7).

At a visit to MDSP Health Services on January 4, 2018, Christians stated that he "eats more now than he did previously." *Id.* ¶ 27 (quoting Doc. 99-5 at 1). At that visit, Christians claimed that his weight loss began when he was transferred to MDSP. *See* Doc. 99-5 at 1. He also claimed that he ate his regular meal tray and additional commissary items. Doc. 104 ¶ 27. Approximately two months later, he told Health Services that he had been buying and eating $100 to $400 worth of commissary food a month in addition to eating his regular meals. *Id.* ¶ 28. On April 17, 2018, Christians told Health Services that he continued to lose weight despite eating about 4,000 calories a day. *Id.* ¶ 29. Christians was diagnosed with celiac disease, and he was placed on a gluten-free diet around October 24, 2018. *Id.* ¶¶ 76-77. He told Nursing Staff on February 22, 2019, that he "purchases commissary in excess" and estimated his daily calorie intake to be greater than 5,000. *Id.* ¶ 30 (quoting Doc. 99-21 at 1). Christians told Dr. Steve Gutnik, the gastroenterologist who diagnosed him with celiac disease, that he was "eating over 4,000 calories a day" at a visit on July 26, 2019. *Id.* ¶ 31 (quoting Doc. 99-70 at 1). According to Christians, these caloric estimates were based on his belief at the time that he was receiving nearly 3,000 calories a day through his meals. Doc. 120 ¶ 29. He claims that he has since learned that he was receiving 1,750 calories a day at that time. *Id.*

Christians has submitted food journals tracking his caloric intake during January 2020 and April 2021. Doc. 114 at 6-23. He claims that he used the USDA's Nutrative Value of Food Guide to calculate the calorie totals of his meals. Doc. 119 ¶¶ 10-12. He alleges that he was served 1,750 calories a day at MDSP and about 2,000 calories a day at SDSP and that he was

only served 1,225 calories on December 30, 2021. *Id.* From January 1, 2020, to January 11, 2020, Christians averaged 1,979.18 calories a day, according to his journal. *See* Doc. 114 at 6-16. From April 23, 2021, to April 29, 2021, Christians averaged 2,014.71 calories a day, according to his journal. *See id.* at 17-23. Christians also included one journal from December 30, 2021, when he received 1,717 calories, but he claims that without the cake or cookie served, he received only 1,225 calories. *Id.* at 24.

According to Christians, a 6'2" man weighing 248 pounds with "a very intensely active lifestyle" would require 4,476 calories a day under the Mifflin-St. Jeor equation. Doc. 119 ¶ 14 (citing *Ingrassia v. Schafer*, 2013 WL 5913740, at *3 (E.D. Mo. Nov. 1, 2013)). Christians has submitted a caloric needs chart from the USDA Dietary Guidelines for Americans, 2020-2025, which states that a moderately active male between 36 and 45 years old[6] requires 2,600 calories a day, while an active male of the same age range requires 2,800 calories a day. Doc. 74-1 at 39.

### 2.    Weight Loss

Christians alleges that he lost weight at an unhealthy rate from March 2017 to August 2018, while the DOC Defendants contend that his weight loss was healthy. *See* Doc. 104 ¶ 34. Christians alleges that he lost nearly 90 pounds in 17 months, including 16 pounds from September 6, 2017, to October 4, 2017, a rate of four pounds per week. Doc. 119 ¶¶ 15-16. He alleges that he also lost 30 pounds from April 19, 2017, to July 12, 2017, a rate of nearly three pounds per week. *Id.* ¶ 17. These weights are supported by medical documentation submitted by Christians. Doc. 73-1 at 1. The DOC Defendants' statements regarding Christians' weight loss and health draw largely from the affidavit of Dr. Mary Carpenter, the Medical Director for Correctional Health Care and a defendant in this lawsuit. *See* Doc. 103 ¶ 2. At his intake physical

---

[6] According to his medical records, Christians is currently 43 years old. *See* Doc. 99-1 at 1.

on October 1, 2013, Christians weighed 217 pounds. *Id.* ¶ 54. According to Dr. Carpenter, losing one to two pounds per week is safe. Doc. 104 ¶ 34 (citing Doc. 103 ¶ 119). Thus, by this measure, Christians could have safely lost over 100 pounds between March 8, 2017, and August 13, 2018. *Id.* ¶ 35 (citing Doc. 103 ¶ 120). Christians does not dispute this number, but he claims that he lost an unsafe amount of weight during certain periods between March 8, 2017, and August 13, 2018, such as when he lost 16 pounds in four weeks or 30 pounds in ten weeks. *See* Doc. 120 ¶ 35.

Christians weighed 307 pounds on April 4, 2017, at which point he expressed concern over his weight gain to Health Services at SDSP and indicated that he wanted to continue checking his weight. Doc. 104 ¶ 39 (citing Doc. 99-1 at 1). He weighed 284 pounds on June 14, 2017. Doc. 73-1 at 1. Christians weighed 260 pounds in November 2017 and on January 4, 2018. Doc. 104 ¶ 40. On March 9, 2018, he weighed 255 pounds, and on April 17, 2018, he weighed 244 pounds. *Id.* ¶¶ 41-42. Despite the weight loss, he was said to have good muscle tone and good strength. *Id.* He weighed 221 pounds on August 13, 2018. Doc. 73-1 at 1. His medical records from January 7, 2019, state that his "recent weights have been stable." Doc. 104 ¶ 43 (quoting Doc. 99-71 at 2). On April 4, 2019, he weighed 222 pounds. *Id.* ¶ 44. Between then and November 2, 2020, he weighed 227, 247, 238, 235, 239, 238, and 242 pounds. *Id.* ¶¶ 45, 48-51, 53-54. The DOC Defendants state that Christians was not in any immediate danger to his health as a result of this weight loss. *Id.* ¶ 55. Christians disputes this statement, arguing that his deficient caloric intake and weight loss show that he was in danger. Doc. 120 ¶ 55.

Christians saw Dr. Gutnik on July 19, 2018, to determine if there was an underlying medical condition causing his weight loss. Doc. 104 ¶¶ 59-60. At that visit, Christians told Dr. Gutnik that he "eats a lot of food to make up for the weight loss but does not seem to make any

difference." *Id.* ¶ 61 (quoting Doc. 99-62 at 1). Dr. Gutnik described Christians' weight loss as "gradual but progressive." *Id.* (quoting Doc. 99-62 at 1). Dr. Gutnik's report stated that he was concerned about celiac disease, pancreatic insufficiency, or inflammatory bowel disease, so he recommended that Christians undergo further testing. *Id.* ¶ 63. Christians underwent an EGD and colonoscopy on September 12, 2018. *See id.* at 64. Dr. Gutnik could not "exclude gluten sensitive enteropathy" from the test results. *Id.* ¶ 66 (quoting Doc. 99-65 at 1). A record from Christians' Health Services visit on October 24, 2018, indicates that he had "[r]ecently had a colonoscopy suggesting celiac with negative CT enterography." Doc. 99-17 at 2. At this point, Christians had an order for a gluten-free diet but had not yet started that diet, and the medical plan was to begin a gluten-free diet. *Id.* at 2, 4

Christians saw Dr. Gutnik for a follow-up on April 25, 2019, and Dr. Gutnik described Christians' circumstances as "complex." Doc. 104 ¶ 68 (quoting Doc. 99-66 at 3). Dr. Gutnik stated that he was "[n]ot sure why [Christians] lost so much weight." *Id.* (quoting Doc. 99-66 at 1). Dr. Gutnik noted that Christians' biopsy "suggested the possibility of celiac disease although [his] tissue transglutaminase and levels were normal." Doc. 99-66 at 1. Dr. Gutnik also noted that this combination "is quite rare but not impossible." *Id.* at 3. Dr. Gutnik "could not explain the situation" and "had a hard time explaining things[.]" *Id.* at 1. He further stated that he was "bothered" by Christians' case and that "something is not right." *Id.* at 3. At a July 26, 2019, examination, Dr. Gutnik stated that his presumption was that Christians' weight loss was caused by celiac disease, but that they would conduct another biopsy given that Christians had been following his gluten-free diet closely. Doc. 99-70 at 1. Following the biopsy, Dr. Gutnik stated that Christians had "mildly increased inflammation in his small bowel" that suggested that "[Christians] is not taking his gluten free diet perfectly." Doc. 99-71 at 1. Christians notes that

Dr. Gutnik was under the impression that Christians had been eating 3,000 or more calories a day when examining him. *See* Doc. 120 ¶ 68.

Dr. Gutnik wrote a letter to Christians on January 19, 2022, after Christians informed him that he had been eating fewer calories during the time he was diagnosed with celiac disease than he had previously believed. *See* Doc. 118 at 26-27. In this letter, Dr. Gutnik explained to Christians that "[i]n regard to whether you have gluten disease or not, I can say with all honesty I do not know with certainty." *Id.* at 26. Dr. Gutnik wrote that some signs, such as tissue transglutaminase levels, did not suggest celiac disease, while other signs, such as biopsies and HLA genetic testing, did suggest celiac disease. *Id.* Christians also informed Dr. Gutnik that he had started eating gluten again, and Dr. Gutnik replied that Christians would need more biopsies to investigate the possibility of celiac disease. *See id.* at 27. Dr. Gutnik explained that if Christians had recently gained weight on a gluten-rich diet, he likely did not have gluten disease. *Id.*

The DOC Defendants contend that Christians' weight loss was also caused in part by his decision to stop taking his mental health medications. Doc. 104 ¶ 78. Christians told Health Services that he felt his weight gain was caused by his mental health medications on April 4, 2017. *Id.* ¶ 79 (citing Doc. 99-1 at 1). According to Dr. Carpenter, anxiety medication often causes weight gain, and weight gain is a possible side effect of many anti-depressants. *Id.* (citing Doc. 103 ¶ 5). Christians then quit taking his mental health medication around June 23, 2017. *Id.* ¶ 80. Defendants argue that Christians' weight loss was caused by the combination of his untreated celiac disease and his no longer taking mental health medication that was contributing to his prior weight gain. *Id.* ¶ 82. The DOC Defendants also argue that stress and anxiety may have played a role in Christians' weight loss. *Id.* ¶ 83. Although medical records show that

11

Christians told Health Services that he had a history of anxiety in the past, Christians insists that he did not report anxiety and that this is a mistake made by Dr. Sultana. Doc. 99-33 at 3; Doc. 120 ¶ 83; *see* Doc. 118 at 12-13.

### 3. Loss Of Muscle and Strength

Christians alleges that he lost muscle and strength as a result of his caloric deficit. Doc. 26 ¶¶ 43, 53. The DOC Defendants note that in a Health Services visit on January 7, 2019, Christians complained that he used to be able to bench press[7] 400 pounds but now could only bench press 250 pounds. Doc. 104 ¶ 84 (citing Doc. 99-74 at 2). They note that Christians was described as having good muscle tone and strength at that appointment and at an earlier Health Services visit on April 17, 2018. *Id.* ¶¶ 85-86. They also note that some left-side weakness suffered by Christians was caused by muscle atrophy after a neck injury. *Id.* ¶¶ 87-88. Christians argues that his loss of 150 pounds of strength is a significant drop and that the descriptions of him as having good muscle tone and strength are relative to the person examining him. Doc. 120 ¶¶ 84-85. He argues that his left-side weakness is a separate issue from his global loss of strength. *Id.* ¶ 87.

### 4. Diabetes and Insulin Resistance

Christians alleges that losing weight quickly has put him at risk of diabetes and insulin resistance, as does his high-carbohydrate diet. Doc. 26 ¶¶ 37, 41. On July 19, 2018, Christians denied that he had cardiac disease or diabetes when seeing Dr. Gutnik. Doc. 104 ¶ 96 (citing Doc. 99-62 at 1). Tests performed on or about April 25, 2019, showed no signs of diabetes, and Dr. Gutnik confirmed this at a September 5, 2019, visit. *Id.* ¶¶ 97-98. Christians "denied any

---

[7] The medical record refers to "binge press" rather than "bench press." Doc. 99-74 at 2. The Court believes that this is an error in the medical record.

recent changes to health" at a Health Services visit on September 2, 2020, and his lab results showed no signs of diabetes at that time. *Id.* ¶ 100 (quoting Doc. 99-52 at 2). Christians states that "[d]iabetes and insulin resistance are a real threat with the current diet." Doc. 120 ¶ 95. He claims that his excessive perspiration and urination are precursors to diabetes. *Id.* ¶ 99. He also points to his constant thirst as a symptom of diabetes or prediabetes. *Id.* ¶ 166.

### 5.      High Blood Pressure

Christians claims that losing weight quickly has increased his risk of heart disease, stroke, and high blood pressure. Doc. 26 ¶ 37. The DOC Defendants note that Christians has no history of high blood pressure in his medical records and that his blood pressure has improved since his weight loss. Doc. 104 ¶¶ 104-105. They note that his blood pressure was 149/94 on April 10, 2017, and was later 133/79 on January 4, 2018. *Id.* ¶ 106. Since then, his blood pressure has remained consistent. *Id.* ¶ 107, They also note that Christians "denied cardiac disease" in a visit with Dr. Gutnik on July 19, 2018. *Id.* ¶ 108 (quoting Doc. 99-62 at 1). Christians does not dispute these facts regarding his blood pressure but argues that losing weight quickly increases his risk of stroke. Doc. 120 ¶¶ 104, 108.

### 6.      Thyroid Function

Christians also claims that losing weight quickly can depress thyroid function. Doc. 26 ¶ 37. The DOC Defendants argue that Christians may have had hypothyroidism prior to his incarceration on or about September 25, 2013. Doc. 104 ¶ 110. Christians was diagnosed with hypothyroidism in October 2013 and placed on medication to treat it. *Id.* ¶ 111 (citing Doc. 99-77 at 1). Christians then told Health Services that he had quit his thyroid medication and was feeling good at an appointment on October 6, 2017. *Id.* ¶ 112 (citing Doc. 99-3 at 1). His TSK and T4 levels were within normal limits at an appointment on October 21, 2019, at which point it

was determined that his thyroid appointments would be discontinued. *Id.* ¶ 113 (citing Doc. 99-33 at 2). Christians does not dispute any facts regarding his thyroid function. *See* Doc. 120 ¶¶ 109-114.

### 7.      Fainting Spells and Dizziness

Christians alleges that he has had fainting spells and dizzy spells caused by his weight loss. Doc. 26 ¶¶ 43, 52. The DOC Defendants allege that he first complained of fainting spells at a Health Services visit on January 4, 2018, although Christians claims that he visited Health Services for this issue several times. Doc. 104 ¶ 116 (citing Doc. 99-5 at 2); Doc. 120 ¶ 116. At this visit, Christians reported dizziness severe enough to almost cause fainting upon standing or changing positions. Doc. 104 ¶ 116 (citing Doc. 99-5 at 2). Health Services conducted orthostatic blood pressure readings, which were later described as adequate. *Id.* ¶ 120 (citing Doc. 99-74 at 1). Health Services also noted that Christians had significant earwax buildup, which could have caused dizziness, although Christians argues that one incident of earwax buildup would not cause years of dizziness. *Id.* ¶ 121 (citing Doc. 99-5 at 4); Doc. 120 ¶ 121. On January 2, 2019, Christians told Health Services that his dizziness issues had recently subsided, but he was still concerned at times when changing positions. Doc. 104 ¶ 122 (citing Doc. 99-18 at 3). Five days later, he saw Health Services again with complaints of dizzy spells over the past year. *Id.* ¶ 124 (citing Doc. 99-74 at 1). At this visit, Christians reported that he had not fallen as a result of his dizziness, but he claims that he fell and broke his leg because of dizziness in August 2020. *Id.* (citing Doc. 99-74 at 1); Doc. 120 ¶ 124. The DOC Defendants note that this fall occurred on July 12, 2020. Doc. 128 at 24 (citing Doc. 99-49 at 1-2).

Christians saw Health Services again on July 15, 2020, at which point it was noted that he was on Clonidine, which can cause dizziness. Doc. 104 ¶¶ 125-126. Christians' medical records

from this visit indicated that Clonidine was "probably contributing to his orthostatic hypotension." *Id.* ¶ 126 (quoting Doc. 99-50 at 4). Christians claims that he experienced dizziness prior to starting Clonidine, and the DOC Defendants do not provide a clear date as to when Christians started Clonidine. Doc. 120 ¶ 126; *see* Doc. 104 ¶¶ 125-126.

### 8.    Fatigue and Insomnia

Christians alleges that his inadequate diet has caused fatigue and insomnia. *See* Doc. 26 ¶ 53. The DOC Defendants attribute Christians' fatigue to his various psychiatric medications. Doc. 104 ¶ 127. They note that anxiety medications or antidepressants can cause fatigue. *Id.* ¶ 128 (citing Doc. 103 ¶ 146). At his intake physical on October 1, 2013, Christians acknowledged that he took Zyprexa, Remeron, and Depakote for psychiatric issues. *Id.* ¶ 127 (citing Doc. 99-76 at 1). He was later prescribed Clonidine, Fluoxetine, and Trazodone. *Id.* ¶ 129. The DOC Defendants state that "[t]he well-known side effects of such medications often also include weakness, fatigue and feelings of tiredness." *Id.* (citing Doc. 103 ¶ 147). On February 22, 2019, Christians was encouraged to discuss his fatigue symptoms with Mental Health. *Id.* ¶ 130 (citing Doc. 99-21 at 3). At two visits with Health Services in April, Christians was further encouraged to follow up with Mental Health and told that "some of his symptoms were related to mental health or side effects of his medications." *Id.* ¶¶ 131-132 (cleaned up) (quoting Doc. 99-23 at 2).

The DOC Defendants allege that Christians' insomnia is and was caused by his untreated anxiety following his cessation of psychiatric medication around June 23, 2017. *Id.* ¶¶ 133-134. On January 18, 2018, Christians noted that he had trouble sleeping, and a Psychiatric Chart Note from this date indicated that this "probably [was] a result of coming off of his meds abruptly." *Id.* ¶ 135 (quoting Doc. 99-95 at 1). The chart note also stated that Christians had constant jingles or songs in his head, and he could only sleep for three or four hours a night. *Id.* ¶ 136 (citing

Doc. 99-95 at 1). On June 19, 2019, Christians asked Health Services if he could get a sleep aid and stated that he was trying to get off Trazadone. *Id.* ¶ 138 (citing Doc. 99-27 at 3). The DOC Defendants allege that Christians has not complained of insomnia to Health Services since that visit. *Id.* ¶ 140. Christians disputes this claim, stating that he still suffers from insomnia, but does not cite to any specific Health Services records in which he reported insomnia. Doc. 120 ¶ 140.

The DOC Defendants also allege that Christians' fatigue has been caused by celiac disease, which they argue explains why he has reported being negative for fatigue since January 2020. Doc. 104 ¶¶ 142-143. They further allege that this timeline somewhat coincides with Christians being placed on a gluten-free diet. *Id.* ¶ 143. Christians disputes these statements, claiming that he experiences hunger pains, fatigue, dizziness, and lightheadedness when he cannot afford to supplement his insufficient diet with commissary purchases. Doc. 120 ¶ 143. The DOC Defendants note that Christians reported "continued difficulty with fatigue" as early as April 9, 2014, but Christians attributes this to a former medication that he is no longer on. Doc. 104 ¶ 144 (quoting Doc. 99-77 at 1); Doc. 120 ¶ 144. The DOC Defendants also attribute Christians' fatigue to his history of anxiety, while Christians claims that he has no history of anxiety. Doc. 104 ¶ 145; Doc. 120 ¶ 145.

### 9. Frequent Urination and Bowel Movements

Christians alleges that his diet has caused frequent urination and bowel movements. Doc. 26 ¶ 52. He complained of increased urinary frequency to Health Services on October 6, 2017, and on November 13, 2017. Doc. 104 ¶¶ 146-147. He claimed that this issue had been ongoing for two to four years. *See id.* Christians visited Dr. George Fournier, a urologist with the Yankton Medical Clinic, on December 22, 2017. *Id.* ¶ 150. Dr. Fournier noted that Christians had previously been prescribed Ditropan for this issue, with little effect. *Id.* ¶ 151 (citing Doc. 99-56

at 1). Dr. Fournier discontinued Christians' Ditropan and prescribed Flomax. *Id.* ¶ 152 (citing Doc. 99-56 at 4). At a follow-up visit about three months later, Christians reported that his urinary hesitancy improved after quitting Ditropan but that his urinary flow had not improved on Flomax. *Id.* ¶ 153 (citing Doc. 99-58 at 1). Dr. Fournier found that Christians' bladder emptying had improved significantly and that Christians was drinking too much liquid, so he recommended Christians cut his fluid intake in half and continue on Flomax. *Id.* ¶ 154 (citing Doc. 99-58 at 3).

Christians revisited Dr. Fournier about a month and a half later and reported that the problem was improving, which is reflected in Dr. Fournier's report. *Id.* ¶¶ 155-156 (citing Doc. 99-60 at 1). Christians again complained of frequent urination on February 22, 2019, and Health Services told him to remain patient as his medication can take several months to provide a full benefit. *Id.* ¶¶ 162-163 (citing Doc. 99-21 at 2). After complaining again of frequent urination on July 17, 2020, Christians explained that he was drinking at least eight cups of water a day. *Id.* ¶ 164 (citing Doc. 99-51 at 2-3). The DOC Defendants claim that Christians' excessive fluid intake and anxiety likely caused his urinary frequency, and Christians states that he drinks so much because of a constant thirst that he believes is caused by diabetes or prediabetes. *Id.* ¶¶ 165-166; Doc. 120 ¶ 166. The DOC defendants also ascribe Christians' overactive bladder to coffee, chocolate, and spicy foods, which are all among his commissary purchases. Doc. 104 ¶¶ 169-171. Christians claims that he consumed these products without any problems before he developed urinary issues. Doc. 120 ¶ 169.

Christians claims that he has had issues with chronic diarrhea and loose stools caused by his diet. *See* Doc. 26 ¶ 52. When he saw Dr. Gutnik on July 19, 2018, he reported a change in bowel habits over about nine months. Doc. 104 ¶ 158 (citing Doc. 99-62 at 1). Dr. Gutnik was

concerned that Christians could have "malabsorption from underlying small bowel disease such as celiac disease or even pancreatic insufficiency[,]" and he also suggested that inflammatory bowel disease could be the cause. *Id.* ¶ 159 (quoting Doc. 99-62 at 3). Christians underwent biopsies and further testing, which ruled out malabsorption but did not rule out gluten sensitive enteropathy. *Id.* ¶¶ 160-161 (citing Doc. 99-65 at 1). The DOC Defendants argue that Christians' anxiety has contributed to his bowel issues, and Christians again disputes that he currently has or has ever had anxiety. *Id.* ¶¶ 167-169; *see* Doc. 120 ¶¶ 167-168.

### 10.   High Cholesterol

Christians alleges that his elevated cholesterol has been caused by his diet. *See* Doc. 26 ¶¶ 53-54. The DOC Defendants note that Christians had a cholesterol level of 282 mg/DL and an LDL level of 189 mg/DL on April 5, 2017, but they explain that his cholesterol levels gradually improved as he lost weight. Doc. 104 ¶ 172 (citing Doc. 99-98 at 1). On or about September 28, 2017, Christians' cholesterol was 231 mg/DL and his LDL level was 143 mg/DL. *Id.* ¶ 173 (citing Doc. 99-99 at 1). Christians' cholesterol was 203 mg/DL and his LDL level was 145 mg/DL on April 3, 2018. *Id.* ¶ 174 (citing Doc. 99-100 at 1). By April 25, 2019, Dr. Gutnik stated that Christians' numbers were "essentially normal except for some very modest hyperlipidemia and a minimally elevated ALT." Doc. 99-66 at 1. The DOC Defendants attribute this improvement to Christians' gluten-free diet, although Christians claims that he no longer follows this diet and that his lipid levels remain controlled by medication alone. Doc. 104 ¶ 176; Doc. 120 ¶ 176. They state that Christians continued to purchase items with gluten from the commissary and that this caused his cholesterol to rise to 229 mg/DL and his LDL level to rise to 151 mg/DL on August 20, 2019. Doc. 104 ¶¶ 176, 179 (citing Doc. 99-72 at 1).

Christians disputes this conclusion, arguing that his cholesterol was high prior to his increased commissary purchases, so the high cholesterol could not have been caused by his commissary purchases. *See* Doc. 120 ¶ 195. Because his cholesterol had only slightly improved to a cholesterol of 216 mg/DL and an LDL level of 148 mg/DL by October 3, 2019, Christians was placed on Lovastatin for his hyperlipidemia. Doc. 104 ¶¶ 183-184 (citing Doc. 99-101 at 1). He showed no improvement by March 26, 2020, so his provider doubled his dosage of Lovastatin. *Id.* ¶ 186 (citing Doc. 99-46 at 5). On September 19, 2020, Christians' cholesterol was down to 209 mg/DL and his LDL level was 139 mg/DL. *Id.* ¶ 189 (citing Doc. 99-103 at 1). This is a borderline high cholesterol level and a moderate risk LDL level. *Id.* ¶¶ 191-192 (citing Doc. 99-97 at 1-2).

### 11.    Hunger Strike

Christians makes several allegations regarding inadequate nutrition while in the Segregated Housing Unit in his second amended complaint. *See* Doc. 83 ¶¶ 127(N)-(WW). Because of his objections to the quality and quantity of the food he received while in Segregated Housing, Christians began a hunger strike on or about March 31, 2021. *See* Doc. 104 ¶ 205. The DOC Defendants state that Christians' health was closely monitored during this hunger strike, that they repeatedly encouraged Christians to resume eating, and that they followed SDDOC policy in evaluating Christians during the hunger strike. *See* Doc. 104 ¶¶ 207-240. Christians makes no claims regarding the DOC Defendants' treatment of him during this period other than to allege that the meals offered to him before and during the hunger strike were inadequately nutritious. *See* Doc. 83 ¶¶ 127(N)-(WW); Doc. 120 ¶¶ 206, 211, 221-222, 225. Christians states that he lost 21 pounds in two weeks in Segregated Housing before he started his hunger strike. Doc. 120 ¶ 206. Thus, this Court does not construe Christians as bringing claims regarding his

19

treatment during the hunger strike except as to the adequacy of the food he was served before and during the strike.

### 12.    Rejected Art Book

Christians claims that he has developed an interest in pastel painting and purchased art supplies to pursue this interest. Doc. 26 ¶ 136. Christians alleges that a friend of his purchased and mailed him a book on pastel painting, Encyclopedia of Pastel Techniques, which was rejected by SDSP officials in June 2020 because it contained nudity. *Id.* ¶¶ 136-137. The DOC Defendants acknowledge that this occurred and that Christians was notified of this rejection on June 15, 2020. Doc. 104 ¶ 243. In an Informal Resolution Request, Christians argued that he should be allowed the book because it was not sexually themed and because the nudity contained within did "not depict the subject lewdly or engaged in any actual or simulated sexual acts." *Id.* ¶ 244 (quoting Doc. 99-150 at 1). The DOC Defendants argue that SDDOC Policy 1.3.C.8 subjects materials featuring "nudity *or* sexually explicit conduct" to rejection and that they were thus justified in rejecting Christians' art book. *Id.* ¶ 245 (quoting Doc. 101 ¶ 44).

### B.    Legal Standard

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A summary judgment motion must be supported by evidence on the record, which may include affidavits or declarations based upon personal knowledge. Fed. R. Civ. P. 56(c). The non-moving party is entitled to the benefit of having all reasonable inferences resolved in his or her favor, but the non-moving party must present specific facts showing a genuine issue for trial. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1207 (8th Cir. 2013) (citation omitted). That is, a non-moving party must present "sufficient probative evidence"

capable of supporting a finding in his or her favor, not "mere speculation, conjecture, or fantasy." *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc) (quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985)).

Section 1983 creates civil liability for a person who, acting under the color of state law, deprives another of his or her federal constitutional or statutory rights. 42 U.S.C. § 1983. However, "[q]ualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To overcome the defense of qualified immunity, the plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Clearly established" law cannot be demonstrated at a high level of generality; rather, it must put officers on "fair notice." *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 613, 616 (2015) (citations omitted). To show that a right was clearly established, the plaintiff must provide either "controlling authority . . . which clearly established the rule on which [he or she] seek[s] to rely" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

C.    **Legal Analysis**

   1.    **Eighth Amendment Claim**

The Eighth Amendment's prohibition against cruel and unusual punishment require prisoners to be provided with nutritionally adequate meals to maintain health. *See, e.g., Cody v. CBM Corr. Food Servs.*, 250 F. App'x 763, 765 (8th Cir. 2007); *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980). "Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Constitution. Rather, the Constitution is only violated if the food provided is inadequate to maintain good health." *Jones v. Allen*, 2007 WL 2725218, *4 (W.D. Ark. September 18, 2007) (citing *Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)). Additionally, food must be prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992).

In *Wishon*, the Eighth Circuit Court of Appeals held that prisoners have a right to adequate nutrition and the failure to provide adequate nutrition may qualify as a deliberate indifference that violates the Eighth Amendment. *Id.* A prisoner making a deliberate indifference claim for failure to provide adequate nutrition must show that "the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food." *Id.* In *Ingrassia v. Schafer*, the Eighth Circuit held that it is "clearly established that a prisoner may properly allege a constitutional violation by demonstrating significant weight loss or other adverse physical effects from lack of nutrition." 825 F.3d 891, 899 (8th Cir. 2016); *see also Davis v. Missouri*, 389 F. App'x. 579, 579 (8th Cir. 2010) (per curiam) (citing cases for the proposition that "inmate claiming inadequate diet under Eighth Amendment must allege he lost weight or suffered adverse physical effects, or was denied nutritionally or calorically adequate diet").

To show deliberate indifference, an inmate must demonstrate that a prison official knew the "inmate face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Kenyon v. Dooley*, 2014 WL 3700878, at *3 (D.S.D. July 25, 2014) (alterations in original) (quoting *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997)). An inmate must show that defendants "failed to act despite . . . knowledge of a substantial risk of serious harm." *Ingrassia*, 825 F.3d at 897 (omission in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Thus, Christians must show 1) that the nutrition he received was inadequate or that he suffered weight loss or other adverse physical effects as a result of his diet; and 2) that the DOC defendants were aware of and deliberately indifferent to the inadequate nutrition.

Here, the DOC Defendants make no argument that Christians' right to an adequate diet is not clearly established and only argue that "Christians has not and cannot demonstrate a violation of his rights[.]" *See* Doc. 99 at 7. Thus, this Court need only determine whether Christians' Eighth Amendment rights were violated.

### a.    Caloric Intake

The DOC Defendants argue that Christians' allegations are insufficient to state an Eighth Amendment violation because the calorie amounts alleged by Christians do not constitute a violation. Doc. 99 at 24. They cite to two Western District of Arkansas cases which found that "in attaining a healthy weight, the National Institutes of Health indicates that eating plans containing 1200 to 1600 calories each day are suitable for men." *Id.* (cleaned up) (quoting *Giddings v. Cradduck*, 2017 WL 2791345, at *7 (W.D. Ark. June 6, 2017)); *see also Avery v. Helder*, 2017 WL 9477752, at *13 (W.D. Ark. July 21, 2017). Thus, defendants argue, even if Christians were receiving 1,750 calories a day, he would be receiving sufficient nutrition. *Id.*

23

This Court cannot say that, as a matter of law, Christians' allegations are insufficient to state an Eighth Amendment violation. Christians puts forth evidence, in the form of the USDA Dietary Guidelines caloric needs chart, that he requires 2,600 to 2,800 calories a day. Doc. 74-1 at 39. Language preceding this chart states that "the reference man is 5 feet 10 inches tall and weighs 154 pounds." *Id.* at 38. Christians is 6'2" and weighs well over 154 pounds. *See* Doc. 99-1 at 2. Thus, it follows that his caloric needs are greater than those estimated in the USDA Dietary Guidelines caloric needs chart. Further, Christians alleges that he requires 4,476 calories a day under the Mifflin-St. Jeor equation. Doc. 119 ¶ 14. The two cases cited by the DOC Defendants cite to a National Institutes of Health webpage that is no longer active, so this Court cannot evaluate the claims that 1,200 to 1,600 calories a day are sufficient for a male seeking to lose weight. *See Giddings*, 2017 WL 2791345, at *7 n.6; *Avery*, 2017 WL 9477752, at *13 n.10. And the 2017 food service review by Barbara Wakeen noted that the recommended calorie amount for the "average reference male" was 2,757. Doc. 99-78 at 7. Losing weight may require a lower caloric intake than that required for maintaining weight. But without further evidence, Christians' allegations that he has received between 1,750 to 2,000 calories a day state a violation of his Eighth Amendment rights.

The DOC Defendants next argue that Christians' estimation of his caloric intake is incorrect. Doc. 99 at 24-29. The DOC Defendants note the several instances in which Christians told Health Services employees and Dr. Gutnik that he was eating a lot of commissary, increasing his caloric intake, eating about 4,000 or 5,000 calories a day, and attending all meals. *Id.* at 27-28. The DOC Defendants further note the 2017 evaluation performed by Wakeen as evidence that the caloric average at MDSP was 2,760 and that "the SDDOC overall provides a

quality, nutritious low-cost meal to inmates."[8] *Id.* at 25 (quoting Doc. 99-78 at 2). The DOC

Defendants argue that Christians "had no *personal knowledge* about the nutritional content of

[the meals] to create a fact question as to their nutritional value" and that he lacks the training or

education to estimate calorie counts. *Id.* at 26 (alteration in original) (quoting *Donahue v.*

*Plummer*, 2019 WL 5076646, at *14 (E.D. Ark. May 21, 2019)).

Because this Court relied on Wakeen's report in *Brakeall v. Stanwick-Klemik* to find that

the plaintiff "ha[d] not raised genuine issues of material fact that the food served in MDSP is

nutritionally adequate[,]" the DOC Defendants argue that this Court should reach a similar result

in the present case. *Id.* (first alteration in original) (quoting *Brakeall v. Stanwick-Klemik*, 2020

WL 1180727, at *15 (D.S.D. Mar. 11, 2020)). In *Brakeall*, the plaintiff made several allegations

regarding the quality and quantity of food served in MDSP and the sanitation and hygiene of the

food service program. 2020 WL 1180727, at *14. The plaintiff alleged that he received the same

lunch and dinner every day for his Kosher diet: "a six ounce bowl of instant rice mix (formerly

12 ounces), an apple, baby carrots, and a peanut butter and jelly on rye sandwich." *Id.* (citation

omitted). He alleged that sometimes he would only receive "a tea bag, a few slices of lunch meat,

and a piece of matzoh." *Id.* (citation omitted). He also claimed that CBM[9] would cut portion

sizes when they ran out of food. *Id.* The plaintiff noted that across the 21 main line meals served

each week, only two or three trays a month were severely impacted by these shortages, but he

argued that "if you are the one getting chili water soup because they ran short again . . . you

might conclude that there is a pattern to the failures[.]" *Id.* (omission and alteration in original)

(citation omitted). Thus, the plaintiff in *Brakeall* argued that he and other inmates sometimes

---

[8] This quote comes from the 2017 evaluation's executive summary, which appears to have been
drafted by DOC officials, not Wakeen. *See* Doc. 99-78 at 3.
[9] CBM is the prior name of Summit Food Service.

received inadequate meals. *Id.* This Court found that Wakeen's 2017 evaluation, along with the plaintiff's concession that only two or three trays a month were severely impacted by shortages, established that nutrition was not inadequate at MDSP. *See id.* at *14-15.

Here, Christians alleges both that the food quality and nutritional value are insufficient across the board at MDSP and SDSP, similar to the claims made in *Brakeall*, and he also makes detailed allegations regarding the food that he, personally, has received. *See* Doc. 118 at 14-15. As to overall quality and nutrition, Christians submits an affidavit from a fellow inmate, Samuel Lint, who claims that the food provided by Summit Food Service does not meet contractual obligations for quality and nutritional value. Doc. 95. Lint claims to have specific knowledge of Summit's obligations under their contract with the DOC because he requested and received a copy of that contract. *Id.* at 1. Christians has submitted other inmate affidavits making similar claims. *See, e.g.*, Doc. 96. As to Christians' meals, he provides detailed food journals demonstrating his caloric intake over two time periods. Doc. 114 at 6-24. Christians provides evidence of inadequate nutrition beyond that offered by the plaintiff in *Brakeall*.

The DOC defendants argue that these journals, along with grievances submitted by Christians to MDSP and SDSP, "do not amount to evidence" because they are "mere allegations." Doc. 128 at 10. This Court disagrees. Although claims of inadequate nutrition laid out in a complaint may be mere self-serving allegations, inmate affidavits and documentation of food consumed rises above the level of "mere speculation, conjecture, or fantasy." *See Gregory*, 974 F.2d at 1010. The DOC Defendants argue that Christians' past statements that he had been receiving up to 4,000 calories a day raise questions of credibility. Doc. 128 at 6, 10. But credibility is not a question for the Court on summary judgment. *Ingrassia*, 825 F.3d at 897 (citing *Tlamka v. Serrell*, 244 F.3d 628, 634 (8th Cir. 2001)).

The DOC Defendants point to an admission provided by the Summit Defendants in response to a discovery request in which they state that "each diet served at SDSP has a minimum calorific value of 2,700 calories as required by the contract between Summit and the South Dakota Department of Corrections." Doc. 128 at 8 (quoting Doc. 118 at 30). Christians raises questions regarding the caloric value of food served to him from 2017 to today, and while the Summit Defendants' admission, along with the 2017 and 2019 evaluations, provide answers as to what an inmate could reasonably expect to receive as a food tray during this time, they do not provide any more evidence as to what Christians was actually served than do the food journals, grievances, and inmate affidavits offered by Christians. Genuine questions of material fact remain as to Christians' caloric intake, and summary judgment is denied on this issue.

### b.    Weight Loss

The DOC Defendants admit that Christians lost a significant amount of weight while at SDSP and MDSP, but they argue that this weight loss must be considered in the context of his prior obesity. Doc. 99 at 29-30. The Eighth Circuit rejected a similar argument in *Ingrassia*, where the defendants argued that "they [could not] be liable for withholding adequate nutrition, because the objective evidence—[the plaintiff's Body Mass Index]—demonstrate[d] adequate nutrition." 825 F.3d at 897. Specifically, the defendants argued that because the plaintiff's Body Mass Index stayed within the "normal" range, he could not have been underfed. *Id.* The *Ingrassia* court noted that this was a factor favoring defendants but not one that foreclosed an inadequate-nutrition claim as a matter of law. *Id.* at 897-98. Similarly, this Court cannot say that Christians' weight loss was not an adverse health effect solely because he was obese prior to losing weight.

The DOC Defendants further argue that Christians' weight loss was not excessive because he only lost 50 pounds in 5 months, which would fall under the one to two pounds per week deemed safe by Dr. Carpenter. Doc. 99 at 31. But the record shows that Christians lost weight at a greater rate than one to two pounds per week at certain times in 2017. *See* Doc. 73-1 at 1. Between April 19 and July 12 of 2017, Christians lost 30 pounds, or two and a half pounds per week. *Id.* Between September 6 and October 4 of 2017, Christians lost 16 pounds, or four pounds per week. *Id.* In *Ingrassia*, the Eighth Circuit noted that when nutrition is inadequate, a "19-pound weight loss in 8 months [is] sufficient to state a constitutional violation[.]" 825 F.3d at 898 (citing *Davis*, 389 F. App'x at 579). Given that Christians was obese before he began losing weight, his weight loss may have been healthy and thus not an adverse health effect caused by his diet, but this Court is in no position to make that determination at this time.

The DOC Defendants argue that Christians' weight loss was not caused by inadequate nutrition but instead by a combination of his quitting psychiatric medications that caused weight gain and his celiac disease. Doc. 99 at 20-23. Christians expressed concern about his mental health medications' impact on his weight in April 2017, but he did not quit his medications until around June 23, 2017. Doc. 99 at 22. Christians weighed 304 pounds on April 19, 2017, and he weighed 284 pounds on June 14, 2017. Doc. 73-1 at 1. Thus, by the time he quit his psychiatric medications, Christians had already lost 20 pounds in eight weeks, or two and a half pounds per week. *See id.*

Christians disputes his diagnosis of celiac disease, arguing that his mistaken belief as to his caloric intake resulted in a mistaken diagnosis by Dr. Gutnik. Doc. 118 at 10-11. According to Christians, he told Dr. Gutnik that he was receiving 2,800 to 3,000 calories a day from his meals but has since learned that he was receiving fewer calories than that. *Id.* at 10. He argues

28

that Dr. Gutnik's diagnosis of celiac disease was based on incorrect information. *Id.* at 10-11. He further argues that he informed Dr. Gutnik of the mistake and that Dr. Gutnik has since "changed his tune on [Christians' celiac disease diagnosis]." *Id.* The DOC Defendants argue that Christians' change in medications and his celiac disease "in combination, would account for the difficulty, at the time, to pinpoint a precise reason for Christians' loss of weight." Doc. 99 at 23 (citing Doc. 103 ¶ 132). Given Dr. Gutnik's difficulties in diagnosing Christians, the DOC Defendants are correct that the cause of Christians' weight loss is difficult to identify. Dr. Gutnik initially struggled with Christians' diagnosis, concluding that Christians was a "complex" case in which some factors suggested celiac disease and some did not. *See* Doc. 99-66 at 3. Dr. Gutnik ultimately recommended Christians stay on his gluten-free diet, but this diagnosis was made while Dr. Gutnik and Christians both believed Christians was eating 4,000 or more calories a day. *See id.* at 1.

Again, as the non-moving party, Christians must put forth "sufficient probative evidence" to support a finding in his favor as to the cause of his weight loss. *See Gregory*, 974 F.2d at 1010. This Court finds that Christians has met his burden. Essentially, this Court has been presented with two explanations for Christians' weight loss. First is that Christians lost weight because his meals were insufficiently nutritious, and his prior statements to medical professionals that he was getting about 3,000 calories a day through meals, plus more calories through commissary, were mistaken because he only learned that his meals were insufficiently nutritious after he had lost weight and began investigating his caloric intake. Although the DOC defendants repeatedly insist that Christians' varying statements about his caloric intake demonstrate a lack of honesty, they could also show that Christians was honestly mistaken about his caloric intake. The second explanation is that Christians lost weight after he quit medication

that can cause weight gain and after he was diagnosed with celiac disease, which can cause weight loss when untreated. But Christians began losing weight before quitting his medications, and his diagnosis of celiac disease was partially dependent on Dr. Gutnik's belief that Christians was receiving 3,000 calories a day from meals. Because genuine questions of fact exist regarding Christians' caloric intake, and the cause of Christians' weight loss is dependent on his caloric intake, genuine questions of fact exist regarding the cause of Christians' weight loss as well. Summary judgment on this issue is denied.

### c.   Loss of Muscle and Strength

The DOC Defendants argue that Christians' medical records do not support his claim that he has lost muscle and strength. Doc. 99 at 31. They note that Christians' medical records indicated good muscle tone and strength at several visits to Health Services from 2017 to 2020. *Id.* at 31-33. But Christians' medical records also show that he repeatedly complained of muscle and strength loss to Health Services and that he reported a 150-pound reduction in the amount he could bench press. *See* Doc. 99-74 at 2.

The DOC Defendants' argument resembles that of the defendants in *Ingrassia*, who unsuccessfully argued that a healthy Body Mass Index foreclosed a claim of inadequate nutrition. 825 F.3d at 897-98. Here, the DOC Defendants argue that Christians fails to show muscle loss because he had good muscle tone throughout the time period in question, but it is possible to lose muscle and still retain good muscle tone. The DOC Defendants offer no other explanation for Christians' muscle and strength loss except to note that one instance of left-side weakness was caused by a neck injury. *See* Doc. 99 at 31-33; Doc. 104 ¶¶ 87-88.

Christians argues that his medical records actually show that he has lost muscle mass. Doc. 118 at 16. Because he lost a considerable amount of weight while consistently having good

muscle tone, Christians argues that the findings of good muscle tone indicate he did not have a significant amount of fat to lose and thus he must have lost muscle mass. *See id.* The DOC Defendants respond that if Christians were losing muscle and not fat, his medical records would not describe his muscle tone as good and would not describe him as being physically fit, and thus he must have been losing fat and not muscle. Doc. 128 at 21. These competing arguments speak to the vagaries of relying on a finding of "good muscle tone" to argue for or against a loss of muscle or strength. Christians' medical records indicate a significant reduction in his weightlifting capability and repeated complaints of muscle and strength loss. *See* Doc. 99-74 at 2. As above, the genuine questions of fact regarding Christians' caloric intake become genuine questions of fact regarding the cause of his muscle and strength loss. Thus, Christians has met his burden to survive summary judgment on this issue.

### d.     Diabetes

The DOC Defendants argue that Christians' medical records show no signs of diabetes. Doc. 99 at 33. Christians acknowledges that he does not have diabetes but claims that he is trying to prevent diabetes from developing. Doc. 118 at 17. He argues that his diet puts him at risk of developing diabetes. *Id.* Christians also alleges that he is constantly thirsty and that this is a sign of diabetes. Doc. 120 ¶ 166. The DOC Defendants argue that Christians' "perceived risk is far too speculative to warrant relief." Doc. 99 at 34.

To the extent that Christians seeks injunctive relief, he need not "await the consummation of threatened injury to obtain preventive relief." *Farmer*, 511 U.S. at 845 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). But he still must show a substantial risk of serious injury and deliberate indifference to that risk. *Id.* Here, Christians argues that the SDDOC diets do not meet standards set by the American Diabetes Association. Doc. 118 at 17. He argues that

prison menus must reflect these standards, but the Middle District of Alabama case that he cites to for this proposition, *Gaddis v. Campbell*, specifically dealt with medical and dietary requirements for diabetic inmates and does not apply here. *See* 301 F. Supp. 2d 1310, 1311-12 (M.D. Ala. 2004). The risk of harm alleged by Christians is not substantial enough to rise above the speculative level as required by *Gregory*. *See* 974 F.2d at 1010. Summary judgment is granted to the DOC Defendants on this issue.

### e.      High Blood Pressure

Christians acknowledges that he does not have high blood pressure but argues that losing weight quickly may have increased his risk of high blood pressure. Doc. 118 at 16. Here, Christians makes no claims regarding risk of future harm. *See id.* The DOC Defendants note that Christians' blood pressure improved as he lost weight and has been stable since January 4, 2018. Doc. 99 at 35. Thus, the DOC Defendants are granted summary judgment on this issue.

### f.      Thyroid Function

Christians alleges that his weight loss risked depressing his thyroid function because of the release of dangerous chemicals from fat cells. *See* Doc. 118 at 18. The DOC Defendants note that Christians was diagnosed with hypothyroidism when he was first incarcerated in 2013 and was placed on medication. Doc. 99 at 35-36. About four years later, he took himself off this medication and has not had complaints or abnormal thyroid test results since. *Id.* at 36. Again, Christians makes no claims regarding risk of future thyroid harm and only alleges that his weight loss put him at risk of past harm that does not appear to have occurred. *See* Doc. 118 at 18. The DOC Defendants are granted summary judgment on this issue.

### g.      Fainting Spells and Dizziness

Christians alleges that he has suffered from fainting spells and lightheadedness because of his diet. Doc.118 at 18. The DOC Defendants argue that Dr. Carpenter concluded that diet was not the cause of these issues after reviewing his medical records. Doc. 99 at 37. They note that Christians first reported fainting spells on January 4, 2018, at which point he said they had been ongoing for about three weeks. *Id.* According to the DOC Defendants, this shows that any fainting spells were not caused by diet because Christians would have likely suffered them during the five years prior to January 2018 that he had been incarcerated. *Id.* They argue that Christians' anxiety and medications caused his fainting spells, noting that Clonidine, Fluoxetine, and Flomax all may have contributed to his dizziness. *Id.* at 37-38. Because Christians started Flomax shortly before January 2018, the DOC Defendants point to Flomax as a likely cause of dizziness. *Id.* at 38. They also argue that earwax buildup could have been a factor. *Id.* at 39. Christians argues that the fainting spells and dizziness can be connected to his diet because he experiences these issues when he is out of commissary money and cannot supplement his diet. Doc. 118 at 18. He further argues that he has experienced these episodes while not on medication. *Id.*

The Court finds that Christians has not presented sufficient probative evidence to show a genuine issue of material fact regarding Christians' fainting spells and dizziness. The DOC defendants have put forth evidence that these issues have been caused by Christians' other medical conditions. *See* Doc. 99 at 37-39. Christians puts forth no evidence, other than his own allegations, that his fainting spells and dizziness were caused by his diet or lack of nutrition. *See* Doc. 118 at 18. Under *Atkinson*, Christians "must present specific facts showing a genuine issue for trial." 709 F.3d at 1207. Christians' claims regarding his fainting spells and dizziness are

mere speculation. *See* Gregory, 974 F.2d at 1010. Thus, the DOC defendants are granted summary judgment on this issue.

     **h.**    **Fatigue**

     Christians alleges that he has suffered from fatigue and insomnia as a result of his diet. *See* Doc. 118 at 18. The DOC Defendants argue that these issues are caused by Christians' anxiety and mental health medications. Doc. 99 at 39-40. When first incarcerated in 2013, Christians was taking Zyprexa, Remeron, and Depakote, which can cause fatigue according to Dr. Carpenter. *Id.* (citing Doc. 103 ¶ 146). Christians has also been prescribed other mental health medications, including Clonidine, Fluoxetine, and Trazodone, since then. *Id.* at 40. These medications also can cause fatigue. *Id.* (citing Doc. 103 ¶ 147). Medical staff told Christians on April 8, 2019, that some of his symptoms, including fatigue, were related to his mental health issues and medications. *Id.* Christians argues that medication could not have caused his fatigue because he suffered from fatigue while not on mental health medication. Doc. 118 at 18-19. The DOC Defendants also argue that Christians' fatigue was caused by celiac disease. Doc. 99 at 41. Christians has reported being negative for fatigue since January 2020, and the DOC Defendants claim that this "coincide[s], somewhat," with the time period when Christians began adhering to his gluten-free diet. *Id.* The DOC Defendants also point to an injection Christians underwent shortly before December 6, 2019, as an event that may have caused fatigue. *Id.* at 41-42. They note that there are "a variety of factors identified in [Christians'] medical records, other than the alleged poor diet," that could have caused fatigue. *Id.* Christians argues that "[a]nyone who has ever not had enough to eat has likely experienced fatigue." Doc. 118 at 18.

     The DOC Defendants have identified several potential causes of Christians' fatigue unrelated to his diet. Doc. 99 at 39-42. Christians has put forth no specific facts showing a

genuine issue regarding the cause of his fatigue and relies only on his own speculative

allegations that his fatigue has been caused by his diet. *See* Doc. 118 at 18. Thus, the DOC

defendants are granted summary judgment on this issue.

> **i.  Insomnia**

Christians alleges that he has suffered from insomnia caused by his diet. *See* Doc. 118 at

19. The DOC Defendants argue that Christians' insomnia is likely caused by his untreated

anxiety, given that Christians quit his mental health medication in July 2017. Doc. 99 at 42.

Christians later went to Health Services on January 2, 2019, and stated that he told Mental Health

of his insomnia, for which he was put on Clonidine and Trazadone. *Id.* at 43. Around that time

and also on June 19, 2019, Christians asked Health Services for a sleep aid, which is not

prescribed by Health Services. *Id.* at 43-44. Since that time, Christians has not reported insomnia

to Health Services. *Id.* at 44.

Christians argues that he does not suffer from anxiety, and that if he did, his medication

would have addressed it. Doc. 118 at 19. Instead, Christians notes that his insomnia began when

he started losing weight. *Id.* Christians makes no argument as to how weight loss has caused

insomnia other than that the two began at the same time. *See id.* While it is intuitive how some

issues, such as fatigue, can stem from a lack of nutrition, insomnia does not connect as easily to

poor diet or weight loss. Thus, because Christians has put forth no evidence linking his insomnia

to his diet, summary judgment is granted for the DOC Defendants on this issue.

> **j.  Frequent Urination and Bowel Movements**

Although Christians alleged in his complaint that his frequent urination was caused by his

diet, he affirmatively declined to address this issue in his brief in opposition to summary

judgment. Doc. 118 at 19. He also states that his "frequent and loose stools subsided with a

probiotic and fiber added to his diet as reported to Dr. Gutnik." *Id.* To the extent that this problem was caused by an inadequate diet in the first place, the problem has been addressed through a change to Christians' diet. Thus, because the DOC Defendants have addressed this problem, they were not deliberately indifferent to the dietary issues that caused it. Summary judgment is granted to the DOC Defendants on this issue.

### k.     High Cholesterol

Christians alleges that his diet contains high-cholesterol foods, resulting in his high cholesterol. *Id.* at 19-21. The DOC Defendants cite to *Cody v. CBM Correctional Food Services* for the proposition that failure to provide a prescribed diet for high cholesterol does not qualify as deliberate indifference to serious medical needs in violation of the Eighth Amendment "in absence of evidence that the food [Christians] was served was not [sic] nutritionally inadequate." Doc. 99 at 48 (quoting[10] *Cody*, 250 F. App'x at 765). A prisoner alleging a claim for deliberate indifference to inadequate nutrition must show that the food "was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food." *Id.* (quoting *Wishon*, 978 F.2d at 449). In *Cody*, the Eighth Circuit affirmed the district court's finding that the plaintiff offered "no verifying medical evidence that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the kind of injury in [the] case." *Id.* (internal quotation omitted). Under *Cody*, a prisoner can bring a claim by showing that his health suffered as a result of the food, and high cholesterol caused by a prison diet would fall under this label. *See id.* The DOC Defendants also

---

[10] Although the DOC Defendants attribute this quote to the Eighth Circuit's ruling in *Cody*, this exact language not found within the text of *Cody*. *See* 250 F. App'x at 764-65. Similar language in *Cody* states that a prisoner must show that "the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food." *Id.* at 765 (quoting *Wishon*, 978 F.2d at 449).

argue that the diet at the SDDOC facilities is healthy, but this argument again relies on the misinterpretation of the 2019 evaluation's reference to NCCHC standards discussed above. *See* Doc. 99 at 49.

The DOC Defendants argue that Christians' medical records show that his cholesterol has decreased since he started losing weight and since he has been prescribed Lovastatin. *Id.* at 50-51. Christians acknowledges that this is true but argues that he should not require high doses of medication to address an issue caused by his poor diet. Doc. 118 at 20. He argues that the lack of fruit, non-starchy vegetables, and fiber in his diet, along with the six servings of fats, sweets, and oils that he alleges the diet contains daily, has caused his high cholesterol. *Id.* The DOC Defendants also argue that Christians' elevated cholesterol levels are caused by his consumption of commissary foods, many of which are unhealthy snacks. Doc. 99 at 52-53. Christians claims that some of the commissary foods he purchases are traded to or shared with other inmates and that he does not consume a significant amount of commissary foods, noting that some of the purchases he has made, such as 15 four-ounce blocks of cheese and 19 bags of chips over the course of a year, are small quantities when the timeframe is taken into account. Doc. 118 at 20-21. He also claims that he purchases commissary to supplement his insufficient meals and that his cholesterol was elevated before he began purchasing significant amounts of commissary. *See id.* at 17-18, 21. The DOC Defendants note that trading of commissary purchases is not allowed by SDDOC policy. Doc. 128 at 25-26.

The DOC Defendants have put forth evidence that Christians' high cholesterol has not been caused by his diet and that his high cholesterol is being treated. Doc. 99 at 50-53. Christians provides no "specific facts showing a genuine issue for trial" as to the cause of his high cholesterol. *See Atkinson*, 709 F.3d at 1207. Instead, he only offers speculative allegations that

his high cholesterol has been caused by his diet. *See* Doc. 118 at 20-21. Thus, the DOC

defendants are granted summary judgment on this issue.

### l.      **Deliberate Indifference**

The DOC Defendants argue that they did not fail to act in response to any risk of

substantial harm posed to Christians and were thus not deliberately indifferent to that risk. Doc.

99 at 11-16. The DOC Defendants point to the 2017 and 2019 evaluations as steps taken to

"ensure inmates have access to nutritious meals while incarcerated with SDDOC facilities." *Id.*

at 12 (quoting Doc. 99-78 at 3). The 2017 evaluation included an "off-site review evaluating the

DOC menus and food service program, including a summary nutritional analysis of the main

menu and therapeutic diets." *Id.* (quoting Doc. 99-78 at 3). It also included "unannounced on-site

reviews . . . conducted by the SDDOC Director of Operations and the independent consultant."

*Id.* at 12-13 (quoting Doc. 99-78 at 4). The DOC Defendants note that the 2019 evaluation found

that sodium had been further reduced since 2017 and that the only "notable recommendation or

concern" was a lack of fresh fruit or vegetables. *Id.* at 13. They further note that the 2019

evaluation concluded that SDDOC facilities are NCCHC accredited and thus adhere to NCCHC

standards which include "the American Heart Association diet and lifestyle recommendations

and the USDA Dietary Guidelines." *Id.* (quoting Doc. 99-79 at 7).

As discussed above, the DOC Defendants misrepresent the 2019 evaluation, which

expressly stated the opposite regarding the NCCHC standards. *See* Doc. 99-79 at 7-8. Instead of

claiming that the DOC adheres to the NCCHC standards, the 2019 evaluation expressed concern

that the DOC's practice of combining medical and specialty diets resulted in a lack of attention

to the NCCHC standards for main population menus. *Id.* As to the NCCHC standards, the 2019

evaluation concluded that "[t]he main population menus meet some of these criteria" before

38

explaining that "[i]f menus were aligned further with some of these nationally recognized standards, recommendations and guidelines," the DOC could reduce the number and types of medical diets and optimize cost and health outcomes. *Id.* at 8. Further, this concern was listed under "notable recommendations or concerns[,]" along with the lack of fruit and vegetables. *Id.* The other notable recommendations or concerns listed were lack of supervision at breakfast and a high percentage of kosher diets with selective participation at meals. *Id.*

The 2019 evaluation noted several other concerns at SDSP, such as a lack of color in meals, breakfast trays that were still wet, and some portion and quality issues, such as oatmeal that appeared thin, a failure to serve applesauce until this was mentioned to the supervisor, and an underserved portion of eggs until the portion was questioned. *Id.* at 1. Another portion of the evaluation noted that "some portions were in question" during a different breakfast service at SDSP. *Id.* at 3. Several sanitation concerns, such as areas of the kitchens that needed to be mopped or cleaned, were noted. *Id.* at 2-4. Other than noting that thermostats on the tray washing machines were in need of repair, the 2019 evaluation did not raise any concerns at MDSP. *Id.* at 7. Also, the 2019 evaluation did not contain any sort of nutritional analysis that discussed calorie amounts for meals. *See id.* at 1-8.

The DOC Defendants argue that they "reasonably responded to the alleged problem . . . by retaining an independent consultant," and that this response "serves to preclude any finding of deliberate indifference." Doc. 99 at 16 (citing *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (per curiam)). In *Mays*, the Seventh Circuit Court of Appeals found that "prison officials acknowledged that [the plaintiff's] diet was inadequate and took steps to fix it" when an administrator agreed with the plaintiff "that the vegan menu at [the prison] was deficient and promised to change it." *Mays*, 575 F.3d at 646, 648. It is unclear whether prison officials in *Mays*

actually changed the vegan menu or merely promised to do so, but in any case, officials acknowledged the problem, and the Seventh Circuit found that officials took steps to address the problem. *See id.* Here, the DOC Defendants have taken steps towards investigating the alleged problem by having evaluations done in 2017 and 2019, but rather than take steps towards fixing it, they argue that the problem does not exist. That may be the case, as there are genuine questions of material fact regarding Christians' caloric intake and the cause of his weight loss and other adverse health effects. But if Christians has, in fact, been underfed for significant portions of the past five years, then merely conducting two third-party evaluations in 2017 and 2019[11] does not serve as a reasonable response that would preclude a finding a deliberate indifference. *See Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016) ("Knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference.").

The DOC Defendants argue that Christians is "attempting to hold prison officials liable based solely on their responses to the various grievances he submitted in connection with his medical dilemmas directly related to his diet." Doc. 99 at 16 (internal quotation omitted). Eighth Circuit precedent is clear that "denial of [a plaintiff's] grievances [does] not state a substantive constitutional claim[.]" *Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam); *see also Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam) ("[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the [F]ourteenth [A]mendment." (first alteration in original) (quoting *Azeez v.*

---

[11] Christians disputes that the 2019 evaluation involved a third party, arguing that it was conducted by the DOC Director of Operations. Doc. 120 ¶ 21. The record is unclear as to who conducted this evaluation. *See* Doc. 99-79.

*DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982))). While the DOC Defendants are correct that denial of Christians' grievances is not itself a constitutional violation, grievances are evidence that prison officials were aware of the grieved conditions, a necessary element of deliberate indifference. *See Farmer*, 511 U.S. at 846 ("[T]o survive summary judgment, [a plaintiff seeking injunctive relief] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so[.]"). Most importantly, the DOC Defendants do not identify the individual defendants whose sole participation in this action was responding to Christians' grievances and do not move for summary judgment on claims against specific individual defendants on these grounds. *See* Doc. 99 at 16-20.

The DOC Defendants assert that they cannot be held liable, in their individual capacities, for menus prepared by the registered dietician. *Id.* at 18. Noting that "prison officials cannot be held liable for refusing to override a prison doctor's decision[,]" the DOC Defendants argue that they "have no authority to change any of the dietary decisions made by the registered dietician." *Id.* at 18-19. The DOC Defendants make a strong argument that failure to change or override the registered dietician's dietary decisions alone does not constitute deliberate indifference, but Christians' claims extend beyond alleging a failure to reverse dietary decisions or alleging that the menu was insufficient. *See id.*; Doc. 118 at 5. Christians argues that "the menu was not being adhered to[,]" that it was being altered, and that incorrect portion sizes were listed. Doc. 118 at 5. He also argues that he filed grievances and had conversations with several individual defendants regarding these issues. *Id.* at 5-6.

The DOC Defendants argue that they were not deliberately indifferent because they passed several of Christians' grievances on to Summit and instructed Christians to contact Summit. Doc. 99 at 17 n.4. They cite to *Giddings*, in which the Western District of Arkansas found that defendants could be deliberately indifferent to an inmate's nutritional needs, even when they contracted food service to an outside party, because they failed to pass the plaintiff's food grievances on to kitchen staff in all but one instance.[12] 2017 WL 2791345, at *6. Here, the DOC Defendants are correct that passing several grievances on to Summit demonstrates more of a response than the actions of the defendants in *Giddings*, but this does not preclude a finding of deliberate indifference. *See id.* The State of South Dakota and its prison officials should take no comfort in the fact that they have contracted with Summit for an adequately nutritious diet. It is still the function of the public entity that has custody of the prisoners to ultimately see that their nutritional needs are met.

The *Giddings* court also found that "[c]ontracting out prison [food service] does not relieve the State of its constitutional duty to provide [an adequate diet] to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Id.* (second and third alterations in original) (quoting *West v. Adkins*, 487 U.S. 42, 56 (1988)). The DOC Defendants still have a constitutional duty to provide an adequate diet to inmates. *See id.* If passing grievances along to Summit during the five years that Christians claims he has not been receiving an adequate diet did not address the alleged food issues, then the DOC Defendants may have been deliberately indifferent regarding that duty. *See Gray*, 826

---

[12] In *Giddings*, the court ultimately found that the plaintiff's diet was nutritionally adequate and that defendants were entitled to summary judgment. 2017 WL 2791345, at *7.

F.3d at 1009. Thus, this Court cannot say that the DOC Defendants were not deliberately indifferent to the risk of harm posed to Christians by his diet.

Because genuine questions of material fact remain regarding Christians' caloric intake, the cause of his weight loss and other adverse health effects, and the DOC Defendants' response to these alleged issues, summary judgment is not appropriate at this time.

### 2.    First Amendment Claim

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner*, the Supreme Court provided four factors to determine whether a prison regulation withstands scrutiny:

> (1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether alternative means for exercising the right remain open to the prisoner; (3) the impact of the regulation on prison staff, other inmates, and the allocation of prison resources; and (4) the availability of ready alternatives to the regulation.

*Hamilton v. Schriro*, 74 F.3d 1545, 1551 (8th Cir. 1996) (citing *Turner*, 482 U.S. at 89-91). "[P]rison officials may lawfully censor prison mail that is detrimental to the security, good order and discipline of the institution." *Kaden v. Slykhuis*, 651 F.3d 966, 968 (8th Cir. 2011) (per curiam) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989)). "The first factor [of *Turner*] operates as a threshold condition that the regulation must satisfy to pass constitutional muster." *Sisney v. Kaemingk*, 15 F.4th 1181, 1190 (8th Cir. 2021). "Assuming the regulation satisfies this threshold requirement, the court must determine the regulation's constitutionality by balancing

the remaining three factors." *Id.* The *Turner* analysis is used for both as-applied challenges and for facial challenges. *Thornburgh*, 409 U.S. at 403-04.

Here, Christians brings an as-applied challenge against Young[13] and Mousel. *See* Doc. 26 ¶ 147; Doc. 118 at 23-25. Under Federal Rule of Civil Procedure 25(d), this challenge is also brought against Sullivan and Wasko in their official capacities. The DOC Defendants argue that Christians' art book falls under SDDOC Policy 1.3.C.8 because it contains nudity. Doc. 99 at 61-62. Christians notes that this policy has an exception for "nude material that is illustrative of medical, educational or anthropological content." Doc. 118 at 23 (internal quotation omitted). The DOC Defendants acknowledge this exception but state that Christians has not raised this argument until his response to the DOC Defendants' motion for summary judgment. Doc. 128 at 30. They argue that the burden to show that an exception applied was on Christians, as the language in the exception is not mandatory. *Id.* (citing *Bell v. Young*, 2018 WL 3148385, at *33 (D.S.D. June 27, 2018). The full language of the exception states that "published material containing nudity that is illustrative of medical, educational or anthropological content may be excluded from this definition." *Bell*, 2018 WL 3148385, at *7.

In *Sisney v. Kaemingk*, this Court ruled on both as-applied challenges and a facial challenge to the policy in question. 468 F. Supp. 3d 1135, 1138 (D.S.D. June 24, 2020). The defendants in *Sisney* rejected several items sent to the plaintiff, including an art book titled Matisse, Picasso, and Modern Art in Paris and reproduction pictures of Michelangelo's sculptures and paintings, because they contained nudity. *Id.* This Court found that "no showing ha[d] been made that banning [the art book and reproduction pictures] [was] reasonably related

---

[13] Christians brings this claim against Darin Young, the former SDSP Warden, in his individual and official capacity. The current SDSP Warden is Dan Sullivan, who is automatically substituted for Young on the official capacity claim.

44

to a legitimate penological objective." *Id.* at 1142. This Court also found for the plaintiff on the facial challenge and revised the policy to remove bans on non-explicit nudity or written sexual content. *Id.* at 1147. The Eighth Circuit upheld this Court's ruling on the as-applied challenge to the art book and reproduction pictures, finding that "[a]lthough a few of the featured works include nudity, the defendants have identified none that even arguably depicts its subject lewdly or as engaged in any actual or simulated sexual acts." *Sisney*, 15 F.4th at 1193 (internal quotation omitted). Further, the Eighth Circuit noted that "[c]ommon sense does not suggest, and the defendants have offered no evidence to prove, a rational connection between banning pictures of artwork such as Michelangelo's 'David' and legitimate government interests such as security and rehabilitation." *Id.* The Eighth Circuit reversed this Court on the facial challenge, ultimately finding that the policy was not substantially overbroad. *Id.* at 1199.

This Court finds that the same as-applied analysis applies to Christians' art book. The DOC Defendants have only argued that the book falls under the SDSP pornography policy and that "[c]ourts have routinely held that there is a rational connection between censoring pornography and promoting legitimate penological interests." Doc. 99 at 63 (quoting *Sisney*, 15 F.4th at 1192). But the DOC Defendants cite language from *Sisney*'s ruling on two erotic novels, not its ruling where it found no legitimate government interest was rationally connected to banning the works of art in question. *See id.* at 1192-93. As in the Eighth Circuit's ruling in *Sisney*, the DOC Defendants here offer no evidence to prove a rational connection between banning artwork and legitimate government interests, instead only arguing that the artwork is pornographic and thus can be censored. *See* Doc. 99 at 61-69; Doc. 128 at 29-33. Thus, this Court cannot grant summary judgment to the DOC Defendants on the grounds that they did not violate Christians' First Amendment rights by rejecting his art book.

Christians seeks both money damages and injunctive relief in the form of the return or replacement of his book. Doc. 26 ¶¶ 139, 154. The DOC Defendants argue that they are entitled to qualified immunity on Christians' invidivual capacity First Amendment claim for money damages. Doc. 99 at 67. Christians' art book was rejected on June 15, 2020, nine days before this Court issued its decision in *Sisney*. *See id.* at 61. Christians then submitted an Informal Resolution Request the following month. *Id.* In an Administrative Remedy Response dated July 31, 2020, Young informed Christians that pending decisions on the defendants' motion for stay and "final determination of the issues [in *Sisney*] on appeal, the status quo will be maintained."[14] *Id.* (quoting Doc. 99-153 at 1). Because the Eighth Circuit had not yet ruled on *Sisney*, there was no "controlling authority" on this issue that clearly established the rule on which Christians seeks to rely. *See Layne*, 562 U.S. at 617. Nor has Christians identified a consensus of cases of persuasive authority on this issue. *See id.*; Doc. 118 at 23-25.

Further, while the Eighth Circuit's ruling in *Sisney* does indicate that the rejection of artwork with some incidental nudity may violate the First Amendment, it did so in ruling on an as-applied challenge to specific collections of art. 15 F.4th at 1193. This Court, in its ruling in *Sisney*, noted its experience with art galleries and museums to conclude that "[t]here are very few of those gallery and museum images and books where a case could be made for a banning based on the work being sexually explicit[,] . . . [b]ut all of those images and books are not before the Court in this as applied analysis." 469 F. Supp. 3d at 1142. In other words, an as-applied

---

[14] This Court denied defendants' motion for stay in *Sisney* on August 10, 2020. *Sisney v. Kaemingk*, 2020 WL 4582707, at *2 (D.S.D. Aug. 10, 2020). The Eighth Circuit later denied defendants' motion for a stay on August 27, 2020. Order, *Sisney v. Kaemingk*, No. 20-2460 (8th Cir. Aug. 27, 2020). Thus, by declaring that he would wait until final determination of the issues on appeal, Young was in violation of this Court's denial of a stay and the Eighth Circuit's denial of a stay, as well as this Court's original ruling.

challenge requires an "independent review of the evidence[,]" and the results of this review depend on the specific and unique circumstances of each rejected item. *See id.* at 1141 (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 986 (8th Cir. 2004)). Thus, because each as-applied challenge requires a new review of the evidence, a very high bar must be met to determine that the outcome of a prior as-applied challenge would clearly establish a rule for a later as-applied challenge unless the two challenges regarded identical or strikingly similar evidence. *Cf. City Union Mission, Inc., v. Sharp*, 36 F.4th 810, 818 n.3 (8th Cir. 2022) (narrowly defining the question posed by a qualified immunity analysis as "whether there was a clearly established constitutional right to free exercise within 500 feet of Margaret Kemp Park" rather than the broader question of whether there was a clearly established constitutional right "to engage in free exercise of religion within 500 feet of a park with playground equipment" (internal quotation omitted)).

Here, while Christians' art book may feature nudity similar to that challenged in *Sisney*, these are different works of art. *See* Doc. 127-2; Doc. 127-3. Because Christians' right to receive the art book in question was not clearly established when Young and Mousel rejected it, Young and Mousel are entitled to summary judgment on his individual capacity First Amendment claim for money damages.

The DOC Defendants argue that they have since amended SDDOC Policy 1.3.C.8 to allow for the viewing of materials containing nudity or sexually explicit conduct in designated viewing rooms. Doc. 99 at 67-68. They argue that if Christians were to receive another copy of the art book, he could now view it in a viewing room, but because this policy was not in place at the time that he first received the art book, that copy was destroyed. *Id.* at 68-69. Christians argues that he wants to learn how to paint, which he cannot do in a viewing room. Doc. 118 at

25. But he can learn to paint[15] by reading and viewing the book in a viewing room, and this Court finds that to be an adequate remedy.

Because Christians has a sufficient means by which he can pursue his artistic goals, the Court finds that his official capacity claim for injunctive relief is moot. Thus, summary judgment is granted as to Christians' claim for injunctive relief against Mousel, Wasko, and Sullivan in their official capacities.

## II.  Christians' Motion to Submit a Second Amended Complaint

Christian moved to submit a second amended complaint on November 22, 2021. Doc. 79. The DOC Defendants filed a response in opposition to Christians' motion, and the Summit Defendants joined this response. Docs. 87, 92. Thus, this portion of the order will refer to "defendants" to refer to both sets of defendants as a whole. Under Federal Rule of Civil Procedure 15(a)(1), "[a] party may amend its pleading once as a matter of course within 21 days after serving it," or 21 days after service of a responsive pleading or motion. Thereafter, the party may amend only with the written consent of the opposing party or the court's permission. Fed. R. Civ. P. 15(a)(2). Because Christians' motion to submit a second amended complaint was filed more than 21 days after the defendants responded to his complaint and because defendants oppose his motion, Christians must have leave from the Court to amend. *Id.* "The court should freely give leave [to amend] when justice so requires." *Id.* Even under this generous standard, a court may deny a request to amend for "compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Sherman v. Winco Fireworks,*

---

[15] Some say pastels are drawing, some say painting. This Court draws with pastels.

*Inc.*, 532 F.3d 709, 715 (8th Cir. 2008) (quoting *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005)).

"A liberal amendment policy, however, is in no way an absolute right to amend. Where an amendment would likely result in the burdens of additional discovery and delay to the proceedings, a court usually does not abuse its discretion in denying leave to amend." *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 943 (8th Cir. 2000) (internal citation omitted). "When late tendered amendments involve new theories of recovery and impose additional discovery requirements, appellate courts are less likely to hold a district court abused its discretion." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008) (citation omitted). Further, a "[d]enial of a motion for leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6)." *Moody v. Vozel*, 771 F.3d 1093, 1095 (8th Cir. 2014) (internal quotation omitted). Under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Christians seeks to add additional defendants to his Eighth Amendment inadequate nutrition claims, to bring new Eighth Amendment inadequate nutrition claims against existing defendants, and to bring First Amendment retaliation claims against defendants Young, Christensen, and Stratman. Doc. 83 ¶¶ 127(A)-127(ZZ), 140-142. Defendants argue that these claims are futile because they would not withstand a motion to dismiss under Rule 12(b)(6). Doc. 87 at 5-12. Further, defendants argue that Christians brought these claims with a dilatory motive because he could have raised them in his earlier complaint. *Id.* at 12-13.

### A.    Dilatory Motive

Defendants argue that Christians' second amended complaint "was prompted by dilatory motives" because some of the incidents alleged occurred before Christians filed his first amended complaint on November 10, 2020. *Id.* at 12. Defendants cite to a District of Nebraska case for the proposition that when "a motion to amend a complaint is based on allegedly new information that the plaintiff knew, or through the exercise of reasonable effort could have known at an earlier time, the motion should be denied." Doc. 87 at 13 (citing *In re Acceptance Ins. Cos., Inc., Secs. Litig.*, 352 F. Supp. 2d 928, 933 (D. Neb. 2003)).

In *In re Acceptance Insurance Cos., Inc., Securities Litigation*, the District Court of Nebraska examined two Eighth Circuit Court of Appeals cases as a basis for the proposition stated above. *See* 352 F. Supp. 2d at 933 (citations omitted). In *Floyd v. Missouri Department of Social Services, Division of Family Services*, the Eighth Circuit affirmed the district court's denial of plaintiff's motion for leave to amend when the plaintiff filed a motion to amend her complaint more than twenty months after she filed her initial complaint and more than seven months after defendants filed a motion for summary judgment. 188 F.3d 932, 939 (8th Cir. 1999). In *Svoboda v. Trane Co.*, "appellant inexplicably sought leave to amend in order to introduce new theories of liability on the eve of trial, nearly a year after the complaint had been filed." *Svoboda v. Trane Co.*, 655 F.2d 898, 900 (8th Cir. 1981) (per curiam) (footnote omitted). Further, the Eighth Circuit found evidence of undue delay and prejudice because the defendant had already conducted extensive discovery. *Id.* (citation omitted). The *In re Acceptance Insurance Cos., Inc., Securities Litigation* court concluded that "delay alone is an insufficient basis upon which to deny a motion to amend" and considered unfair prejudice, bad faith, and futility in its analysis.

Here, Christians filed his motion to amend one year after filing his first amended complaint, but because Christians was unable to identify and serve one defendant who was ultimately dismissed, the DOC defendants did not answer Christians' first amended complaint until October 1, 2021. *See* Docs. 69, 70. Christians filed his second motion to amend on November 22, 2021. Doc. 79. Defendants had not yet filed their motion for summary judgment at that time. *See* Doc. 98.  Although defendants are correct that some of the claims asserted in the second amended complaint are based on information Christians knew or should have known prior to filing his first amended complaint, defendants make no argument regarding unfair prejudice or bad faith. *See* Doc. 87 at 12-13. Instead, they only argue that Christians should be precluded from asserting claims regarding conduct that occurred before he filed his first amended complaint. *Id.* Christians argues that he filed the second amended complaint after repeated communication with DOC officials in an attempt to resolve the alleged issues through the prison grievance process. Doc. 93 at 1-2. He claims that he prepared and filed his second amended complaint after being told that "there was nothing that would remove [his disciplinary infraction] from his prison record" at the end of October 2021. *Id.* at 1. Thus, because defendants have made no showing of unfair prejudice or bad faith, this Court will not deny Christians' motion to amend based on the delay alone.

## B.   Futility of Claims

### 1.   Eighth Amendment Inadequate Nutrition Claims

#### a.   Claims Against New Defendants

Christians seeks to bring an Eighth Amendment inadequate nutrition claim against Pechous, Genie Birch, Greasman, Dawn Alumbaugh, Barnetche, Marjama, Winters, Padilla,

Mullins, Hulscher, Driskie,[16] Becker, Hettig, Sorenson, and Perret, all of whom are SD DOC employees. Doc. 83 ¶¶ 32(A)-(H). He also seeks to bring an Eighth Amendment inadequate nutrition claim against Beth, who is a Summit supervisor, and against Summit Food Service. *Id.* ¶¶ 32(I)-(J). He sues all defendants in their individual and official capacities. *Id.* ¶ 32(K). Christians' allegations are largely that he informed the proposed defendants that his meals were missing items, spoiled, too small, or otherwise inadequate, and that the proposed defendants failed to rectify the issue. *See id.* ¶¶ 127(A)-(ZZ).

Defendants argue that the proposed defendants did not possess the authority to alter Christians' meal plan and were not involved with the food served to him because Summit Foods provides all meals to inmates. Doc. 87 at 8-9. They argue that all menus are created by the registered dietician employed by Summit Foods. *Id.* at 8. Further, they note that Christians acknowledges being told by individual proposed defendants that they "could do nothing" about his food issues. *Id.* at 7 (quoting Doc. 83 ¶¶ 127(K), (DD)).

Christians argues that while Summit Foods is responsible for designing menus, prison officials, including the proposed defendants, "are responsible for assuring the menu that is in place is adhered to." Doc. 93 at 4. He argues that he was held in the Segregated Housing Unit, where he had no ability to bring food complaints to Summit Foods staff. *Id.* at 3-4. He argues that the proposed defendants, who were responsible for bringing him food while he was in Segregated Housing, "ha[d] access to menus and could easily verify food trays for correctness

---

[16] Christians brings a claim against Driskie, a former deputy warden at SDSP, in his or her individual and official capacity. Under Rule 25(d), Driskie's successor is automatically substituted as a party for Christians' official capacity claim. But Christians does not identify Driskie's successor, and his official capacity claims against other defendants remain to provide injunctive relief. Thus, Christians' claim against Driskie in his or her official capacity is dismissed.

when complaints are made." *Id.* at 3. He also notes that he did not name as proposed defendants the officials who attempted to rectify his food issues, only those that he alleges refused to attempt to address the issues. *Id.*

Christians alleges facts sufficient to state a claim for violation of his Eighth Amendment rights against the proposed defendants. He alleges that he repeatedly received portions that were missing items, contained spoiled or rotten food, or were otherwise insufficient. *See* Doc. 83 ¶¶ 127(A)-(ZZ). The Court finds that these new claims are akin to those that survived the screening of Christians' first amended complaint. *See* Doc. 27 at 9-11. Thus, Christians' Eighth Amendment claims against new defendants are not futile except for his official capacity claim against Driskie.

### b.    New Claims Against Dismissed Defendants

Christians seeks to bring new Eighth Amendment inadequate nutrition claims against Marlin C. Sejonha, Justin Barthel, Shane Sejonha, Naomi McLaughlin, and Jeff Green, defendants who were previously dismissed from this case because they were not personally involved in and not aware of the alleged deprivations. *See* Doc. 54 at 6-7; Doc. 83 ¶¶ 127(XX)-(YY). These five defendants are Summit executives who Christians argued "[could not] be ruled out until after their depths of involvement [are] discovered." Doc. 26 ¶¶ 20-22, 26-27, 126. This Court found that Christian "only present[ed] an abstract possibility" that these defendants were personally involved. Doc. 83 at 7.

In his second amended complaint, Christians alleges that Summit executives, including the five dismissed defendants, visited the South Dakota State Penitentiary in May 2020 to "see the day-to-day operations first hand." Doc. 83 ¶ 127(XX). Christians argues that this visit made these defendants "aware of the substandard nutrition and diet, the unsanitary kitchen practices

and lack of properly trained kitchen workers resulting in the poor quality meals." *Id.* He also alleges that Marlin C. Sejonha signed the food contract between the South Dakota DOC and Summit and that this contract requires Summit to follow USDA guidelines. *Id.* ¶ 127(YY).

These allegations alone are not sufficient to state a claim for deliberate indifference. To show deliberate indifference, an inmate must demonstrate that a defendant knew the "inmate[] face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *see also Coleman*, 114 F.3d at 786. "[C]onstructive knowledge, or the 'should-have-known' standard, is not sufficient to support a finding of deliberate indifference[.]" *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998). Christians makes no showing that these defendants knew he faced a risk of harm because of food issues at SDSP. At most, Christians argues that these defendants should have been aware of these issues, which is insufficient under *Spruce*. Thus, Christians' Eighth Amendment claims against the previously dismissed defendants are futile.

### 2.    First Amendment Retaliation Claims

Christians seeks to bring First Amendment retaliation claims against Young, Christensen, and Stratman, all of whom are currently defendants to this lawsuit. Doc. 83 ¶¶ 127(CC), 127(FF), 140-142. Christians seeks money damages for this claim. *Id.* ¶ 155. He sues Christensen and Stratman in their individual and official capacities, Young in his individual capacity, and Sullivan in his official capacity. *See* Doc. 83 ¶ 35.

The Supreme Court has stated, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Christians seeks monetary damages for his First Amendment retaliation claims. Doc. 26 ¶¶ 152-

55. The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Will*, 491 U.S. at 66 (citation omitted). But when an official capacity claim is asserted for injunctive relief against a state officer, the defense of qualified immunity does not apply. *See Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009). Because the state of South Dakota has not waived its sovereign immunity and because Christians seeks monetary damages, all claims against Christensen, Stratman, and Sullivan in their official capacities for monetary damages would not survive a motion to dismiss under Rule 12(b)(6) and are thus futile.

Christians brings First Amendment retaliation claims against Young, Christensen, and Stratman in their individual capacities for money damages. In order for a plaintiff to allege a First Amendment retaliation claim, he must show that "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson County*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

Christians alleges that Young, Christensen, and Stratman retaliated against him for filing grievances regarding the food at the State Penitentiary. Doc. 83 ¶¶ 127(CC), 127(FF), 140-142. Specifically, he alleges that Young threatened to have him transferred to a more violent prison and that Christensen and Stratman stole paperwork he needed for his lawsuit and grievances, falsely claimed that he assaulted them, and falsely accused him of organizing a hunger strike. *Id.* Thus, taking Christians' allegations as true, Christians clearly satisfies the first prong of a First Amendment retaliation claim because "[t]he filing of a prison grievance, like the filing of an

inmate lawsuit, is protected First Amendment activity." *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994)).

For Christians to satisfy the second prong of a First Amendment retaliation claim, he must demonstrate both that Young, Christensen, and Stratman took an adverse action toward him and that the alleged adverse action "would chill a person of ordinary firmness from continuing in the activity[.]" *Spencer*, 738 F.3d at 911 (quoting *Revels*, 382 F.3d at 876); *see also Lewis*, 486 F.3d at 1029 (holding in a First Amendment retaliation claim that the record contained insufficient evidence that increasing the prisoner's work load would chill a prisoner of ordinary firmness from using the prison grievance process). "The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003)). This is an objective test that looks at whether a reasonable prisoner's actions would be chilled by an official's alleged adverse actions. *See id.* (citing *Garcia*, 348 F.3d at 729).

Here, Christians has alleged sufficient facts to show that a prisoner of ordinary firmness would have been "chilled" from using the grievance procedure and asserting an inmate lawsuit. As to Christians' claim against Young, defendants argue that Young never attempted to carry out the alleged threat nor took any affirmative action suggesting that he would act on it, and thus Young's conduct did not constitute adverse action. Doc. 87 at 11-12. Defendants cite to several cases from other district courts not in the Eighth Circuit for the proposition that an isolated threat, without more, does not adversely affect an inmate. *Id.* at 11 (citations omitted). One such case cited by defendants, *McKinney v. Rutenbar*, explains that "although the Sixth Circuit has indicated that some threats can rise to the level of an adverse action in some circumstances, it has

56

not held, and it is not clearly established, that a threat of prison transfer or job termination, standing alone, is sufficiently adverse to constitute prohibited retaliation." *See* 2016 WL 4144253, at *2 (W.D. Mich. Aug. 4, 2016) (internal citations omitted). But the exceptions described by the *McKinney* court suggest that threats of transfer for the purpose of worsening an inmate's circumstances or living conditions may adversely affect an inmate. *See id.* (citing *Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009)). Here, Christians alleges that Young twice threatened to transfer him to a more violent prison. Doc. 83 ¶¶ 127(CC), (FF). Defendants do not argue that Christians' allegations against Christensen and Stratman are futile, only that they are prompted by dilatory motives. *See* Doc. 87 at 12. Thus, Christians satisfies the second prong of a First Amendment retaliation claim.

To satisfy the third prong, Christians must show that "the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer*, 738 F.3d at 911 (quoting *Revels*, 382 F.3d at 876). Here, Christians alleges sufficient facts to meet the third prong. He claims that Young threatened to transfer him because he had been filing food grievances and that Christensen and Stratman falsely brought disciplinary charges against him in because of his food grievances. *Id.* ¶¶ 127(CC), 127(FF), 140-141. Thus, Christians has alleged facts to show that Young, Christensen, and Stratman violated his First Amendment right to be free from retaliation.

Christians is granted leave to amend his complaint to add new defendants to his Eighth Amendment inadequate nutrition claims, except for his official capacity claim against Driskie, and to bring new First Amendment retaliation claims against Young, Christensen, and Stratman in their individual capacities. Christians is denied leave to bring Eighth Amendment inadequate nutrition claims against the previously dismissed Summit defendants and new First Amendment retaliation claims against Christensen, Stratman, and Sullivan in their official capacities.

### III.   Christians' Objection to This Court's Order Dismissing Complaint Against Lieutenant Maddox

On September 27, 2021, this Court found that Christians failed to state a claim against defendant Lieutenant Maddox and dismissed Maddox from this case. Doc. 69 at 4. Specifically, this Court found that Christians made no mention of Maddox in his complaint. *Id.* at 3-4. Christians filed an objection in response to this order, arguing that Maddox was mentioned in one paragraph of his complaint. Doc. 75 at 1 (citing Doc. 26 ¶ 94). Christians is correct that his complaint alleges that "Maddox did not allow pictures [of food] prompting [a] grievance." *See* Doc. 26 ¶ 94. But this is the only allegation contained in his complaint regarding Maddox. *See id.* Christians argues that further claims regarding Maddox were contained in the evidence he submitted along with his original complaint and that Maddox failed to correct obvious issues with food trays. Doc. 75 at 1. Christians does not indicate where in the record these allegations are contained, and this Court will not pore over the extensive record to find this information. Christians' objection, Doc. 75, is overruled.

### IV.   Discovery Issues

Christians has filed a motion to compel Summit Food Service to provide the address of defendant Kevin Trierweiler and a motion to compel the DOC and Summit to provide discovery documents, and the DOC Defendants have filed a motion for a protective order staying discovery pending the resolution of their motion to dismiss on qualified immunity grounds. Docs. 76, 80, 89. Summit opposes Christians' first motion to compel, the DOC Defendants oppose Christians' second motion to compel, and Christians opposes the DOC Defendants' motion for protective order. Docs. 82, 86, 107. Christians has also filed a motion asking this Court for an order allowing him to contact other inmates for affidavits or declarations. Doc. 81. Defendants have not opposed this motion. Because this Court has denied in part and granted in part the DOC

Defendants' motion for summary judgment, the DOC Defendants' motion for protective order, Doc. 89, is denied as moot.

### A.   Christians' First Motion to Compel

Christians has filed a motion to compel Summit Food Service to provide the address of defendant Kevin Trierweiler, a former employee of Summit, so that Christians can have Kevin Trierweiler served. Doc. 76. Christians argues that he wrote a letter to Summit on May 20, 2021, asking for Kevin Trierweiler's information and that Kevin Trierweiler's brother, John Trierweiler, still works for Summit. *Id.* at 1. The Summit Defendants argue that Christians failed to confer with them as required by Federal Rule of Civil Procedure 37(a)(1). Doc. 82 at 2-3. They argue that this motion is premature because Christians filed it on November 3, 2021, a week before discovery began and before Christians served any discovery on them. *Id.* at 3. The Summit Defendants further argue that their discovery obligations do not extend to the addresses of former employees if those employees "have no knowledge or discoverable information regarding the allegations contained within the Complaint." *Id.* (citing Fed. R. Civ. P. 26(1)(A)(i)). Christians argues that it would be easy for the Summit Defendants to find and provide Kevin Trierweiler's contact information. Doc. 84 at 1-2.

Defendants are correct that Christians' motion to compel is premature. A party may file a motion to compel disclosure or discovery after the party "has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1); *see also* D.S.D. Civ. LR 37.1 ("A party filing a motion concerning a discovery dispute must file a separate certification describing the good faith efforts of the parties to resolve the dispute."). Christians' letter on May 10, 2021, was sent well in advance of discovery, as the initial scheduling order in this case was issued on

November 10, 2021, and thus Christians' letter could not itself be discovery or an effort to confer regarding a discovery dispute. *See* Doc. 76 at 1; Doc. 78. Further, Christians has shown an ability to conduct discovery in accordance with the federal rules. *See* Doc. 118 at 34-39 (The Summit Defendants' responses to Christians' second set of written discovery). Thus, Christians' first motion to compel, Doc. 76, is denied.

**B.     Christians' Second Motion to Compel**

Christians has filed a motion to compel Summit Food Service and the DOC to provide menus, nutritional analysis reports, food nutrition labels, and manuals from the American Dietetic Association and the American Diabetes Association. Doc. 80 at 1-2. The DOC Defendants oppose this motion, arguing that Christians has failed to submit a formal request for production of documents under Federal Rule of Civil Procedure 34, has failed to confer with opposing parties as required by Rule 37(a)(1), that the menus in question are not discoverable, and that they are not in possession of the manuals requested. Doc. 86 at 4-8. Christians argues that he has made several attempts to request these materials and that defendants have either denied these requests or failed to respond. Doc. 94 at 1. The Summit Defendants have not responded to this motion.

Christians filed this motion twelve days after this Court's scheduling order. *See* Docs. 78, 80. Although Christians alleged in his motion that he repeatedly attempted to contact defendants, these attempts were made before or at the very start of discovery and were thus premature. Again, the party moving for an order compelling discovery must make a good faith effort to confer with the party failing to provide discovery and also must file a certification describing those efforts. Fed. R. Civ. P. 37(a)(1); D.S.D. Civ. LR 37.1. The DOC Defendants are also correct that documents they do not possess, such as the manuals requested by Christians, are not

subject to discovery. *See* Fed. R. Civ. P. 34(a)(1) (limiting requests for production of documents to "the following items in the responding party's *possession, custody, or control*" (emphasis added)).

The DOC Defendants cite to *Cody v. CBM Correctional Food Services*, 2005 WL 3018694, at *7 (D.S.D. Nov. 9, 2005), and *Rogers v. Scurr*, 676 F.2d 1211, 1213 (8th Cir. 1982) for the proposition that prison menus are not subject to discovery. Doc. 86 at 5-6. The plaintiff in *Cody*, a diabetic with hypertension, was provided a special diet with daily prepared menus. *Cody*, 2005 WL 3018694, at *1. Although he was promised that he could access these menus, a prison official later notified him that he would not be provided copies. *Id.* The plaintiff then argued that prison officials' failure to provide menus after promising to do was a violation of his civil rights, and the court rejected this claim. *Id.* at *7. In *Rogers*, the Eighth Circuit reversed a district court's granting of injunctive relief to Muslim inmates who claimed that prison officials violated their right to exercise their religion. 676 F.2d at 1211. The Eighth Circuit found that the district court granted injunctive relief without finding any constitutional or statutory deprivation and that, without a "presently existing actual threat" to the plaintiffs' rights, no injunction should have been granted. *Id.* at 1214 (quoting *Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969)). One form of injunctive relief that was granted by the district court and reversed by the Eighth Circuit was access to a pork-free diet line or a daily menu that included the pork content of food items served along with a requirement that non-pork items be sufficient for nutrition. *Id.* at 1213. Neither *Cody* nor *Rogers* touched on whether prison menus are shielded from discovery.

The DOC Defendants also cite to *Gard v. Dooley*, arguing that the menus in question would not be relevant to Christians' claims. Doc. 86 at 6 (citing *Gard v. Dooley*, 2017 WL

61

782279, at *8 (D.S.D. Feb. 28, 2017)), In *Gard*, this Court denied the plaintiff's motion to compel defendants to provide "[a] copy of all CBM Food Service menus that contain diabetic menus from January 1, 2010, to present." 2017 WL 782279, at *7. The plaintiff in *Gard* stated that he wanted the requested menus to show that he did not receive his prescribed diabetic diet. *Id.* This Court denied the plaintiff's motion to compel because the plaintiff made no showing of how the documents he requested were relevant to the question of whether he received his prescribed diabetic diet. *Id.* at *8.

Here, because Christians argues both that he does not receive the correct amount of food as indicated by daily menus and that the menus are insufficiently nutritious even when followed, menus may be relevant to Christians' claims, provided that his requests fall within the scope of discovery as described in Federal Rule of Civil Procedure 26(b)(1). Although Christians' second motion to compel, Doc. 80, is denied, this Court notes that none of the cases cited by the DOC Defendants suggest that prison menus are not subject to discovery as a matter of law.

C.    **Christians' Motion for Order That Plaintiff May Contact Other Inmates to Collect Affidavits or Declarations**

Christians asks this Court for an order allowing him to visit with and collect affidavits or declarations from Craig Returns From Scout, Daniel Augustine, and Kevin Brown. Doc. 81 at 1. Christians alleges that these inmates have informed him that they have information regarding Summit's kitchen practices, including Summit's changing of expiration dates on food products and Summit's use of rancid meat. *Id.* Christians states that his requests for inmate-to-inmate correspondence were rejected by prison officials. *Id.* The DOC Defendants have not responded to this motion.

This Court finds that Christians has made a showing that the three inmates in question may have information that falls under the scope of discovery as described in Rule 26(b)(1). This

Court also recognizes that that "prison officials ordinarily must have wide latitude within which to make appropriate limitations." *Rogers*, 676 F.2d at 1215. Thus, Christians' motion for an order allowing him to collect affidavits or declarations from Returns From Scout, Augustine, and Brown, Doc. 81, is granted, but discretion as to how to allow Christians to collect affidavits or declarations is left to SDSP, who shall do so in a manner that does not interfere with SDSP operations.

## V.  Motion for Appointment of Counsel

Christians moves for appointment of counsel. Doc. 77. He argues that he cannot investigate the facts and conduct discovery from prison, that counsel will help "limit litigation to potentially meritorious issues[,]" and that counsel will help him identify unknown defendants and locate defendants for whom he cannot find contact information. *Id.* at 1-2. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). Under 28 U.S.C. § 1915(e)(1), "[t]he court may request an attorney to represent any person unable to afford counsel." District courts may appoint counsel, and the Eighth Circuit has acknowledged the "express authority of the district court to make such appointments." *Nelson v. Redfield Lithograph Printing*, 728 F.2d 1003, 1004 (8th Cir. 1984) (citations omitted). "[T]he appointment of counsel should be given serious consideration by the district court if the plaintiff has not alleged a frivolous or malicious claim." *Id.* at 1005.

Factual complexity is not the only factor that a district court considers whether appointment of counsel is appropriate. *Johnson v. Williams*, 788 F.2d 1319, 1322 (8th Cir. 1986) (citation omitted). The Eighth Circuit considers "the factual complexity of the case, the ability of the indigent to investigate the facts, the existence of conflicting testimony, the ability of the indigent to present his claim and the complexity of the legal issues." *Abdullah v. Gunter*, 949

F.2d 1032, 1035 (8th Cir. 1991) (citing *Johnson*, 788 F.2d at 1322-23). Christians' second

amended complaint, briefs in opposition to defendants' motions for summary judgment,

responses to defendants' statements of undisputed material facts, and ability to serve discovery

all show that he capable of litigating his claims to this Court. Thus, Christians' motion for

appointment of counsel, Doc. 77, is denied. The Court remains open to the possibility of

appointing counsel if this case proceeds beyond the motions stage. It is one thing to well

represent one's position on paper to the court, and it is yet another to be able to adequately try a

case to a jury.

## VI.    Motion for Expert

Christians asks this Court to appoint an independent nutrition expert to "combat defense

exhibits of nutrition reports" and to show "the errors and bias in those reports." Doc. 110 at 1.

The DOC Defendants oppose this motion, arguing that while the Court can appoint an expert

under Federal Rule of Evidence 706, this is not the exceptional case that justifies an expert. Doc.

115 at 4. They further argue that an expert appointed under Rule 706 is to assist the factfinding

of the Court and should not be appointed for the benefit of one party. *Id.* at 4-5.

Although this Court granted Christians leave to proceed in forma pauperis under 28 U.S.C.

§ 1915, Doc. 18, this "does not provide for the appointment of expert witnesses to aid an indigent

litigant." *Dale v. Dooley*, 2015 WL 224969, at *4 (D.S.D. Jan. 15, 2015) (quoting *Hannah v.

United States*, 523 F.3d 597, 601 (5th Cir. 2008)). "A court may appoint an expert for indigent

prisoners under . . . Rule 706(a), but this purpose is to 'assist the trier of fact from a position of

neutrality, not to serve as an advocate.' " *Johnson v. Kaemingk*, 2020 WL 376589, at *1 (D.S.D.

Jan. 23, 2020) (quoting *Dale*, 2015 WL 224969, at *4).

At this time, there is no need for an expert to assist the trier of fact as this case is still in the motions stage. Further, after review of the motion, the questions Christians proposes to have the expert answer are positioned to serve Christians as an advocate. While an expert may ultimately be necessary in this case, an expert is not necessary at this time. Christians' motion for expert, Doc. 110, is denied.

## VII.   Motion to Seal

The DOC Defendants have filed a motion to seal copies of some of the nude images contained in Christians' art book that have been submitted as evidence. Doc. 127. The DOC Defendants argue that if the submitted images were served on Christians, he would receive copies of the materials that SDSP refused to provide him and would effectively circumvent DOC policy. *Id.* at 4. They argue that this Court should conduct an in-camera inspection of the images under seal in order to prevent Christians from "evad[ing] security restrictions by the simple expedient of filing suits and obtaining prohibited materials through discovery." *Id.* at 5 (quoting *Lindell v. McCaughtry*, 115 F. App'x 872, 876 (7th Cir. 2004)). Christians has not responded to this motion. This Court recognizes the concerns raised in this motion and agrees that these images can be reviewed in camera. The DOC Defendants' motion to seal, Doc. 127, is granted.

## VIII.   Motion to Extend Discovery

The Summit Defendants filed a motion to extend discovery on May 24, 2022. Doc. 132. Specifically, they seek to extend the discovery completion deadline until September 18, 2022, without extending any other deadlines in this case. *Id.* ¶ 11. Christians opposes this motion as untimely, although it was filed before the most recent motions deadline of June 30, 2022. *See* Doc. 133 at 1; Doc. 125. The Summit Defendants argue that an extension of this deadline will allow for further discovery after this Court rules on their pending motion for summary judgment.

*Id.* ¶ 12. But the proposed deadline of September 18, 2022, has passed. Thus, the Summit Defendants' motion to extend discovery, Doc. 132, is denied as moot. If further discovery is needed after this Court rules on the Summit Defendants' motion for summary judgment, the parties can address that issue at that time.

Accordingly, it is

ORDERED:

1. That the DOC Defendants' motion for summary judgment, Doc. 98, is granted on the following Eighth Amendment inadequate nutrition claims issues: that Christians' diet caused him to be at higher risk of diabetes, higher risk of high blood pressure, and higher risk of loss of thyroid function; and that his diet caused fainting spells and dizziness, fatigue, insomnia, frequent urination, frequent bowel movements, and high cholesterol.

2. That the DOC Defendants' motion for summary judgment, Doc. 98, is granted on Christians' First Amendment claim.

3. That the DOC Defendants' motion for summary judgment, Doc. 98, is otherwise denied.

4. That Christians' motion to submit a second amended complaint, Doc. 79, is granted as to his new Eighth Amendment inadequate nutrition claims against Pechous, Genie Birch, Greasman, Dawn Alumbaugh, Barnetche, Marjama, Winters, Padilla, Mullins, Hulscher, Becker, Hettig, Sorenson, Perret, Beth, and Summit Food Services in their individual capacities and in their official capacities for injunctive relief.

5.  That Christians' motion to submit a second amended complaint, Doc. 79, is granted as to his new Eighth Amendment inadequate nutrition claims against Driskie in his or her individual capacity only.

6.  That Christians' motion to submit a second amended complaint, Doc. 79, is granted as to his new First Amendment retaliation claims against Young, Christensen, and Stratman in their individual capacities.

7.  That Christians' motion to submit a second amended complaint, Doc. 79, is otherwise denied.

8.  The Clerk shall send blank summons forms and Marshal Service Form (Form USM-285) to Christians so that he may cause the complaint to be served upon defendants Pechous, Birch, Greasman, Alumbaugh, Barnetche, Marjama, Winters, Padilla, Mullins, Hulscher, Becker, Hettig, Sorenson, Perret, Beth, and Summit Food Services.

9.  Christians shall complete and send the Clerk of Courts a separate summons and USM-285 form for each new defendant. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summons. If the completed summons and USM-285 form are not submitted as directed, the complaint may be dismissed.

10. The United States Marshal Service shall serve the completed summonses, together with a copy of the Second Amended Complaint, Doc. 83, and this order, upon the new defendants.

11. The new defendants will serve and file an answer or responsive pleading to the amended complaint on or before 21 days following the date of service or 60 days if the new defendants fall under Fed. R. Civ. P. 12(a)(2) or (3).

12. Christians will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

13. That Christians' objection to this Court's order dismissing complaint against Lieutenant Maddox, Doc. 75, is overruled.

14. That the DOC Defendants' motion for protective order, Doc. 89, is denied as moot.

15. That Christians' first motion to compel, Doc. 76, is denied.

16. That Christians' second motion to compel, Doc. 80, is denied.

17. That Christians' motion for order that plaintiff may contact other inmates to collect affidavits or declarations, Doc. 81, is granted.

18. That Christians' motion for appointment of counsel, Doc. 77, is denied.

19. That Christians' motion for expert, Doc. 110, is denied.

20. That the DOC Defendants' motion to seal, Doc. 127, is granted.

21. That the Summit Defendants' motion to extend discovery, Doc. 132, is denied as moot.

22. That Christians' motion for time extension to reply to motion for summary judgment, Doc. 112, is denied as moot.

23. That Christians' motion to delay summary judgment, Doc. 113, is denied as moot.

24. That Christians' motion in opposition to summary judgment, Doc. 117, is denied as moot.

25. That Christians' motion in opposition to modify scheduling order, Doc. 133, is denied

    as moot.

DATED September _____, 2022.

                                               BY THE COURT:

ATTEST:
MATTHEW W. THELEN, CLERK

                                             Lawrence L. Piersol
                                             United States District Judge