UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MARK CHRISTIANS, | 4:20-CV-04083-LLP |
| Plaintiff, | |
| vs. | ORDER GRANTING THE SUMMIT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RULING ON MISCELLANEOUS MOTIONS |
| DARRIN YOUNG, in his individual capacity; DAN SULLIVAN, in his official capacity; TROY PONTO, Deputy Warden SDSP, individual and official capacity; JESSICA COOK, Associate Warden SDSP/Jameson, individual and official capacity; BRENT FLUKE, Warden MDSP, individual and official capacity; REBECCA SCHIEFFER, Associate Warden MDSP, individual and official capacity; ALEX REYES, Associate Warden MDSP, individual and official capacity; CODY HANSON, Unit Manager Jameson, individual and official capacity; SETH HUGHES, Unit Manager Jameson, individual and official capacity; NANCY CHRISTENSEN, Unit Manager MDSP, individual and official capacity; DEREK EKEREN, Unit Coordinator Jameson, individual and official capacity; DEB EILERS, Unit Coordinator MDSP, individual and official capacity; LAURIE STRATMAN, Unit Coordinator MDSP, individual and official capacity; JULIE STEVENS, Case Manager MDSP, individual and official capacity; JARRED ANDERSON, KELLY BUCHHOLZ, CBM/Summit Food Services Worker MDSP, individual and official capacity; JOHN TRIERWEILER, Summit District Manager, individual and official capacity; KEVIN TRIERWEILER, Site Manager Jameson, individual and official capacity; PAMELA THOMAS, Executive Chef, Summit Corrections, individual and official capacity; UNNAMED SUMMIT LICENSED DIETITIAN(S), individual and official capacity; DIETARY ASSISTANTS, individual and | |

1

official capacity; DIRECTORS OF
OPERATIONS, individual and official capacity;
DISTRICT MANAGERS, individual and
official capacity; FOOD SERVICE
DIRECTORS, individual and official capacity;
ASSISTANT FOOD SERVICE DIRECTORS,
individual and official capacity; FOOD
SERVICE WORKERS, individual and official
capacity; JUSTIN BARTHEL, Director of
Dietary Summit, individual and official capacity;
CRAIG MOUSEL, Property Officer, SDSP,
individual and official capacity; MIKE
LEIDHOLT, South Dakota Secretary of
Corrections, individual and official capacity;
KELLIE WASKO, official capacity,
PECHOUS, Unit Coordinator, individual and
official capacity; GENIE BIRCH, Program
Manager, individual and official capacity;
GREASMAN, Correctional Officer, individual
and official capacity; DAWN ALUMBAUGH,
Correctional Officer, individual and official
capacity; BARNETCHE, Correctional Officer,
individual and official capacity; MARJAMA,
Correctional Officer, individual and official
capacity; WINTERS, Correctional Officer,
individual and official capacity; PADILLA,
Correctional Officer, individual and official
capacity; MULLINS, Correctional Officer,
individual and official capacity; HULSCHER,
Correctional Officer, individual and official
capacity; DRISKIE, Former Deputy Warden,
individual capacity; BECKER, Lieutenant,
individual and official capacity; HETTIG,
Lieutenant, individual and official capacity;
PERRET, Lieutenant, individual and official
capacity; BETH, Summit Supervisor, individual
and official capacity, SUMMIT FOOD
SERVICE, individual and official capacity;
JESSICA WALDNER, individual and official
capacity,

Defendants.

Plaintiff, Mark Christians, is an inmate at the South Dakota State Penitentiary (SDSP). He filed a pro se civil rights lawsuit under 42 U.SC. § 1983. Doc. 1. Pending before the Court is a motion for summary judgment filed by defendants Jarred Anderson, Kelly Buchholz, John Trierweiler, Pamela Thomas, Justin Barthel, Unnamed Summit Licensed Dieticians, Unnamed Summit Dietary Assistants, Unnamed Summit Directors of Operations, Unnamed Summit District Managers, Unnamed Summit Food Service Directors, Unnamed Summit Assistant Food Service Directors, and Unnamed Summit Food Service Workers (the "Summit Defendants").[1] Doc. 135. Christians opposes this motion and asks this Court to dismiss it as untimely. Docs. 139, 143. The Summit Defendants oppose Christians' motion to dismiss their summary judgment motion as untimely. Doc. 146. Also pending before the Court are defendant Dawn Alumbaugh's motion for extension of time to file an answer, Doc. 153, defendant Summit Food Service's motion to join the Summit Defendants' motion for summary judgment, Doc. 156, Christians' motion to amend his complaint, Doc. 145, Christians' motion to find the DOC Defendants in contempt of court and subsequent motion to withdraw his contempt motion, Docs. 157, 162, Christians' motion for a temporary restraining order, Doc. 158, the DOC Defendants' motion to extend the time to respond to Christians' motions, Doc. 161, and Christians' motion for appointment of counsel, Doc. 182. For the following reasons, this Court grants the Summit Defendants' motion for summary judgment.

I.      **Christians' Motion to Amend his Complaint**

---

[1] As discussed below, Summit dietician Jessica Waldner is substituted for defendant Unknown Summit Dietician. *See* Doc. 145. Also, Summit Food Services joins this motion for summary judgment. *See* Doc. 156. Thus, the "Summit Defendants" includes Waldner and Summit Food Services.

Christians has filed a motion to amend his complaint by substituting Jessica Waldner for defendant Unknown Summit Dietician. Doc. 145. Defendants do not oppose this motion. Thus, Christians' motion to amend his complaint to substitute Jessica Waldner as a defendant, Doc. 145, is granted.

**II.    Christians' Motion to Dismiss the Summit Defendants' Motion for Summary Judgment as Untimely**

Christians moves to dismiss the Summit Defendants' motion for summary judgment as untimely. Doc. 143. Under this Court's amended scheduling order, all motions were due on or before June 30, 2022. Doc. 125. The Summit Defendants filed their motion for summary Judgment, memorandum in support, statement of undisputed facts, and related exhibits on June 30, 2022. Doc. 146 ¶ 2. They were informed by the Deputy Clerk on July 5, 2022, that their filings were improper because their motion, memorandum, and statement of undisputed facts needed to be submitted as separate filings. *Id.* ¶ 3 (citing Doc. 146-1). They were also instructed to provide descriptions for every exhibit or attachment. Doc. 146-1. The Summit Defendants then submitted a notice of filing error and refiled the documents as instructed. Doc. 146 ¶ 4.

Christians argues that the new summary judgment motion should be dismissed as untimely. Doc. 143 at 1. He argues that the corrected motion places an undue burden on him because he had already responded to the Summit Defendants' first filings by the time he received the corrected filings. *Id.* Defendants respond that the only difference between the first filings and the corrected filings is that the motion for summary judgment, memorandum, and statement of undisputed facts, which were substantively the same, were filed separately in the corrected filings. Doc. 146 ¶ 6. Thus, they argue that Christians' response, which he was able to file despite the error, applies equally to the corrected filings. *Id.*

4

This Court agrees with the Summit Defendants. Because the filing error had no impact on Christians' ability to respond, his motion to dismiss the Summit Defendants motion for summary judgment as untimely, Doc. 143, is denied.

III.   **Summit Food Service's Motion to Join the Summit Defendants' Motion for Summary Judgment**

Summit Food Services was named as a defendant in Christians' second amended complaint. Doc. 83 ¶ 32(J). Summit Food Services seeks to join the Summit Defendants' motion for summary judgment, arguing that the claims against them are "similar, if not identical, to the allegations asserted against Summit Defendants[.]" Doc. 156 at 3. Christians does not oppose this motion. Thus, Summit Food Services' motion to join the Summit Defendants' motion for summary judgment, Doc. 156, is granted.

IV.   **The Summit Defendants' Motion for Summary Judgment**

A.   **Factual Background**

The Court recites the relevant facts in the light most favorable to Christians because the Summit Defendants move for summary judgment. Where facts relevant to the remaining claims are disputed, both parties' averments are included.

Christians brings an Eighth Amendment conditions of confinement claim against the Summit Defendants, alleging that he received inadequate nutrition while incarcerated at SDSP and at the Mike Durfee State Prison in the SD DOC prison system. *See* Doc. 83 ¶¶ 4, 36, 145. Christians weighed 307 pounds on March 8, 2017, and 221 pounds on August 13, 2018. Doc. 73-1 at 1. He acknowledged on April 10, 2017, that his weight was excessive. Doc. 137 ¶ 9. The Summit Defendants argue that Christians' weight was a result of his psychiatric medication, while Christians claims that the high-carbohydrate, low-protein prison diet was a factor. *Id.* ¶ 10; Doc. 142 ¶ 10. On October 6, 2017, Christians told medical staff that he stopped taking his

psychiatric medication. Doc. 137 ¶ 11. According to Dr. Mary Carpenter, the Correctional Health Care Medical Director and a former defendant in this lawsuit, Christians stopped taking this medication around June 23, 2017. Doc. 103 ¶¶ 2, 6. On April 8, 2019, DOC medical staff told Christians that his weight loss over the prior two years was adequate. Doc. 137 ¶ 18.

Christians was diagnosed with celiac disease on or about October 24, 2018. Doc. 137 ¶ 12. He was then placed on a gluten-restrictive diet. *Id.* ¶ 13. The Summit Defendants contend that "Summit was required to prepare and serve [Christians] with a gluten-restrictive diet[,]" but Christians claims that he did not always receive a gluten-free diet. *Id.* ¶ 14; Doc. 142 ¶ 14. Although Christians told medical staff on April 25, 2019, that he was following his gluten-free diet strictly, his commissary purchases show that he purchased some items containing gluten. Doc. 137 ¶¶ 19-20. Christians states that he followed his gluten-free diet "for about 18-22 months but ended it when symptoms did not go away." Doc. 142 ¶ 20.

Christians claims that his celiac disease diagnosis was "reversed" by Dr. Steve Gutnik, the gastroenterologist who diagnosed him. *See id.* ¶ 12. Christians told Dr. Gutnik that he was eating over 4,000 calories a day on July 26, 2019. Doc. 104 ¶ 31. Christians claims that these estimates were based on his belief at the time that he was receiving nearly 3,000 calories a day through his meals, and he claims that he has since learned that he was only receiving 1,750 calories a day at the time. Doc. 120 ¶ 29. At a visit on April 25, 2019, Dr. Gutnik found that Christians' circumstances were "complex" and that while his biopsies "suggested the possibility of celiac disease . . . [his] tissue transglutaminase and levels were normal. Doc. 99-66 at 1, 3. Dr. Gutnik described this combination as being "quite rare but not impossible." *Id.* at 3. He "could not explain the situation" and was "bother[ed]" by Christians' case, stating that "something is not right." *Id.* at 1, 3.

Christians later informed Dr. Gutnik that he believed he had been eating fewer calories than he initially told Dr. Gutnik, and Dr. Gutnik replied in a letter dated January 19, 2022, that "[i]n regard to whether you have gluten disease or not, I can say with all honesty I do not know with certainty." *See* Doc. 118 at 26. Dr. Gutnik explained that the indicators of celiac disease were unclear because Christians' TTG level was normal but his biopsies were highly suggestive of celiac disease. *Id.* He stated that Christians' diagnosis of celiac disease was based in part on his losing weight while eating a high-calorie diet. *Id.* Dr. Gutnik explained in the letter that if Christians had recently gained weight on a gluten-rich diet, he likely did not have celiac disease. *Id.* at 27.

Summit Food Service was the food service provider at SD DOC facilities from the date that Christians alleged he began losing weight to the time that the Summit Defendants filed their motion for summary judgment. *See* Doc. 137 ¶ 4. The Summit Defendants claim that they do not approve or deny inmate meal requests and that they only respond to inmate requests approved by the DOC. *Id.* ¶ 5. Christians disputes this claim, alleging that Summit dietician Jessica Waldner denied his "requests for additional fruit, vegetables, and dairy products at a telephone conference in May or June of 2021." *See* Doc. 142 ¶ 5. The Summit Defendants state that "[a]ll diets served to inmates within the SDDOC comply with the National Institute of Health — Dietary Recommended intakes and Recommended Dietary Allowances guide and contain a weekly average of 2,700 calories as required by the SDDOC contract."[2] Doc. 137 ¶ 23. They further

---

[2] The Summit Defendants states that the "weekly average" for inmate diets is 2,700 calories. Doc. 137 ¶ 23. This is repeated in the Summit Defendants' statement of undisputed material facts, the affidavit of Waldner, twice in the Summit Defendants' memorandum in support of its motion for summary judgment, and thrice in the Summit Defendants' reply to Christians' response to its motion for summary judgment. *Id.*; Doc. 137-4 ¶ 7; Doc. 136 at 3, 16; Doc. 144 at 11-12, 14. Christians noted this discrepancy in his response brief, stating that Summit "should serve that amount daily." Doc. 140 at 3. This Court can only assume that this is an error on the

7

claim that "[t]he gluten-restrictive diet contains a variety of meat, gluten-free starches, veggies, fruit, gluten-free tortillas, milk, fortified drinks, and a gluten-free dessert." *Id.* ¶ 24. Christians responds that "Summit does not follow menus or comply with a gluten-free diet." Doc. 142 ¶ 24. The Summit Defendants contend that "[a]ll Summit staff, including inmates working in the kitchen, receive the requisite training to ensure that all foods are served in an appropriate and sanitary manner." Doc. 137 ¶ 27. Christians disputes this assertion. Doc. 142 ¶ 27.

   In his complaint, Christians alleged that he received approximately 1,750 calories per day and that his recommended daily calorie total is approximately 3,000 calories per day. Doc. 83 ¶ 40. Christians has submitted detailed food journals tracking his caloric intake during January 2020 and April 2021. Doc. 114 at 6-23. He claims that he used the USDA's Nutritive Value of Food Guide to calculate his caloric intake. Doc. 119 ¶¶ 10-12. According to his journal, Christians averaged 1,979.18 calories a day from January 1, 2020, to January 11, 2020, and 2,014.71 calories a day from April 23, 2021, to April 29, 2021. *See* Doc. 114 at 6-23. Christians also submitted a caloric needs chart from the USDA Dietary Guidelines for Americans, 2020-2025, which states that a moderately active male of his age requires 2,600 calories a day and an active male of his age requires 2,800 calories a day. *See* Doc. 74-1 at 39.

   Christians alleges that his inadequate diet caused weight loss, irregular bowel movements, urinary issues, muscle atrophy, fainting spells, H. Pylori, and a broken ankle after a fainting spell. Doc. 142 ¶ 21. The Summit Defendants claim that Christians' medical issues are

---

part of the Summit Defendants and that Summit did not actually serve a diet of 2,700 calories per week, as even Christians only alleges that "daily calories are often as low as 1,200[.]" *See id.* Further, although the Summit Defendants state that the contract with the DOC requires 2,700 calories, they do not specify where in the contract this is mandated. *See* Doc. 137 ¶ 23 (citing Doc. 137-2). This Court has reviewed the contract provided by the Summit Defendants and can find no reference to a daily or weekly calorie requirement. *See* Doc. 137-2.

unrelated to the food provided by Summit. Doc. 137 ¶ 21. They further claim that Christians

participated in a hunger strike from March 31, 2021, to May 2, 2021, and that he lost

approximately 47 pounds as a result. Doc. 142 ¶ 22. Christians disputes this number, claiming

that he lost 60 pounds during the hunger strike, and argues that the hunger strike is not relevant

because it occurred four years after he originally lost weight. Doc. 137 ¶ 22.

### B.    Legal Standard

The Court shall grant a motion for summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A summary judgment motion must be supported by evidence on the

record, which may include affidavits or declarations based upon personal knowledge. Fed. R.

Civ. P. 56(c). The non-moving party is entitled to the benefit of having all reasonable inferences

resolved in his or her favor, but the non-moving party must present specific facts showing a

genuine issue for trial. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1207 (8th Cir. 2013)

(citation omitted). That is, a non-moving party must present "sufficient probative evidence"

capable of supporting a finding in his or her favor, not "mere speculation, conjecture, or

fantasy." *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc) (quoting

*Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985)).

Section 1983 creates civil liability for a person who, acting under the color of state law,

deprives another of his or her federal constitutional or statutory rights. 42 U.S.C. § 1983.

However, "[q]ualified immunity shields a government official from liability in a § 1983 action

unless the official's conduct violates a clearly established constitutional or statutory right of

which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir.

2014) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To overcome the defense of

qualified immunity, the plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Clearly established" law cannot be demonstrated at a high level of generality; rather, it must put officers on "fair notice." *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 613, 616 (2015) (citations omitted). To show that a right was clearly established, the plaintiff must provide either "controlling authority . . . which clearly established the rule on which [he or she] seek[s] to rely" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

## C.   Legal Analysis

### 1.   Unknown Defendants

Under Federal Rule of Civil Procedure 4(m), claims against a defendant who is not served within 90 days after the filing of the complaint can be dismissed either by the court after notice to the plaintiff, or on motion. Here, the Summit Defendants have filed a summary judgment motion which seeks in part to dismiss claims against the unknown Summit defendants. Doc. 136 at 6-7. The Summit Defendants argue that the remaining unknown Summit defendants must be dismissed because Christians "has been allowed to engage in reasonable discovery and has failed to seek out the identities of any unknown defendant." *Id.* at 7. They argue that the remaining unknown defendants have not been served. *Id.*

10

Christians responds that he has asked the Summit Defendants for information without a reply and that he filed a motion to compel Summit Defendants to provide information, which they resisted. Doc. 140 at 5. He claims that he did not know, based on the Summit Defendants' prior responses, that they were responsible for producing information on the unknown defendants. *Id.* He further claims that he filed a motion for an attorney or investigator to help him find information and that the Summit Defendants have not been "forthright and honest[.]" *Id.*

The Summit Defendants argue that any unknown defendants could have been identified through discovery and note that Christians successfully served two sets of written discovery upon them in this case. Doc. 136 at 6-7. Although "courts must be sensitive to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights," *see Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980), Christians has successfully filed discovery in this case and cannot rely merely on the fact that he did not know he could ask about the unknown defendants in discovery. Thus, the Summit Defendants are granted summary judgment regarding claims against the remaining unknown Summit defendants.

### 2.   Eighth Amendment Claim

The Eighth Amendment's prohibition against cruel and unusual punishment requires prisoners to be provided with nutritionally adequate meals to maintain health. *See, e.g., Cody v. CBM Corr. Food Servs.*, 250 F. App'x 763, 765 (8th Cir. 2007); *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980). "Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Constitution. Rather, the Constitution is only violated if the food provided is inadequate to maintain good health." *Jones v. Allen*, 2007 WL 2725218, at *4, 2007 U.S. Dist. LEXIS 105014, at *9 (W.D. Ark. Sept. 18, 2007) (citing *Burgin v. Nix*, 899 F.2d 733, 734-35

(8th Cir. 1990) (per curiam)). In *Ingrassia v. Schafer*, the Eighth Circuit held that it is "clearly established that a prisoner may properly allege a constitutional violation by demonstrating significant weight loss or other adverse physical effects from lack of nutrition." 825 F.3d 891, 899 (8th Cir. 2016).

To show deliberate indifference, an inmate must demonstrate that a prison official knew the "inmate face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Kenyon v. Dooley*, 2014 WL 3700878, at *3, 2014 U.S. Dist. LEXIS 101673, at *10 (D.S.D. July 25, 2014) (alterations in original) (quoting *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997)). An inmate must show that defendants "failed to act despite . . . knowledge of a substantial risk of serious harm." *Ingrassia*, 825 F.3d at 897 (omission in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Thus, Christians must show 1) that the nutrition he received was inadequate to maintain good health or that he suffered weight loss or other adverse physical effects as a result of his diet; and 2) that the Summit Defendants were aware of and deliberately indifferent to the inadequate nutrition.

### a.      Qualified Immunity

The Summit Defendants argue that Christians has failed to "satisfy the subjective requirement [of qualified immunity], as Summit employees could not have reasonably known that [a violation of Christian's Eighth Amendment right to adequate nutrition] was occurring." Doc. 136 at 9. This Court must determine whether the defense of qualified immunity is available to the Summit Defendants before evaluating their argument.

The Summit Defendants correctly assert "that contracted food service providers at prisons . . . are government actors for purposes of constitutional violations." *Id.* at 8. "But private individuals, as state actors, are not necessarily entitled to assert the defense of qualified

immunity in defending section 1983 claims." *Davis v. Buchanan County*, 11 F.4th 604, 617 (8th Cir. 2021) (citing *Domina v Van Pelt*, 235 F.3d 1091, 1096 (8th Cir. 2000)). To determine whether the Summit Defendants can assert qualified immunity, this Court applies the factors set out by the Supreme Court in *Richardson v. McKnight*, 521 U.S. 399 (1997), and *Filarsky v. Delia*, 566 U.S. 377 (2012). *Davis v. Buchanan County*, 11 F.4th at 617. "[T]he availability of qualified immunity to state actors depends on two factors: the 'general principles of tort immunities and defenses applicable at common law, and the reasons we have afforded protection from suit under § 1983.' " *Id.* (quoting *Filarsky*, 566 U.S. at 384).

This Court has previously found that qualified immunity is not available to a private food provider defendant. *Dale v. CBM Corr. Food Servs.*, 2018 WL 3320842, at *3, 2018 U.S. Dist. LEXIS 111854, at *6-10 (D.S.D. July 5, 2018). In *Dale*, this Court noted that "[i]n analyzing which situations qualified immunity should or should not be applied, the Courts have considered avoiding unwarranted timidity on the part of those engaged in the public's business as being 'the most important special government immunity-producing concern.' " *Id.* at *3, 2018 U.S. Dist. LEXIS 111854, at *9-10 (quoting *Filarsky*, 566 U.S. at 390). This Court then compared the food provider defendant to the privately employed prison guards discussed in *Filarsky*, where "the various incentives characteristic of the private market . . . ensured that the guards would not perform their public duties with unwarranted timidity or be deterred from entering that line of work." *Id.* at *3, 2018 U.S. Dist. LEXIS 111854, at *9 (quoting *Filarsky*, 566 U.S. at 393). This Court concluded that "[t]he concern of unwarranted timidity is more applicable to guards than to those providing food services." *Id.* at *3, 2018 U.S. Dist. LEXIS 111854, at *10. As to marketplace competition, another factor under *Richardson*, this Court found that "[t]here are surely more entities providing institutional food services than there are providing full prison

13

operation. In addition, a corporation running a prison for a governmental entity could more likely anticipate prisoner claims than would a food service to a prison, or at least a greater volume of claims." *Id.* Thus, both timidity and marketplace competition weighed more heavily in favor of qualified immunity being unavailable to a food service provider than they did when the Supreme Court found that qualified immunity was unavailable to private prison guards in *Richardson. See id.*; *Richardson*, 521 U.S. at 409-12.

This Court's analysis in *Dale* applies here, and the Summit Defendants are not entitled to assert the defense of qualified immunity. Because qualified immunity is not available to the Summit Defendants, this Court need only address whether the Summit Defendants deprived Christians of his constitutional rights.

### b.    Deliberate Indifference

"To demonstrate a constitutional violation, [Christians] must show that the defendants were deliberately indifferent to his nutritional needs, that is, 'failed to act despite . . . knowledge of a substantial risk of serious harm.' " *Ingrassia*, 825 F.3d at 897 (omission in original) (quoting *Farmer*, 511 U.S. at 842). The DOC Defendants had knowledge of Christians' weight loss and other claims of health problems because of his diet. *See* Doc. 147 at 38-43. Those claims have already been determined to go forward. *Id.* at 43. There has been no such showing as to the Summit Defendants. This Court need not address the nutritional adequacy of Christians' diet or the impact of Christians' diet on his health because, even assuming that the food he was provided by Summit was inadequate and that his health suffered as a result of the food, Christians cannot show that the Summit Defendants were sufficiently aware of a substantial risk of serious harm as to render them deliberately indifferent.

The Summit Defendants argue that they have not been deliberately indifferent to Christians' dietary needs. Doc. 136 at 22-24. They argue that "SDDOC staff, not Summit Defendants, review and address complaints by inmates." *Id.* at 24. They claim that they follow orders from the DOC regarding inmate diet alterations or additions and that "[t]here are no instances wherein Summit Defendants received an order from the SDDOC relating to [Christians'] diet and refused to comply with such orders." *Id.* They further claim that had they "received a legitimate complaint" demonstrating that Christians' diet did not comply with the contract or with national dietary standards, they "would be required to address it[,]" but state that "[s]uch a scenario simply did not occur[.]" *Id.*

Christians raises three arguments regarding the Summit Defendants' awareness of the risk posed to him by his diet. First, he argues that Summit knowingly served spoiled and expired food and that they intentionally altered expiration dates on food products in order to serve expired food. Doc. 140 at 20. Second, he argues that Summit failed to properly train inmate kitchen workers and that they were aware of the lack of training, resulting in improperly prepared food. *See id.* at 12-13, 16, 20. Third, he claims that his grievances filed with the DOC were forwarded on to Summit, making Summit aware of the food's failure to provide him adequate nutrition and to adhere to the dietary guidelines of Summit's contract with the DOC. *See id.* at 20-21.

### (1) Expired Food

Christians claims that Summit staff "chang[ed] expiration dates on foods and directed inmates to do the same" and that Summit staff "served knowingly spoiled rotten food." *Id.* at 20. The Summit Defendants contend that they do not serve expired food and did not knowingly change expiration dates, arguing that Christians has presented no evidence of these practices

15

beyond "self-serving, conclusory affidavits[.]" Doc. 136 at 23. Christians claims that other inmates have first-hand knowledge of DOC kitchen practices. Doc. 140 at 20. Christians has previously filed a motion to require the DOC to allow him to contact these inmates, which this Court granted. Doc. 81; Doc. 147 at 62-63. Christians then filed a motion to hold the DOC Defendants in contempt for refusing to follow that order, but he has since filed a motion to withdraw that motion after he was allowed to attempt to contact the inmates in question. Docs. 157, 162. Of the three inmates Christians sought to contact, one was released from DOC custody and thus the DOC could not arrange for Christians to contact him, one expressed a desire not to be involved in this lawsuit, and one provided an affidavit. *See* Doc. 165 at 7-8; Doc. 163.

The inmate who provided an affidavit, Kevin Brown, claims that he "received rancid spoiled meat on many occasions" and that, when he reported this to DOC officials and Summit staff, the food "would be replaced most often with the same rancid meat." Doc. 163 at 1. He also claims that the spoiled food would not always be replaced, and when it was not replaced, he could not eat the food. *Id.* But Brown makes no claims that Summit knowingly served spoiled or expired food, only that the food served was spoiled on many occasions and that replacements were often also spoiled. *See id.* Brown also makes no claims that Summit intentionally altered expiration dates. *See id.* Thus, because Christians presents no evidence as to these claims, the Summit Defendants are entitled to summary judgment on Christians' claims that Summit knowingly served expired food and intentionally altered expiration dates.

### (2)   Failure to Train

Christians claims that no inmate has ever received a training certificate because the training program does not exist. Doc. 140 at 13. He cites the affidavit of Samuel Lint, another

inmate at SDSP.[3] *Id.* Lint, who states that he worked extensively in restaurants before being incarcerated, claims that he has received a copy of the contract between the DOC and Summit in order to investigate dietary issues at SDSP. Doc. 95 at 1. Aside from criticizing the quality and nutritional content of the food served, Lint states that Summit is required to provide food safety training for inmate kitchen workers under the contract. *Id.* at 2; *see also* Doc. 136 at 23 (stating that "all Summit staff, including inmate workers, receive the requisite training to ensure that all foods are served in an appropriate manner" (citing Doc. 137-3 ¶¶ 8, 9)). Lint claims that this training, which should have begun in 2014, has never occurred. Doc. 95 at 2.

The Summit Defendants cite the affidavit of Summit Director of Dietary Services Justin Barthel, a defendant in this lawsuit, for the proposition that inmate workers undergo training. Doc. 136 at 23 (citing Doc. 137-3 ¶¶ 8, 9). They also cite their contract with the DOC, which details Summit's training programs for employees. Doc. 144 at 13-14 (citing Doc. 137-2 at 79-83). Summit Defendants are correct that the contract describes this training, but the existence of a training program in a contract alone does not establish that the training in question occurred.[4] On December 11, 2019, Christians received an Informal Resolution Response to a grievance he submitted regarding the lack of training. Doc. 1-1 at 242. In this response, a DOC official states that Summit was contacted about training and that "Summit [was] in the process of

---

[3] Christians also cites the affidavits of inmates Silver McClanahan and Eric Coon. Doc. 140 at 13. Although both McClanahan and Coon have provided affidavits describing poor food quality, serving sizes, and preparation in DOC facilities, neither speak to the lack of training of inmate kitchen workers. *See* Docs. 9, 96, 108.

[4] In fact, the Summit Defendants argue that "if [they] failed to follow the requirements of the SDDOC contract, their contract would likely not be renewed by the SDDOC." Doc. 144 at 6. Although this Court has no knowledge of the reasons for the change, Summit is no longer the DOC food provider. *See* Doc. 177 at 5 n.2. ("The record will reflect that Summit Foods is no longer under contract with the SDDOC to provide meals to the inmate population." (citing Doc. 179 ¶ 10)).

reimplementing a basic food safety training for kitchen workers." *Id.* This suggests that there was no training program in place on or around that date and that Summit was aware of the lack of a training program. *See id.*

While this Court cannot determine whether any training program was implemented at the times in question, Christians presents no evidence that the lack of a training program caused or contributed to the alleged inadequate nutrition. *See* Doc. 140 at 12-13, 16, 20. He claims that his H. Pylori infection was "likely" caused by "the unsanitary practices of food services[,]" but he provides no evidence to back up this assertion. *See id.* at 17. Similarly, he claims that inmate workers use the wrong serving spoon "daily[,]" resulting in inadequate servings, but this claim is only supported by his own assertions. *Id.* at 16. In his affidavit, Lint states that "untrained, inexperienced kitchen workers fumble through the process with no guidance" because of the lack of training. Doc. 95 at 2. Lint states that the food quality is very poor because kitchen workers do not know how to prepare the food. *Id.* He further states that the servings of meat in meals are often too small. *Id.*

At most, Christians provides evidence, through Lint's affidavit, that the lack of training resulted in poor-tasting meals that sometimes had an insufficient quantity of meat. *See* Doc. 140 at 12-13; Doc. 95 at 2. Christians fails to connect the alleged lack of training to the inadequate diet that he claims violates his constitutional rights or to any impact that diet has had on his health. Thus, even if the Summit Defendants were aware of the lack of training, they were not aware of a substantial risk of serious harm posed to Christians by the lack of training. The Summit Defendants are entitled to summary judgment on this issue.

        **(3)**      **The Summit Defendants' Awareness of Christians' Food Complaints**

Christians argues that the Summit Defendants were deliberately indifferent to his inadequate nutrition because the grievances that they received made them aware of his allegations. Doc. 140 at 20-21. He further argues that emails between Summit employees discussing his grievances demonstrate that Summit was aware of the issues in question. *Id.* The Summit Defendants reply that their "mere knowledge that [Christians] took issue with the meals serve [sic] does not rise to the level of deliberate indifference." Doc. 144 at 14 (citing *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998)).

The record reflects that some of Christians' complaints did reach Summit. Christians submitted an Informal Resolution Request to DOC officials on December 26, 2018, in which he stated that his gluten-free diets were too small and that he found it "hard to believe that this main part of our meal supplies enough calories, fats, carbohydrates, and proteins to keep a body functioning normally." Doc. 1-1 at 66. This grievance contained details about portion sizes, stating that when chili and grilled cheese are served as the regular diet, he receives three small corn tortillas and two to three slices of imitation cheese. *Id.* DOC Unit Coordinator Deb Eilers replied: "After consulting with Food Service, Special Diet trays are served according to serving size as identified by a Registered Dietician." *Id.* at 67. Christians submitted another request on April 15, 2019, claiming that his gluten-free heart-healthy meals did not provide the daily recommended quantities of nutrients and were calorically insufficient. *Id.* at 104. He described the portion size as "3 corn tortillas, 1 serv. Corn chips, 3 prewrapped pasturized [sic] prepared cheese slices, ¼ c. canned peaches, 1 c. Jello." *Id.* He also included his estimation that the meal contained 590 calories, 30 grams of fat, 63 grams of carbohydrates, and 16 grams of protein. *Id.*

19

Eilers replied that "CBM[5] has stated that all meals served are approved by a licensed Dietician
and meet nutritional requirements, that is why the meals are acceptable to serve." *Id.* at 105.

Christians submitted further Informal Resolution Requests in which he claimed that his
meals did not follow Summit's contract guidelines with the DOC and USDA dietary guidelines.
*See, e.g.*, Doc. 140-1 at 6-7. In one grievance dated November 5, 2019, Christians described the
differences between the requirements of the USDA MyPlate Guide and the meals that he had
been receiving in terms of fruit, vegetables, grains, protein, and dairy per day. *Id.* He also
referenced the issues with "health, well-being, self-esteem, self-worth, overall attitude and
feelings of security as well as other related problems that can arise out of a poor diet and calorie
deficit over time." *Id.* at 7. In a response dated November 11, 2019, DOC Unit Coordinator
Darek[6] Ekeren summarized Christians' complaints as a "claim that the USDA MyPlate Guide is
not being used as a basis of menu planning" and a "claim that there are discrepancies with the
amount of fruits, vegetables, dairy, and protein provided[.]" *Id.* at 8. He then assured Christians
that these issues, including the grievance to which he was responding, "ha[d] been relayed to the
proper authorities." *See id.*

Emails between Ekeren and Summit officials submitted by Christians show a discussion
regarding Christians' complaints. Doc. 140-1 at 1-2. On November 5, 2019, Ekeren emailed
Kevin Trierweiler, a Summit official, to notify him that Christians had filed 20 Informal
Resolution Requests regarding food issues between December 2018 and October 2019. *Id.* at 2.
Ekeren attached four of the requests, which claimed that inmates were not given comment cards

---

[5] CBM is the prior name of Summit Food Service.
[6] Christians refers to this defendant as Derek Ekeren in his complaint. Doc. 83 at 1. According to
the email chain provided by Christians, the defendant's name is Darek Ekeren. *See* Doc. 140-1 at
2.

to provide Summit feedback as required by the contract between Summit and the DOC, that Christians was receiving Jello every day in violation of the contract's requirement that desserts be varied, that Christians was only receiving milk with breakfast rather than with breakfast and lunch as required by the contract, and the grievance described above that claimed the current menu did not comply with the USDA MyPlate Guide as required by the contract and provided a description of how the diet was not in compliance, including a reference to caloric deficit. *See id.* Later that day, Ekeren forwarded two more Informal Resolution Requests from Christians to Kevin Trierweiler that stated that inmates were not receiving Grade A medium eggs and Grade A or B slices of cheese as required by the contract. *Id.*

Kevin Trierweiler forwarded these concerns to two other Summit Officials, John Trierweiler and Jessica Waldner. *See id.* Waldner replied the next morning, "I think we can use the same reply for this as yesterday. 'Menus are planned according to contract requirements.' " *Id.* at 1. Kevin Trierweiler then asked Waldner, "Does the contract state any of this crap?" *Id.* Waldner replied that "[t]he contract does state grades, however before we went out for bid I confirmed with Cashwa[7] that they were able to conform to these grades. They said they conformed to these grades so I have no concern we are not meeting them purchasing from Cashwa[.]" *Id.* Whether Cash-Wa's assurances that their food conforms to contract requirements were sufficient to render the Summit Defendants not deliberately indifferent cannot be answered at this time. Based on the record before this Court, Cash-Wa appears to have provided assurances to Summit at the time that Summit contracted with Cash-Wa. *See* Doc. 140-1 at 1. There is no evidence before this Court that Waldner or any other Summit Defendant followed up with Cash-

---

[7] According to the Summit Defendants, Cash-Wa Distributing Co. is a vendor that provides food served at DOC facilities. Doc. 136 at 23.

Wa after receiving Christians' complaints. *See id.* At the same time, even if Cash-Wa were supplying food that did not conform to the contract or to USDA guidelines, this would only violate the Eighth Amendment if the food served to Christians were inadequate to maintain good health or caused him to suffer weight loss or other adverse physical effects. *See Ingrassia*, 978 F.2d at 899.

The record shows that the Summit Defendants were aware of some of his complaints regarding the food at DOC facilities. *See* Doc. 140-1 at 1-2. Some of these complaints were mere comments on food quality and nonactionable food preference, and some of the complaints that reached Summit discussed inadequate serving sizes, caloric intake, and nutritional makeup. *See id.* at 1-2, 6-8. The Summit Defendants may have been aware of Christians' descriptions of the portion sizes he received and his estimations of calories, fat, carbohydrates, and protein in his meals. *See* Doc. 1-1 at 66-67, 104-05. Further, the Summit Defendants were aware of the lack of comment cards and their limiting effect on inmates' ability to be heard. *See* Doc. 140-1 at 2. But there is no evidence before the Court that any of the complaints that reached the Summit Defendants made them aware that Christians lost weight or that his health suffered as a result of the food. *See* Doc. 1-1 at 66-67, 104-05; Doc. 140-1 at 1-2, 6-8.

As discussed above, in order to show that the Summit Defendants were deliberately indifferent to his nutritional needs, Christians must show that they "failed to act despite . . . knowledge of a substantial risk of serious harm." *See Ingrassia*, 825 F.3d at 897 (omission in original) (quoting *Farmer*, 511 U.S. at 842). While some of Christians' complaints reached the Summit Defendants, these complaints discussed food quality, quantity, and services at DOC facilities. *See* Doc. 1-1 at 66-67, 104-05; Doc. 140-1 at 1-2, 6-8. There is no evidence in the record that the Summit Defendants were alerted to any of the harms that Christians alleges he

suffered or was at risk of suffering. The Summit Defendants were not aware that Christians was losing weight or that he was losing muscle and strength.

At most, the Summit Defendants were aware of the assertions in one of Christians' grievances that he could develop issues involving "health, well-being, self-esteem, self-worth, overall attitude and feelings of security as well as other related problems *that can arise* out of a poor diet and calorie deficit over time." Doc. 140-1 at 7 (emphasis added). But Christians' generalized concerns about the impact of an inadequate diet are different than allegations that he suffered specific harms or a specific risk of harm. Thus, while Christians may have made the Summit Defendants aware of the alleged inadequacies of his diet, he failed to make them aware of a substantial risk of serious harm as required by *Ingrassia. See* 825 F.3d at 897 (citing *Farmer*, 511 U.S. at 842); *see also Morgan v. Rothe*, 2022 WL 9799601, at *5, 2022 U.S. Dist. LEXIS 170247, at *15 (W.D. Ark. July 21, 2022) (finding food provider defendant not deliberately indifferent under the subjective component "absent at least some knowledge of [the plaintiff's] significant weight loss").

Although some of Christians' complaints reached Summit, there is no evidence before this Court that the Summit Defendants were aware of and deliberately indifferent to Christians' nutritional needs because they were not aware of a substantial risk of serious harm to Christians. Thus, the Summit Defendants' motion for summary judgment, Doc. 135, is granted.

## V.    Christians' Motion to Hold DOC Defendants in Contempt and Motion to Withdraw Contempt Motion

Christians has filed a motion to hold the DOC Defendants in contempt for violating this court's previous order that he be allowed to contact certain other inmates to gather evidence in this case. Doc. 157; *see* Doc. 147 at 62-63. Christians has since filed a motion to withdraw this contempt motion, stating that the DOC has now allowed him to contact the inmates in question.

23

Doc. 162. Thus, Christians' motion to withdraw, Doc. 162, is granted. Christians' motion to hold

the DOC Defendants in contempt, Doc. 157, is denied as moot. The DOC Defendants' motion

for an extension of time to respond to Christians' contempt motion, Doc. 161, is denied as moot.

**VI.      Christians' Motion for a Temporary Restraining Order**

Christians filed a motion for a temporary restraining order, asking this Court to prevent

the DOC from reducing commissary spending limits from $40 a week to $25 a week and care

packs from two per month to one per month. Doc. 158 at 1. He argues that he requires

commissary purchases and care packs to supplement the calories he receives from meals. *Id.* at

1-2. The DOC Defendants oppose Christians' motion. Doc. 177.

"A preliminary injunction is an extraordinary remedy[.]" *Roudachevski v. All–American

Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also Hughbanks v. Dooley*, 788 F. Supp.

2d 988, 992 (D.S.D. 2011). "The burden of proving that a preliminary injunction should be

issued rests entirely with the movant." *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (citation

omitted). "[T]he standard for analyzing a motion for a temporary restraining order is the same as

a motion for a preliminary injunction[.]" *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir.

2022).

When ruling on a preliminary injunction, the court considers "(1) the threat of irreparable

harm to the movant; (2) the state of the balance between this harm and the injury that granting

the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on

the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113

(8th Cir. 1981) (en banc). Since *Dataphase*, the Eighth Circuit has "observed that the 'likelihood

of success on the merits is most significant.' " *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir.

2013) (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012)).

Further, the Eighth Circuit has held that "the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction[.]" *Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996) (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). To demonstrate irreparable harm, a plaintiff must show that the injury is certain, great, and "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Packard Elevator v. Interstate Com. Comm'n*, 782 F.2d 112, 115 (8th Cir. 1986) (internal quotations omitted). A "plaintiff must make a showing of actual, substantial harm resulting from the alleged infringement." *Gard v. Dooley*, 2014 WL 4243586, at *1, 2014 U.S. Dist. LEXIS 118740, at *3 (D.S.D. Aug. 26, 2014) (quoting *Travelers Express Co. v. Transaction Tracking Techs., Inc.*, 305 F. Supp. 2d 1090, 1095 (D. Minn. 2003)).

"Moreover, in the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.' " *Goff*, 60 F.3d at 520 (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)). And "for an injunction to issue 'a right must be violated' and . . . 'the court must determine' whether 'a cognizable danger of future violation exists and that danger must be more than a mere possibility.' " *Id.* at 521 (quoting *Rogers*, 676 F.2d at 1214).

The DOC Defendants argue that Christians fails to show a threat of irreparable harm because he has recently gained weight and was obese around the time he filed his motion for a temporary restraining order. *See* Doc. 177 at 9-12. Christians visited Health Services on November 30, 2022, because his order for a protein snack was discontinued. *Id.* at 9-10. He was

25

not granted a new order for a protein snack because he was not underweight at that time. *See id.* at 10. The DOC Defendants note that Christians weighed 286 pounds at that medical visit and that he only weighed 235 pounds on July 17, 2020. *Id.* at 10-11. The DOC defendants argue that "Christians does not have to worry about weight loss due to an alleged 'lack of calories provided by the DOC.'" *Id.* at 11.

In his reply to the DOC Defendants' response to his motion for a temporary restraining order, Christians does not comment on this contention and only claims that he "has reported significant muscle and strength loss to the medical providers" since the reduction of commissary spending was implemented. *See* Doc. 183 at 2. He argues that the DOC Defendants did not dispute his claims that the calories in his diet are insufficient in their response to his motion. *Id.* He further argues that DOC officials have resisted his efforts to renew his protein snack and to investigate claims that he was bartering his snacks, which he alleges is the reason provided to him as to why he lost his snack order. *Id.* at 1. Christians claims that he "has lost 15 pounds of muscle mass and has gained fat since the cancellation of his protein snack." *Id.*

The DOC Defendants argue that the balance of the harms weighs in their favor. Doc. 177 at 12-16. They argue that the relief requested by Christians, a suspension of the commissary and care pack policy change, would impact "all inmates in South Dakota at every single corrections facility in the State, not just at the SDSP." *Id.* at 13 (citing *Hughbanks*, 788 F. Supp. 2d at 993). They state that the purpose for the new policy is to "reduce the hoarding of products that can be used to barter and gamble." *Id.* (quoting Doc. 179 ¶ 4). They also note safety concerns such as limitations on contraband within cells and prevention of fire hazards due to the accumulation of items in cells. *Id.* at 14 (citation omitted). Christians responds that "[t]he DOC Defendants offer no actual evidence of security threats due to gambling or bartering." Doc. 183 at 2. The DOC

26

Defendants also argue that the public interest weighs in favor of "deference to the expertise of prison administrators." Doc. 177 at 16 (quoting *Hum. Rts. Def. Ctr. v. Sherburne County*, 2020 WL 7027840, at *7, 2020 U.S. Dist. LEXIS 223040, at *22 (D. Minn. Nov. 30, 2020)).

This Court denied summary judgment to the DOC Defendants as to whether Christians' diet while incarcerated was and is nutritionally adequate because genuine issues of material fact still existed regarding Christians' diet. Doc. 147 at 23-27. But this does not mean Christians has met the burden to establish that irreparable harm is imminent. *See Packard Elevator*, 782 F.2d at 115. Other than his own allegations, Christians has set forth no evidence to show that the change in commissary and care pack policy has caused him harm. *See* Doc. 158 at 1-2. Further, the DOC Defendants are correct that the relief sought by Christians would impose a severe burden on prison administration and that the public interest weighs against such a burden. *See Goff*, 60 F.3d at 520-21. Thus, Christians' motion for a temporary restraining order, Doc. 158, is denied. The DOC Defendants' motion for an extension of time to respond to Christians' temporary restraining order motion, Doc. 161, is denied as moot.

## VII.   DOC Defendant Dawn Alumbaugh's Motion for Extension of Time

DOC Defendant Dawn Alumbaugh has filed a motion for extension of time to file an answer to Christians' amended complaint. Doc. 153. DOC Defendants Becker, Genie Birch, Greasman, Hettig, Marjama, Padilla, Pechous, Sorenson, and Winters previously sought an extension of time to file an answer, claiming that in the interest of judicial economy, all DOC Defendants should be served before they are required to answer. *See* Doc. 176 at 4-5. This Court granted the motion. Doc. 181. Defendant Alumbaugh asks for a similar extension that would allow her twenty-one days from the date of service of the second amended complaint upon the unserved defendants. Doc. 153 at 4-5. The remaining unserved DOC Defendants are Barnetche,

Mullins, Hulscher, and Perret. *See* Doc. 176 at 4. Defendant Alumbaugh's motion, Doc. 153, is granted. Defendant Alumbaugh shall answer the complaint twenty-one days from the date of service of the second amended complaint upon the unserved defendants along with the remaining DOC Defendants who have not yet answered the second amended complaint.

## VIII.  Christians' Motion for Appointment of Counsel

Christians has filed a motion for appointment of counsel. Doc. 182. Christians claims that he needs an attorney to help him "locate and collect an affidavit or declaration from Craig Returns From Scout[,]" one of the inmates discussed in this Court's prior order requiring that the DOC allow Christians to contact inmates who had first-hand information about DOC kitchen practices. *See id.*; Doc. 147 at 62-63. Christians claims that he has no way of contacting Returns From Scout because he was released from DOC custody prior to this Court's order. Doc. 182 at 1. In a later supplement, Christians states that he needs an attorney to effect service on DOC Defendants Matthew Hulscher, Kyle Barnetche, Paige Mullin, and Preston Perrett and Summit Defendants Beth McCombs and Kevin Trierweiler, as these defendants are no longer employed by the DOC and by Summit. Doc. 184 at 1. He further states that counsel for the DOC Defendants and the Summit Defendants have refused to provide addresses for former employees. *Id.* Christians claims that he needs counsel to locate these defendants so the lawsuit can proceed. *Id.*

"A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). Under 28 U.S.C. § 1915(e)(1), "[t]he court may request an attorney to represent any person unable to afford counsel." District courts may appoint counsel, and the Eighth Circuit has acknowledged the "express authority of the district court to make such appointments." *Nelson v. Redfield*

*Lithograph Printing*, 728 F.2d 1003, 1004 (8th Cir. 1984) (citations omitted). "[T]he appointment of counsel should be given serious consideration by the district court if the plaintiff has not alleged a frivolous or malicious claim." *Id.* at 1005.

Factual complexity is not the only factor that a district court considers whether appointment of counsel is appropriate. *Johnson v. Williams*, 788 F.2d 1319, 1322 (8th Cir. 1986) (citation omitted). The Eighth Circuit considers "the factual complexity of the case, the ability of the indigent to investigate the facts, the existence of conflicting testimony, the ability of the indigent to present his claim and the complexity of the legal issues." *Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir. 1991) (citing *Johnson*, 788 F.2d at 1322-23). Christians' second amended complaint, briefs in opposition to defendants' motions for summary judgment, responses to defendants' statements of undisputed material facts, and ability to serve discovery all show that he capable of litigating his claims to this Court. Thus, Christians' motion for appointment of counsel, Doc. 182, is denied. The Court remains open to the possibility of appointing counsel if this case proceeds beyond the motions stage. It is one thing to well represent one's position on paper to the court, and it is yet another to be able to adequately try a case to a jury.

This Court construes Christians' supplement as a motion for assisted service. *See* Doc. 184; *see also* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process, and perform all duties in [in forma pauperis] cases."). This Court has previously denied a motion in which Christians asked this Court to compel the Attorney General for the first name of a former DOC Defendant, Lieutenant Maddox, so that he could serve that defendant. Doc. 45 at 4. This Court instructed Christians to "try to serve Lieutenant Maddox with the information that he has before he seeks assistance from the Court to compel another party to act." *Id.* Here,

29

Christians has attempted to serve defendants Hulscher, Barnetche, Mullin, Perrett, McCombs,[8] and Kevin Trierweiler. *See* Doc. 33; Doc. 151 at 1-3, 7-12, 22-24, 34-36. Thus, because Christians has tried to serve these defendants, assisted service is appropriate, and Christians' motion for assisted service regarding the DOC Defendants, Doc. 184, is granted. The DOC Defendants' counsel must provide the last known addresses for Hulscher, Barnetche, Mullin, and Perrett to the United States Marshal Service by **May 1, 2023**. Because this Court has granted summary judgment to the Summit Defendants, Christians' motion for assisted service regarding the Summit Defendants, Doc. 184, is denied as moot.

Accordingly, it is

ORDERED:

1. That Christians' motion to amend his complaint to substitute Jessica Waldner for defendant Unknown Summit Dietician, Doc. 145, is granted. To the extent that Christians seeks leave to correct defendant Beth's name to Beth McCombs, that request is granted.

2. That Christians' motion to dismiss the Summit Defendants' motion for summary judgment as untimely, Doc. 143 is denied.

3. That Summit Food Service's motion to join the Summit Defendants' motion for summary judgment, Doc. 156, is granted.

4. That the Summit Defendants' motion for summary judgment, Doc. 135, is granted.

5. That Christians' motion in opposition of the Summit Defendants' motion for summary judgment, Doc. 139, is denied as moot.

---

[8] McCombs was previously identified as "Beth - Summit Supervisor Jameson Annex[.]" *See* Doc. 83 at 2-3. This Court grants Christians leave to correct defendant Beth's name to Beth McCombs.

6. That Christians' motion to withdraw his contempt motion, Doc. 162, is granted.
Christians motion to hold DOC Defendants in contempt, Doc. 157, is denied as moot.
The DOC Defendants' motion for an extension of time to respond to Christians'
contempt motion, Doc. 161, is denied as moot.

7. That Christians' motion for a temporary restraining order, Doc. 158, is denied. The
DOC Defendants' motion for an extension of time to respond to Christians'
temporary restraining order motion, Doc. 161, is denied as moot.

8. That DOC Defendant Dawn Alumbaugh's motion for an extension of time, Doc. 153,
is granted. The time for Alumbaugh to respond is extended until twenty-one (21) days
after the date of service of the second amended complaint upon said DOC Defendants
not yet served.

9. That Christians' motion for appointment of counsel, Doc. 182, is denied.

10. That Christians' motion for assisted service regarding the DOC Defendants, Doc.
184, is granted. The DOC Defendants' counsel must provide the last known addresses
for Hulscher, Barnetche, Mullin, and Perrett to the United States Marshal Service by
**May 1, 2023**. Christians' motion for assisted service regarding the Summit
Defendants, Doc. 184, is denied as moot.

Dated this 29th day of March, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

31