UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARK CHRISTIANS, | ) | 4:20-CV-04083-LLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | BRIEF IN SUPPORT OF MOTION |
| v. | ) | FOR SUMMARY JUDGMENT |
| | ) | REGARDING NEWLY ADDED |
| | ) | CLAIMS AND DEFENDANTS |
| DARRIN YOUNG, in his individual capacity; | ) | |
| DAN SULLIVAN, in his official capacity; | ) | |
| TROY PONTO, Deputy Warden SDSP, | ) | |
| Individual and official capacity; JESSICA | ) | |
| COOK, Associate Warden  SDSP/Jameson, | ) | |
| individual and official capacity; BRENT | ) | |
| FLUKE, Warden MDSP, individual and official | ) | |
| capacity;  REBECCA SCHIEFFER, Associate | ) | |
| Warden MDSP, individual and official capacity; | ) | |
| ALEX REYES, Associate Warden MDSP, | ) | |
| individual and official capacity; CODY | ) | |
| HANSON, Unit Manager Jameson, individual | ) | |
| and official capacity; SETH HUGHES, Unit | ) | |
| Manager Jameson, individual and official | ) | |
| capacity; NANCY CHRISTENSEN, Unit | ) | |
| Manager MDSP, individual and official capacity; | ) | |
| DEREK EKEREN, Unit Coordinator Jameson, | ) | |
| individual and official capacity; DEB EILERS, | ) | |
| Unit Coordinator MDSP, individual and official | ) | |
| capacity; LAURIE STRATMAN, Unit | ) | |
| Coordinator MDSP, individual and official | ) | |
| capacity; JULIE STEVENS, Case Manager | ) | |
| MDSP, individual and official capacity; CRAIG | ) | |
| MOUSEL, Property Officers, SDSP, individual | ) | |
| and official capacity; MIKE LEIDHOLT, | ) | |
| individual capacity; KELLIE WASKO, official | ) | |
| capacity; PECHOUS, Unit Coordinator, | ) | |
| individual and official capacity; GENIE BIRCH, | ) | |
| Program Manager, individual and official | ) | |
| capacity; GREASMAN, Correctional Officer, | ) | |
| individual and official capacity, DAWN | ) | |
| ALUMBAUGH, Correctional Officer, individual | ) | |
| and official capacity; BARNETCHE, | ) | |
| Correctional Officer, individual and official | ) | |
| capacity; MARJAMA, Correctional Officer, | ) | |
| individual and official capacity; WINTERS, | ) | |

Correctional Officer, individual and official                 )
capacity; PADILLA, Correctional Officer,                      )
individual and official capacity MULLINS,                    )
Correctional Officer, individual and official                )
capacity; HULSCHER, Correctional Officer,                    )
individual and official capacity; DREISKE,                   )
Former Deputy Warden, individual capacity;                   )
BECKER, Lieutenant, individual and official                  )
capacity; HETTIG, Lieutenant, individual and                 )
official capacity; SORENSON, Lieutenant,                     )
individual and official capacity; PERRET,                    )
Lieutenant, individual and official capacity,                )
                                                             )
        Defendants.                                           )

The following brief is submitted by Defendants, pursuant to D.S.D. Civ. LR 7.1(b), Local Rules of Practice of the United States District Court, in support of their Motion for Summary Judgment. A review of the record herein will reveal that the Court, in an Order dated September 28, 2022, granted in part, and denied in part, Defendants' previous Motion for Summary Judgment. Doc. 147. In regards thereto, the Court granted Defendants' Motion for Summary Judgment as to the following claims:

> 1.) that Christians' diet caused him to be at a higher risk of diabetes, higher risk of high blood pressure, and higher risk of loss of thyroid function; and
> 2.) that his diet caused fainting spells and dizziness, fatigue, insomnia, frequent urination, frequent bowel movements, and high cholesterol; and
> 3.) Christians' First Amendment claim.

Doc. 147, p. 66. Defendants' Motion for Summary Judgment, however, was denied as to the following claim:

> 1.) that Christians' diet caused his unexplained weight loss along with his alleged loss of muscle and strength.

Doc. 147, p. 66. The Court, in its Order dated September 28, 2022, granted Christians' motion to submit a Second Amended Complaint to assert a "new Eighth Amendment inadequate nutrition claim against Pechous, Genie Birch, Greasman, Alumbaugh, Barnetche, Marjama, Winters,

2

Padilla, Mullins, Hulscher, Becker, Hettig, Sorenson, and Perret . . . in their individual capacities and in their official capacities for injunctive relief." Doc. 147, p. 66.[1] Christians' motion to submit a Second Amended Complaint was also granted "as to his new Eighth Amendment inadequate nutrition claims against Driskie [sic] in his or her individual capacity only." Doc. 67. Finally, the Court also granted Christians' motion to submit a "new First Amendment retaliation claims against Young, Christensen, and Stratman in their individual capacities." Doc. 147, p. 67.

Subsequent thereto, on October 17, 2023, the Court issued a Second Amended Rule 16 Scheduling Order (Second Amended Complaint). Doc. 202. Pursuant thereto, all motions, other than motions in limine, with supporting briefs, were to be filed on or before January 26, 2024. Defendants were again later directed, in an Order issued on January 5, 2024, that if they intended to move for summary judgment, on any of the claims in the Second Amended Complaint that were permitted to go forward, they must do so on or before January 26, 2024. Doc. 226, p. 6.

[1] As noted by the Court, in its Order dated January 5, 2024, Barnetche has not yet been served because he no longer lives at the last known address counsel for the DOC Defendants provided to the USMS. Doc. 22, pp. 2-3; Doc. 207. Barnetche, as also found by the Court, "did not respond to previous attempts by counsel for the DOC Defendants to contact him, and the DOC Defendants' counsel does not have current contact information for Barnetche." Doc. 226, p. 3; Doc. 215, p. 3. In denying Christians' motion for assisted service, the Court stated that he "cites no authority to support his request that this Court order the DOC Defendants' counsel to accept service on behalf of Barnetche." As held by the Court, "there is no Federal Rule of Civil Procedure or case law that gives this Court authority to order that the DOC Defendants' counsel accept service on behalf of a former DOC employee." Doc. 226, p. 3.

The Court went on, in its Order dated January 5, 2024, to state that Federal Rule of Civil Procedure 4(m) provides that "[i]f a defendant is not served within 90 days after the complaint is filed, the court–on motion or on its own after notice to the plaintiff–must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Doc. 226, p. 3. The order granting Christians leave to file a second amended complaint adding Barnetche as a defendant was entered on September 28, 2022. Doc. 147. The Court therefore indicated that, pursuant to Fed. R. Civ. P. 4(m), it intends to dismiss without prejudice Christians' claims against Barnetche if Barnetche is not served by February 7, 2024. Doc. 226, p. 3. Since Barnetche has not yet been properly served, he is not, unlike Pechous, Genie Birch, Greasman, Alumbaugh, Marjama, Winters, Padilla, Mullins, Hulscher, Becker, Hettig, Sorenson, and Perret, a party to the present Motion for Summary Judgment.

The record will reflect that the entire premise of Plaintiff's claims against Defendants Pechous, Birch, Greasman, Alumbaugh, Marjama, Winters, Padilla, Mullins, Hulscher, Becker, Hettig, Sorenson and Perret, is predicated upon their purported failure to "fix" or "correct" the alleged problem after he complained to them about the adequacy of the meals being served. Doc. 83, pp. 43-51, ¶¶127(B)-127(JJ).  Their sole involvement herein consisted of Christians having complained to them about "slight portions" or "missing food items."  Doc. 83, pp. 43-51, ¶¶127(B)-127(JJ).  Defendants, however, would respectfully assert that, based on the information that was available to them at the time in question, they could have reasonably believed that there was not a "problem" which needed fixing.  As will also be shown below, Defendants are entitled to qualified immunity regardless of whether they were ultimately wrong regarding Christians' caloric intake and the cause of his weight loss.

## QUALIFIED IMMUNITY

Defendants would, once again, assert that to the extent that Christians seeks to sue them in their individual capacities, it is well established that "qualified immunity will function to protect from liability those defendants whose actions were objectively reasonable in light of clearly established constitutional rights."  *Harp v. Sec'y of Corrs.*, 2013 WL 1896930, at *3 (D.S.D.) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).  As was previously found by the Court, "[q]ualified immunity shields a government official from liability in a §1983 action unless the official's conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  Doc. 147, p. 21.  *See Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014) (citing *Harlow,* 457 U.S. at 818).  "To overcome the defense of qualified immunity, the plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional

4

or statutory right; and (2) the right was clearly established at the time of the deprivation." Doc. 147, p. 21. *See Howard v. Kansas City Police Dept.*, 570 F.3d 984, 988 (8th Cir. 2009). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Doc. 147, p. 21. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). According to this Court, "Clearly established law cannot be demonstrated at a high level of generality; rather, it must put officers on 'fair notice.'" Doc. 147, p. 21. *See City and County of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 613, 616 (2015). Plaintiff, therefore, must be able to show that "a reasonable officer could not have believed that his actions were lawful." Doc. 147, p. 21. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Qualified immunity, therefore, shields a defendant from suit "if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information [that the defendant] possessed." *Bernhardt v. Danaher*, 2012 WL 608390, at *3 (Neb.) (citing *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000)). It has therefore been said that "It is important to recognize that in evaluating qualified immunity under a motion for summary judgment the court must examine the information possessed by the officials." *Gainor v. Rogers*, 973 F.2d 1379, 1384 (8th Cir. 1992). *See also Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998) (citing *Anderson*, 483 U.S. at 641). The Court must "examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law." *Langford v. Norris*, 614 F.3d 445, 461 (8th Cir. 2010) (citing *Miller v. Schoenen*, 75 F.3d 1305, 1308 (8th Cir. 1996)). *See also McCaster v.*

5

*Clausen*, 684 F.3d 740, 746 (8th Cir. 2012); *Livers v. Schenck*, 700 F.3d 340, 362 (8th Cir. 2012).

The court has cautioned that "This does not mean reopening an inquiry into the official's subjective intent." *Gainor*, 973 F.2d at 1384 (citing *Harlow*, 457 U.S. at 815). The "relevant question" in this case is simply whether Defendants could have believed that their actions were lawful "in light of the information possessed at the time." *Gainor*, 973 F.2d at 1384 (citing *Anderson*, 483 U.S. at 641). Here, a review of the record herein will reflect that the facts known to Defendants at the time do not appear to be in dispute.

**WEIGHT LOSS**

As was previously noted by the Court, "The Eighth Amendment's prohibition against cruel and unusual punishment require prisoners to be provided with nutritionally adequate meals to maintain health. Doc. 147, p. 22. *See Cody v. CBM Corr. Food Services*, 250 F. App'x 763, 765 (8th Cir. 2007). It was said, however, that "Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Constitution." Doc. 147, p. 22. *Simpson v. Kaemingk*, 2019 WL 4038779, at *6 (D.S.D.) (citing *Jones v. Allen*, 2007 WL 2725218, at *4 (W.D. Ark.)); *Brakeall v. Stanwick-Klemix*, 2018 WL 4691215, at *11 (D.S.D.). *See also Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990). "Inmates do not have a right to be served a particular type of food." *Avery v Ferguson*, 2010 WL 3829433, at *11 (W.D. Ark.) (citing *Burgin,* 899 F.2d at 734-35). *See also Winnett v. Bray*, 2017 WL 7421030, at *2 (E.D. Ark.).

Moreover, the food provided "need not be tasty or aesthetically pleasing." *Giddings v. Cradduck*, 2017 WL 2791345, at *5 (citing *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993)). As was held in *Ryan v. Umphlett,* 2020 WL 2198927, at *3 (E.D. Mo.), "mere

6

dissatisfaction with the variety, portion size or savor of [Christians'] prison diet is insufficient to state a claim." "Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health." *Whitney v. Morse*, 2016 WL 908268, at *6 (W.D. Ark.); *Avery*, 2010 WL 3829433, at *11. An inmate, therefore, claiming an inadequate diet under the Eighth Amendment must establish he "lost weight or suffered adverse physical effects, or was denied nutritionally or calorically adequate diet." Doc. 147, p. 22. *See Davis v. Missouri*, 389 F. App'x. 579 (8th Cir. 2010).

As was previously found by this Court, however, "To show deliberate indifference, an inmate must demonstrate that a prison official knew the 'inmate face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it.'" Doc. 147, p. 23. *See Kenyon v. Dooley*, 2014 WL 3700878, at *3 (D.S.D.) (quoting *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997)). It was said, therefore, that "Christians must show 1) that the nutrition he received was inadequate or that he suffered weight loss or other adverse physical effects as a result of his diet; and 2) that the DOC Defendants were aware of and deliberately indifferent to the inadequate nutrition." Doc. 147, p. 23.

The focus, therefore, in the instant case is on whether Christians can establish that Defendants were aware of and deliberately indifferent to the inadequate nutrition. In denying the previous summary judgment motion filed by Defendants, the Court indicated that they "point to an admission provided by the Summit Defendants in response to a discovery request in which they state that 'each diet served at SDSP has a minimum calorific value of 2,700 calories as required by the contract between Summit and the South Dakota Department of Corrections." Doc. 147, p. 27. According to the Court, however, Christians raised questions regarding the caloric value of food served to him from 2017 to today. "While the Summit Defendants'

7

admission, along with the 2017 and 2019 evaluations," were said to "provide answers as to what an inmate could reasonably expect to receive as a food tray during this time," the Court found that they "do not provide any more evidence as to what Christians was actually served than do the food journals and grievances offered by Christians." Doc. 147, p. 27. Genuine questions of material fact were thus said to remain as to Christians' caloric intake.

Subsequent thereto, however, the Court, on March 29, 2023, issued an Order granting the Summit Defendants' Motion for Summary Judgment. Doc. 185. As was indicated therein, "The Summit Defendants state that '[a]ll diets served to inmates within the SDDOC comply with the National Institute of Health – Dietary Recommended inmates and Recommended Dietary Allowances guide and contain a weekly average of 2,700 calories as required by the SDDOC contract.'" Doc. 185, p. 7. As relevant hereto, the Court found that "the record reflects that some of Christians' complaints did reach Summit." Doc. 185, p. 19. A copy of the contract that Summit entered with the SDDOC was provided by Summit in support of their Motion for Summary Judgment. Doc. 137-2. As expressly stated therein, "The Contractor shall address **all** complaints from inmates and will ensure quality products and services are being provided." (Emphasis added). Doc. 137-1, p. 10. Said contract further provided that "If the facility has an existing process for complaint resolution and/or quality control, the Contractor shall work within that process to resolve complaints and/or quality issues." Doc. 137-1, p. 10.

Pursuant thereto, the record herein will reflect that, as found by the Court, "Emails between [Defendants] and Summit officials . . . show a discussion regarding Christians' complaints." Doc. 185, p. 20. Those emails served to "notify [Summit] that Christians had filed 20 Informal Resolution Requests regarding food issues between December 2018 and October 2019" alone. Doc. 185, p. 20. As was further found by the Court, "some of the complaints that

8

reached Summit discussed inadequate serving sizes, caloric intake, and nutritional make-up." Doc. 185, p. 22. Defendants, therefore, undertook to "assure Christians that these issues . . . had been relayed to the proper authorities." Doc. 185, p. 20.

There can be no dispute whatsoever that Defendants, in response to their emails to Summit, were told that "all meals served are approved by a licensed Dietician and meet nutritional requirements, that is why the meals are acceptable to serve." Doc. 185, p. 20. Those assurances only served to further confirm the belief already held by Defendants that the meals being provided to inmates at the SDSP were nutritionally adequate. Defendants' reasonable beliefs were based on the Reports received from the "private, independent consultant retained to perform an independent review of [their] prison food service program." Doc. 104, pp. 6-7, ¶13; Doc. 99-78. Said evaluation was undertaken to "ensure inmates have access to nutritious meals while incarcerated with SDDOC facilities." Doc. 104, p. 7, ¶14; Doc. 99-78. The record reflects that "the 2017 evaluation of the Prison Food Service Program was completed only a matter of days before Christians, on January 4, 2018, reported to Health Services with complaints of excessive weight loss." Doc. 100, p. 8, ¶19.

As previously argued by Defendants, while noting that "South Dakota menus are high in sodium content and must be reduced," Ms. Wakeen concluded in her written report that "The food service program and food quality [was] overall good." Doc. 104, p. 8, ¶20; Doc. 99-78. As was further found by Ms. Wakeen, "Program integrity exists with the SDDOC Food Service Program." Doc. 100, pp. 6-7, ¶14; Doc. 99-78. According to the 2017 Evaluation of the Prison Food Service Program, "Through its food service contractor, the SDDOC overall provides a quality, nutritious low-cost meal to inmates." Doc. 100, pp. 6-7, ¶14; Doc. 99-78.

9

The Court, in its Order dated September 28, 2022, indicated that the statement that "The SDDOC overall provides a quality, nutritious low-cost meal to inmates" appears to "have been drafted by DOC officials, not Wakeen." Doc. 147, pp. 24-25, n.8. While Ms. Wakeen, in her 2017 Site Visit Report, may not have included the specific statement now referred to, the Affidavit attached hereto will readily reflect that she does, in fact, agree with such an overall summary or assessment of the food service program provided by the SDDOC. Wakeen Affidavit, ¶13. It appears that the statement referred to by the Court, contained in the "Executive Summary" of the 2017 Evaluation of the Food Service Program, was based, at least in part, on the "Nutritional Analysis Review" contained in the 2017 Site Visit Report prepared by Ms. Wakeen. As indicated therein, "CBM use[d] Computrition software, an integrated program that automatically builds/updates the nutritional analysis as the menu is entered." Wakeen Affidavit, ¶10; Doc 99-78, p. 4.

As further indicated in the 2017 Site Visit Report, the calories contained in the meals provided at both the MDSP and SDSP were found to be slightly over that recommended for the adult reference male. Wakeen Affidavit, ¶12; Doc. 99-78, p. 5. As relevant hereto, the 2017 Report specifically states that "The calories [at the MDSP] average 2,760 which are 65 calories less than the SDSP main population menu." Doc. 147, pp. 6-7; Doc. 104, p. 9, ¶25; Doc. 99-78. According to said Report, "The MDSP calories average overall 2,760 which are only slightly over the 2,757 recommended for the adult reference male." Doc. 104, pp. 9-10, ¶25; Doc. 99-78.

There was simply no reason for Ms. Wakeen to have believed that the meals being provided to inmates contained an average caloric intake below that referred to in her Site Visit Report. Wakeen Affidavit, ¶14. Ms. Wakeen certainly had no reason to believe that the meals, as now alleged by Inmate Christians, provided only approximately 1750 calories per day.

10

Wakeen Affidavit, ¶15.  Pursuant to the terms of the contract with Summit, the menus were to be "planned in accordance with the Nations Research Council's Recommended Dietary Allowances (RDAs) to meet the nutritional needs of the individuals."  Wakeen Affidavit, ¶15; Doc. 137-2, p. 9.  As indicated above, the software program utilized by CBM automatically built/updated the nutritional analysis as the menu was entered.  Wakeen Affidavit, ¶15; Doc. 99-78, p. 4.

Said contract expressly provided that "The menus shall be reviewed and approved by a Registered Dietician who is licensed by the State of South Dakota (or independently contracted with the Contractor) in order to ensure compliance with all of the above-mentioned regulations and RDAs for age and gender."  Clark Affidavit, ¶6; Doc. 137-2, p. 9.  There was nothing which would have suggested to Ms. Wakeen, during either of her Site Visits at the SDSP/MDSP, that the food service provider was not complying with the terms of its contract with the SDDOC.  Wakeen Affidavit, ¶16.[2]  Ms. Wakeen, therefore, indicated that she would have to concur with the statement, in the 2017 Evaluation of the Prison Food Service Program, that "Through its food service contractor, the SDDOC overall provides a quality, nutritious low-cost meal to inmates."  Wakeen Affidavit, ¶13.  The finding, in the 2017 Report from Wakeen, that the calories contained in the meals provided at both the MDSP and SDSP were "slightly over that recommended for the adult reference male," along with the assurances received from Summit that "all meals served [were] approved by a licensed Dietician and [met] nutritional

---

[2] Ms. Wakeen did not, due to the COVID-19 Pandemic, conduct any on-site evaluations during 2020 – 2022.  Wakeen Affidavit, ¶21.  She did, however, during October 17, 2023, to October 19, 2023, conduct on-site evaluations at both the Rapid City Minimum Work Center (RCMC) in Rapid City, South Dakota and the Women's State Prison located in Pierre, South Dakota.  Wakeen Affidavit, ¶21.  Ms. Wakeen anticipates conducting similar on-site evaluations at both the MDSP and SDSP later this year.  Wakeen Affidavit, ¶25.

11

requirements, that is why the meals [were] acceptable to serve," only served to confirm Defendants' belief that they were providing a "quality, nutritious low-cost meal to inmates."

In yet a further effort to ensure that inmates have access to nutritious meals while incarcerated within SDDOC facilities, Defendants arranged for yet another independent evaluation of the Food Services Program to be conducted in 2019.  Doc. 104, p. 9, ¶21; Doc. 99-79.  The "Summary of items with notable recommendations or concerns" were contained within the 2019 Report submitted by Wakeen.  Wakeen Affidavit, ¶17; Doc. 99-79, p. 8.  A review of said "Summary of items" will reflect that there were no recommendations or concerns expressed regarding the average calories contained in the meals being served at either the MDSP or SDSP. Wakeen Affidavit, ¶18; Doc. 99-79, p. 8.  According to Wakeen, if she had any concerns regarding the average number of calories provided being below that recommended for the adult reference male, she would have included those concerns in her 2019 Report along with her appropriate recommendations.  Wakeen Affidavit, ¶20.

Even if it could now be said, for sake of argument, that Defendants were mistaken in their beliefs as to the average number of calories contained in the meals provided to Christians, it is well established that qualified immunity would still be available.  *New v. Denver*, 787 F.3d 895, 900 (8th Cir. 2015) (citing *Levan v. George*, 604 F.3d 366, 369 (7th Cir. 2010)).  Defendants would assert that any alleged error in judgment, on their part, was of the sort that qualified immunity was designed to protect.  *Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*, 934 F.3d 876, 883 (8th Cir. 2019) (citing *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)).  "Officials do not lose their qualified immunity because of a mistaken, yet reasonable belief, nor do officials lose their immunity because of a reasonable mistake as to

12

the legality of their actions." *King v. Missouri Dep't of Soc. Services*, 2009 WL 10704974, at *1 (W.D. Mo.) (citing *Forrester v. Bass*, 397 F.3d 1047, 1054 (8th Cir. 2005)).

It has been said, on repeated occasions, that "[q]ualified immunity gives governmental officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 571 U.S. 3, 6, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986))).  Doc. 75, p. 502.  *See also Harp*, 2013 WL 1896930, at *3 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)).  Such immunity clearly "allows officers to make reasonable errors." *Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir. 1996) (citing *Hunter*, 502 U.S. at 229, 112 S.Ct. at 537).  *See also Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011); *Clayborn v. Struebing*, 734 F.3d 807, 808 (8th Cir. 2013).  "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Whitten v. City of Omaha*, 199 F.Supp.3d 1224, 1232 (Neb. 2016) (citing *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012)).  Defendants were therefore "allowed considerable room for 'mistaken judgments.'" *Clayborn*, 734 F.3d at 808 (citing *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011)).  *See also Anderson as trustee for next-of-kin of Anderson*, 934 F.3d at 881; *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016); *New*, 787 F.3d at 898; *Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014).

As already argued elsewhere herein, "It is important to recognize that in evaluating qualified immunity under a motion for summary judgment the court must examine the information possessed by the officials." *Gainor,* 973 F.2d at 1384.  *See also Collins,* 153 F.3d at

13

596 (citing *Anderson,* 483 U.S. at 641).  The Court must "examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law." *Langford,* 614 F.3d at 461 (citing *Miller,* 75 F.3d at 1308).  *See also McCaster,* 684 F.3d at 746; *Livers,* 700 F.3d at 362.  As indicated above, the information possessed by Defendants at the time included assurances from Summit that "all meals served [were] approved by a licensed Dietician and [met] nutritional requirements, that is why the meals [were] acceptable to serve."  Doc. 185, pp. 19-20.  This was after Christians' concerns "had been relayed to the proper authorities."  Doc. 185, p. 20.  Summit was adamant that "all diets served to inmates within the SDDOC complied with the National Institute of Health – Dietary Recommended intakes and Recommended Dietary Allowances guide and contained a weekly average of 2,700 calories as required by the SDDOC contract."  Doc. 185, p. 7.

The assurances received from Summit were, as indicated above, consistent with the findings of the "private, independent consultant retained [by SDDOC] to perform an independent review of [their] prison food service program."  Christians has not and cannot dispute the fact that the 2017 Report prepared by Ms. Wakeen found that the calories contained in the meals provided at both the MDSP and SDSP were "slightly over that recommended for the adult reference male."  That Report specifically stated that "The calories [at the MDSP] average 2,760 which are 65 calories less than the SDSP main population menu."  Doc. 147, pp. 6-7; Doc. 104, p. 9, ¶25; Doc. 99-78.  According to said Report, "The MDSP calories average overall 2,760 which are only slightly over the 2,757 recommended for the adult reference male."  Doc. 104, pp. 9-10, ¶25; Doc. 99-78.  Defendants, therefore, would again assert that they could have reasonably believed that their actions were lawful "in light of the information possessed at the

14

time." *Gainor,* 973 F.2d at 1384 (citing *Anderson,* 483 U.S. at 641).  Christians has not and cannot present any authority which would show that Defendants were not entitled to rely on the opinion of not one, but two registered dieticians who assured them that the meals provided averaged 2,700 calories as required by the SDDOC contract.

Defendants would respectfully assert that is especially true in the instant case since the Court, in its Order dated September 28, 2022, found that "The DOC Defendants are correct that the cause of Christians' weight loss [was] difficult to identify."  Doc. 147, p. 29.[3]  As noted by the Court, Defendants arranged for Christians to be seen by Dr. Gutnik, on July 19, 2018, "to determine if there was an underlying medical condition causing his weight loss."  Doc. 147, p. 9.  Even Dr. Gutnik, however, was "[n]ot sure why [Christians] lost so much weight."  Doc. 147, p. 10.  As further found by the Court, Dr. Gutnik "could not explain the situation" and "had a hard time explaining things."  Doc. 147, p. 10.  He therefore "described Christians' circumstances as 'complex.'"  Doc. 147, p. 10.  While his "presumption was that Christians' weight loss was caused by celiac disease," Dr. Gutnik indicated that they would conduct another biopsy given the contentions by Christians that he was "following his gluten-free diet closely."  Doc. 147, p. 10.  As was later found, however, by Dr. Gutnik, Christians, despite his assertions, was "not taking his gluten free diet perfectly."  Doc. 147, p. 10.  As to whether Christians did have gluten disease, Dr. Gutnik indicated that he could "say with all honesty that [he[ did not know with certainty."  Doc. 147, p. 11.[4]

---

[3] Defendants would assert that whether additional diagnostic techniques or forms of treatment were indicated is a classic example of a matter for medical judgment and is therefore not actionable under 42 U.S.C. §1983.  *Pinder v. Wellpath*, 2022 WL 4372185, at *3 (E.D. Ark.); *Fernow v. Wright*, 2022 WL 16748930, at *2 (E.D. Ark.).

[4] The Court, in its Order dated September 28, 2022, noted that the diagnosis by Dr. Gutnik that Christians remain on his gluten-free diet was "made while Dr. Gutnik and Christians both

(continued . . . )

15

Moreover, while indicating that a normal BMI (Body Mass Index) does not *as a matter of law* foreclose an inadequate nutrition claim, the Court in *Ingrassia v. Schafer*, 825 F.3d 891, 898 (8th Cir. 2016) found that such objective evidence "certainly favor[s] defendants."  Here, Christians does not dispute the fact that he was "educated and redirected several times that his BMI was adequate."  Doc. 104, p. 12, ¶37; Doc. 120, p. 5, ¶37.  Defendants would assert that their belief that Christians' BMI did not suggest serious injury was, as in *Vernon v. Slabosky*, 2016 WL 4775739, at *4 (W.D. Okla.), not only a reasonable inference but "probably the correct one."

In dismissing a similar claim by plaintiff that his diet was so nutritionally inadequate that it violated the Eighth Amendment, the court in *Pew v. Wetzel,* 2021 WL 6622085, at *10 (Pa.), indicated that "in the setting of inmate diet claims, prisoner plaintiffs typically attempt to demonstrate an imminent danger of serious bodily injury by showing they are receiving inadequate sustenance."  The plaintiff, however admitted to having a BMI showing that he was "slightly overweight."  Such averments by plaintiff, as found by the court, failed to demonstrate an imminent danger of serious bodily injury.  *Id.*

A similar result was also reach in *Emery v. Helder,* 2018 WL 715463, at *11 (W.D. Ark.), where the court found that officials "accurately point out, by referencing the Body Mass Index ("BMI"), that plaintiff was obese when he entered the WCDC [Washington County Detention Center] and still overweight when released to the ADC [Arkansas Dept. of

_____

( . . . continued)

believed that Christians was eating 4,000 or more calories a day."  Doc. 147, p. 29.  Defendants, however, at the time in question, had no reason to believe that Christians, in response to their Motion for Summary Judgment, would later claim that his prior statements to medical professions that he was getting about 3000 calories a day through meals were mistaken because he only since learned that he was receiving only 1750 calories a day at that time.  Doc. 120, p. 4, ¶29.

Corrections].” While plaintiff criticized the use of the BMI to determine whether he was overweight, the court indicated that the BMI was still utilized by the National Institute of Health as a “useful measure of overweight and obesity.” *Emery,* 2018 WL 715463, at *11.

Here, in its Order dated September 28, 2022, the Court indicated that “Essentially, [it] has been presented with two explanations for Christians’ weight loss.” Doc. 147, p. 29. “First is that Christians lost weight because his meals were insufficiently nutritious.” “The second explanation is that Christians lost weight after he quit medication that can cause weight gain and after he was diagnosed with celiac disease, which can cause weight loss when untreated.” Doc. 147, pp. 29-30. In discounting the “second explanation” offered by Defendants, the Court indicated that “but Christians began losing weight before quitting his medications.” Doc. 147, p. 30. According to the Court, “Christians weighed 304 pounds on April 19, 2017 and he weighed 284 pounds on June 14, 2017.” Doc. 147, p. 28. “Thus, by the time he quit his psychiatric medications [around June 23, 2017], Christians had already lost 20 pounds in eight weeks.” Doc. 147, p. 28.

The suggestion, however, by Christians that he lost weight because his meals were insufficiently nutritious ignores the fact that, if that were the case, one would expect to see his weight loss continue while incarcerated. Haynes Affidavit, ¶31. The record will reflect that, when seen for his intake physical on October 1, 2013, Christians weighed 217 pounds. Doc. 147, pp. 8-9. When later seen by Health Services, on April 4, 2017, in connection with his complaints of “abnormal weight gain,” Christians’ weight had expanded to 307 pounds. Doc. 104, pp. 12-13, ¶39; Doc. 147, p. 9. He expressed “ongoing concern with weight gain” and requested continued weight checks. Doc. 104, pp. 12-13, ¶39; Doc. 147, p. 9.

17

Christians' recorded weight, when later seen by Health Services on June 14, 2017, was 284 pounds. Doc. 147, p. 9. He weighed 260 pounds when seen by Health Services in November 2017 and again on January 4, 2018. Doc. 104, p. 13, ¶40; Doc. 147, p. 9. On March 9, 2018, he weighed 255 pounds. Doc. 104, p. 13, ¶41; Doc. 147, p. 9. His weight had fallen to 244 pounds on April 17, 2018. Doc. 104, p. 13, ¶42; Doc. 147, p. 9. Almost a year later, on April 4, 2019, Christians weighed 222 pounds. Doc. 104, p. 13, ¶44; Doc. 147, p. 9. As noted by the Court, "Between then [April 4, 2019] and November 2, 2020, he weighed 227, 247, 238, 235, 239, 238, and 242 pounds." Doc. 147, p. 9. There was not any steady or continued decline in weight that one would expect to see if the meals provide were nutritionally inadequate. Haynes Affidavit, ¶31. One would certainly not expect to see the significant increases in weight that were reported above since the filing of the present lawsuit. Haynes Affidavit, ¶31.

The Affidavits and Exhibits attached hereto will reflect that instead Christians' weight has continued to fluctuate since Defendants filed their summary judgment motion in December 2021. When seen by Health Services on October 5, 2022, his weight was said to have "increased 23 pounds since 05/9/2022." Haynes Affidavit, ¶25; Exhibit 1. His recorded weight on that date was 286 pounds. Health Services, therefore, encouraged Christians to "re-institute a cardiovascular exercise program to promote weight loss." Haynes Affidavit, ¶25; Exhibit 1. Christians was "agreeable to the plan." He was again later seen on October 16, 2022, and there were no complaints of "weight loss without trying." Haynes Affidavit, ¶16; Exhibit 2.

Shortly thereafter, however, in a Kite-Request Slip dated November 28, 2022, Christians was complaining of "loseing [sic] muscle mass and strength" as an alleged result of his "snack

18

[being] cancelled due to a fabrication by Steven Swygert." Haynes Affidavit, ¶17; Exhibits 3-5.[5] It appears, in reviewing his medical records, that Christians had a Medical Order for an extra protein snack back in 2019-2020. Haynes Affidavit, ¶18; Exhibits 6-7. Said Order, however, expired in July 2020. Summit, nonetheless, "continued to give patient this extra protein snack for multiple years." Haynes Affidavit, ¶18; Exhibits 6-7. When the SDDOC switched food service providers, in October 2022, Aramark determined that, since there was "no order for patient to receive this extra protein snack," they would discontinue the same. Haynes Affidavit, ¶19; Exhibits 6-7.

A request was therefore placed for a provider to "review chart on patient's behalf in regards to his extra protein snack order being discontinued." Haynes Affidavit, ¶20; Exhibit 8. It was later determined by a provider that Christians' "current BMI [was] not underweight" so no new Order was placed for an extra protein snack. Haynes Affidavit, ¶20; Exhibit 8. Christians was later notified, in Correspondence dated December 2, 2022, that "The provider said your current BMI is not underweight" so there were "no new orders at this time." Haynes Affidavit, ¶20; Exhibits 9.

When recently contacted by counsel in connection with the decision not to issue a new Medical Order authorizing an "extra protein snack," Dr. Haynes, Chief Medical Officer for the SDDOC, undertook to review Christians' medical records. In doing so, Dr. Haynes was unable to find anything in Christians' medical chart which would have raised any concern for malnutrition. Haynes Affidavit, ¶21. As indicated in the Affidavit attached hereto, Albumin can

---

[5] Christians submitted an Informal Resolution Request, dated October 31, 2022, complaining that his "specialist ordered diet snack was cancelled because someone said [he] was giving it away." Exhibit 23. According to Christians, this was a "false allegation and an outright lie." Exhibit 23. As indicated, however, in an Informal Resolution Response dated November 21, 2022, Christians was "seen on camera on 7/20/22 at 4:43 pm giving away [his] 'snack' after dinner was over." Exhibit 24. As further noted therein, this was "happening almost every day." Exhibit 24.

be used as a marker of protein malnourishment.  Haynes Affidavit, ¶21.  Generally, levels below 3.5 could indicate or suggest protein malnutrition.  Haynes Affidavit, ¶21.  Dr. Haynes, therefore, undertook to compare Christians' Albumin levels both before and after his "extra protein snack" was discontinued.  Haynes Affidavit, ¶22.  According to Dr. Haynes, the Albumin level recorded on September 15, 2022, prior to the discontinuation of the "extra protein snack" was 4.4.  Haynes Affidavit, ¶22.  That level was 4.5 when later recorded on March 27, 2023. Haynes Affidavit, ¶22.  When again recorded on September 18, 2023, Christians' Albumin level was 4.4.  Haynes Affidavit, ¶22.  There was thus, in Dr. Haynes' expert opinion, no evidence of any protein malnourishment.  Haynes Affidavit, ¶22.

The record will reflect that Christians weight on October 5, 2022, near the time that the "extra protein snack" was discontinued, was 286 pounds.  Haynes Affidavit, ¶23.  His BMI at the time was 36.7.  Haynes Affidavit, ¶23.   Those numbers are said to be indicative of morbid obesity.  Haynes Affidavit, ¶23.  Christians' body weight, along with his normal Albumin level, did not suggest any concern for malnutrition.  Haynes Affidavit, ¶23.  The decision to discontinue the "extra protein snack" was therefore, in Dr. Haynes' opinion, the correct medical decision.  Haynes Affidavit, ¶23.

In a subsequent Kite-Request Slip, dated February 28, 2023, Christians indicated to Health Services that he wanted to be "called in to get a weight check."  Haynes Affidavit, ¶24; Exhibit 11.  The "weight check" performed on March 2, 2023, showed that he weighed 278.6 pounds.  Haynes Affidavit, ¶24; Exhibit 12.  The above "weight check" serves to refute any assertion by Christians, in an Informal Resolution Request dated March 21, 2023, that he "lost 35 pounds in about 11 weeks" due to "receiving inadequate nutrition."  Haynes Affidavit, ¶24.  As indicated above, Christians was seen by Health Services on October 5, 2022 and his weight was

20

said to have "increased 23 pounds since 05/9/2022." Haynes Affidavit, ¶25; Exhibit 1. His recorded weight on that date was 286 pounds. Health Services, therefore, encouraged Christians to "re-institute a cardiovascular exercise program to promote weight loss." Haynes Affidavit, ¶25; Exhibit 1. Christians, however, still weighed well above 270 pounds at the time of his "weight check" on March 2, 2023. Haynes Affidavit, ¶25; Exhibit 12.

When later seen by Health Services on March 29, 2023, for a "Chronic Disease Encounter, Christians was said to have weighed 258 pounds." Haynes Affidavit, ¶26; Exhibit 13.[6] Although scheduled for a weight check on May 31, 2023, it was "refused by Patient." Haynes Affidavit, ¶26; Exhibit 13. Christians insisted on being able to weigh himself. Haynes Affidavit, ¶26; Exhibit 15. The record reflects that subsequent thereto, on September 21, 2023, Christians was again seen for a "Chronic Disease Encounter." At that time, his weight was said to have remained stable. Haynes Affidavit, ¶27; Exhibit 16. He weighed in at 255 pounds. When later seen, on October 16, 2023, for "TB Symptoms Annual Screening," there were no complaints of weight loss without trying." Haynes Affidavit, ¶27; Exhibit 17. It appears that any weight loss on the part of Christians was due to his having been encouraged, on October 5,

---

[6] Inmate Christians, in an Informal Resolution Request dated March 21, 2023, complained that he had "lost 35 pounds in about 11 weeks." Exhibit 18. According to Christians, he was "getting shorted calories" and was therefore "receiving inadequate nutrition." Exhibit 18. As indicated, however, in an Informal Resolution Response dated March 30, 2023, Anthony Graham, Aramark Supervisor, stated that he was "present a few times during the week of March 20th and observed proper serving sizes distributed at that time." Exhibit 19. Mr. Graham ensured staff that he would "follow up on this claim" and would "make sure his staff understand their responsibility in ensuring proper serving sizes." Exhibit 19. Moreover, a review of Inmate Christians' medical records will readily refute any assertions that he "lost 35 pounds in about 11 weeks." When seen by Health Services on October 5, 2022, Christians' weight had "increased 23 pounds since 05/9/2022." Exhibit 1. At that time, his weight was recorded at 286 pounds. Exhibit 1. When Inmate Christians was later seen by Health Services, on March 2, 2023, for a "weight check," he weighed 278.6 pounds. Exhibit 12. There is nothing in his medical records which would even remotely support the assertion by Inmate Christians that, between January 21, 2023, to March 21, 2023, he lost 35 pounds. Haynes Affidavit, ¶24.

2022, to "re-institute a cardiovascular exercise program to promote weight loss" due to his weight having put on over 20 pounds since May 9, 2022.  Haynes Affidavit, ¶28.  At no time during any of these subsequent encounters with Health Services did Christians mention anything about an alleged loss of muscle mass or strength.  Haynes Affidavit, ¶29.

A review of the record will reflect that Christians' weight continues to be well above that recorded when seen for his intake physical on October 1, 2013. As indicated above, his weight at that time was recorded at 217 pounds.  Doc. 147, pp. 8-9.  His recent weight of 255 pounds is also well above that recorded on May 5, 2020, shortly prior to his having filed the present lawsuit on May 27, 2020.  At that time, his weight was recorded at 235 pounds.  Doc. 104, p. 15, ¶50; Doc. 147, p. 9.  Any suggestion by Christians this his weight loss was due to his meals being insufficiently nutritious therefore fails to account for the fact that one would naturally expect to see a continued decrease in weight while incarcerated.  Haynes Affidavit, ¶31.  As indicated above, one would certainly not expect to see the significant increases in weight that were reported above since the filing of the present lawsuit.  Haynes Affidavit, ¶31.

In dismissing the "new Eighth Amendment inadequate nutrition claims" against certain Summit Defendants, the Court found that Christians' allegations "alone [were] not sufficient to state a claim for deliberate indifference."  Doc. 147, pp. 53-54.  According to the Court, "To show deliberate indifference, an inmate must demonstrate that a defendant knew the 'inmate[] face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it.'"  Doc. 147, p. 54.  *See Farmer v. Brennan*, 511 U.S. 825, 847 (1984); *Coleman,* 114 F.3d at 786.  As found by the Court, "[C]onstructive knowledge, or the 'should-have-know' standard, is not sufficient to support a finding of deliberate indifference[.]"  Doc. 147, p. 54.  *See Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998).  It was said that

Christians "makes no showing that these defendants knew he faced a risk of harm because of food issues at SDSP" and that "At most, Christians argues that these defendants should have been aware of these issues, which is insufficient under *Spruce*." Doc. 147, p. 54.

The SDDOC Defendants would respectfully submit that the same analysis applies to them as well. Christians simply has not and cannot show that they were aware of any serious risks posed by his alleged inadequate nutrition and deliberately indifferent to the same. Doc. 147, p. 23. The question in this case is whether, given the facts known at the time, Defendants should have known that their actions violated the law. *Langford*, 614 F.3d at 461 (citing *Miller*, 75 F.3d at 1308). *See also McCaster*, 684 F.3d at 746; *Livers*, 700 F.3d at 362. Defendants would submit that the answer to that question is a resounding no.

In denying Defendant's previous summary judgment motion, the Court indicated that "genuine questions of fact exist regarding Christians' caloric intake." Doc. 147, p. 30. Defendants, however, would submit that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Baker v. Mueller*, 2023 WL 5098545, at *2 (D.S.D.); *Augustine v. Schreurs*, 2021 WL 6125815, at *1 (D.S.D.); *Brannan v. Cox*, 2020 WL 4719958 at *2 (D.S.D.). "The requirement is that there be no *genuine* issue of *material* fact." *Baker*, 2023 WL 5098545, at *2 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 247, 248 (1986)). *See also Brannan,* 2020 WL 4719958, at *2. Factual disputes that are irrelevant or unnecessary will not be counted. *Augustine*, 2021 WL 6125815, at *1.

The underlying substantive law identifies facts which are "material" for purposes of a motion for summary judgment. *Baker*, 2023 WL 5098545, at *2 (citing *Anderson*, 477 U.S. at 248). *See also Augustine*, 2021 WL 6125815, at *1; *Brannan*, 2020 WL 4719958, at *2. "Only

23

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Baker*, 2023 WL 5098545, at *2; *Augustine*, 2021 WL 6125815, at *1; *Brannan*, 2020 WL 4719958, at *2.  Whether Christians was correct about his caloric intake does not preclude summary judgment in this case.  As indicated elsewhere herein, the "governing law" clearly provides that the Court must "examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law." *Langford*, 614 F.3d at 461 (citing *Miller,* 75 F.3d at 1308).  *See also McCaster*, 684 F.3d at 746; *Livers*, 700 F.3d at 362.

The information possessed by Defendants at the time is not in dispute. That information included assurances from Summit that "all meals served [were] approved by a licensed Dietician and [met] nutritional requirements, that is why the meals [were] acceptable to serve."  Doc. 185, pp. 19-20.  This was after Christians' concerns "had been relayed to the proper authorities."  Doc. 185, p. 20.  Summit was adamant that "all diets served to inmates within the SDDOC complied with the National Institute of Health – Dietary Recommended intakes and Recommended Dietary Allowances guide and contained a weekly average of 2,700 calories as required by the SDDOC contract."  Doc. 185, p. 7.

Those assurances were consistent with the findings of the private, independent consultant retained by SDDOC to perform an independent review of their prison food service program.  Christians has not and cannot dispute the fact that the 2017 Report prepared by Ms. Wakeen that found that the calories contained in the meals provided at both the MDSP and SDSP were "slightly over that recommended for the adult reference male."  Doc. 104,  pp. 9-10, ¶25; Doc. 99-78.

24

Whether Defendants "should have known," based on Christians' supposed food journal, that the meals were nutritionally inadequate, is not sufficient to support a finding of deliberate indifference. Doc. 147, p. 54. *See Spruce*, 149 F.3d at 786. Christians "must demonstrate that a defendant knew the 'inmate[] face[d] a substantial risk of serious harm and disregard[ed] that risk.'" Doc. 147, p. 54. *See Farmer,* 511 U.S. at 847; *Coleman,* 114 F3 at 786. There has been no showing by Christians that Defendants "knew he faced a risk of harm because of food issues at SDSP" and disregarded the same. Doc. 147, p. 54. As found by the Court, Defendants "have taken steps towards investigating the alleged problem." Doc. 147, p. 40. That investigation, as discussed above, included not only retaining an independent consultant but also receiving assurances from Summit that "all meals served [were] approved by a licensed Dietician and [met] nutritional requirements." Doc. 185, p. 20. Christians has not and cannot point to any authority which would suggest that Defendants were required to ignore the findings of not one, but two, registered dieticians in determining whether there was a "problem" with the meals being provided.

As previously found by the Court, "The DOC Defendants make a strong argument that failure to change or override the registered dietician's dietary decisions alone does not constitute deliberate indifference." Doc. 147, p. 41. The Court, however, proceeded to find that Christians' claims "extend beyond alleging a failure to reverse dietary decisions or alleging that the menu was insufficient." According to the Court, he was arguing that "the menu was not being adhered to" or that it was being altered and that incorrect portion sizes were listed." Doc. 147, p. 41. In finding that "The State of South Dakota and its prison officials should take no comfort in the fact that they have contracted with Summit for an adequately nutritious diet," the Court stated that "It

25

is still the function of the public entity that has custody of the prisoners to ultimately see that their nutritional needs are met." Doc. 147, p. 42.

With all due respect to the Court, however, Defendants, in ensuring that Christians' nutritional needs were met, fail to see what more they could or should have done under the circumstances. Christians readily acknowledges that he was told that there was "nothing [they] can do." Doc. 83, p. 49, ¶127(DD). In regards thereto, the contract that had been entered into with Summit, as indicated above, expressly provided that "The Contractor shall address all complaints from inmates and ensure quality products and services [were] being provided." Doc. 137-2, p. 10. Pursuant thereto, Summit was required to work within the existing process at the MDSP/SDSP for complaint resolution to "resolve complaints and/or quality issues." Doc. 137-2, p. 10.

If Christians had any concerns with the "slight portions" that he was receiving or that there were items "missing from his tray," he should have therefore availed himself of the Grievance Procedure set out in SDDOC Policy 1.3.D.7. Clark Affidavit, ¶18. Defendants could not allow Christians, or any other inmate for that matter, to circumvent the established grievance process in place at the SDSP. Clark Affidavit, ¶18. The only action they were able to take, under the circumstances, was to make the issue known to Summit Foods. Clark Affidavit, ¶21. Christians readily concedes that Defendants did just that.

As admitted to by Christians, he was told on repeated occasions, that "food service supervisor [was] being contacted." Doc. 83, p. 23, ¶77; Doc. 83, p. 33, ¶102; Doc. 83, p. 34, ¶104. Christians further admits that the "information [had] been forwarded to the appropriate authorities for further review." Doc. 83, p. 30, ¶99. As already discussed elsewhere herein, the record will reflect that "Emails between [Defendants] and Summit officials . . . show a

discussion regarding Christians' complaints." Doc. 185, p. 20. As was further found by the Court, "some of the complaints that reached Summit discussed inadequate serving sizes, caloric intake, and nutritional make-up." Doc. 185, p. 22. In response to their emails, Defendants were told that "all meals served are approved by a licensed Dietician and meet nutritional requirements, that is why the meals are acceptable to serve." Doc. 185, p. 20.

Defendants, despite Christians' apparent beliefs to the contrary, were not allowed or authorized to go into the kitchen area to prepare a replacement meal tray designed to his personal liking. Clark Affidavit, ¶20. Defendants were also not permitted to retrieve food items from the kitchen to replace supposed items that Christians claimed were missing from his food tray. Clark Affidavit, ¶20. As was previously noted in *Maday v. Dooley*, 2018 WL 4334071, at *5 (D.S.D.), "All food preparation and planning [is] done by CBM." The SDDOC does not employ a dietician but rather relies on the registered dietician employed by CBC. All menus are therefore created or prepared by said dietician. *Cody*, 250 F. App'x at 765.

The SDDOC Defendants, therefore, as in *Morgan v. Rothe*, 2022 WL 9799601, at *4 (W.D. Ark.), did not develop the menus and did not have the authority to change Christians' meal plan and vary from the menus. *See also Ingrassia*, 825 F.3d at 898-99. Christians has not and cannot show that any of the correctional officers, referred to in his Second Amended Complaint, "possessed the authority to change plaintiff's meal plan, had any personal involvement in the making process of what kind of meals inmates are to be served, or deliberately disregarded a medical professional's order to provide him with specific food items." *Ryan*, 2020 WL 2198927, at *4.

There has also been no showing whatsoever that any of these Defendants were dieticians or had any training regarding the nutritional value of the meals being provided. Said Defendants,

27

therefore, were entitled to rely upon the expertise of the Registered Dietician as to the adequacy of Christians' assigned diet. *Tyler v. Sapper*, 2023 WL 8603004, at *8 (N.C.) (citing *IKO v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008)). In a similar line of cases, the courts have made clear that a plaintiff "fails to explain how [Defendants], who [were themselves] not a medical professional, should have recognized [his] medical needs as serious or requiring different treatment, when any such conclusion would have been at odds with the assessment of the . . . medical professionals who examined [him]." *Bartunek v. Hall County, Nebraska*, 2020 WL 1441853, at *15 (Neb.). Defendants, lacking any medical training or expertise "were entitled to rely upon the opinions of those doctors who [were] actually treating and trained to treat inmates." *Wheatley v. Smith*, 2014 WL 1207800, at *6 (Minn.) (citing *Dowty v. Waukazoo*, 2012 WL 4903664, at *9 (D.S.D.)). *See also Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011); *Alexander v. Bell*, 2020 WL 1678228, at *8 (E.D. Ark.); *Grant/Rakim v. Kelley*, 2019 WL 76262, at *2 (E.D. Ark.).

The question in the instant case is "not whether [Defendants] did all they could have, but whether they did all the Constitution requires." *Davis v. Buchanan Cty., Mo.*, 11 F.4th 604, 628 (8th Cir. 2021). As was found in *Davis*, Defendants are entitled to qualified immunity if they "act without the subjective intent to cause harm." *Id. See also Newman v. Holmes*, 122 F.3d 650, 653 (8th Cir. 1997). According to the Court, the "subjective intent to cause harm cannot be inferred from prison guards' failure to act." *Davis*, 11 F.4th at 628. Defendants are entitled to qualified immunity "if they could reasonably believe that their response to the risk was not deliberately indifferent to that risk." *Id.* (citing *Gregoire v. Class*, 236 F.3d 413, 418 (8th Cir. 2000)). While Defendants certainly do not mean to belabor the point, in determining whether a reasonable government official would have known that his actions violated the law, the Court

28

must "examine the information possessed by the government official accused of wrongdoing. *Langford,* 614 F.3d at 461 (citing *Miller,* 75 F.3d at 1308).  *See also McCaster,* 684 F.3d at 746; *Livers,* 700 F.3d at 362.  "Officials do not lose their qualified immunity because of a mistaken, yet reasonable belief, nor do officials lose their immunity because of a reasonable mistake as to the legality of their actions."  *King,* 2009 WL 10704974 at *1 (W.D. Mo.) (citing *Forrester* 397 F.3d at 1054).  "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Whitten,* 199 F.Supp.3d at 1232 (citing *Messerschmidt,* 132 S.Ct. at 1245).

Courts must be "careful to ensure that the requirement of subjective culpability is not lost."  *Clark v. Armontrout*, 28 F.3d 71, 72 (8th Cir. 1994) (citing *Farmer*, 511 U.S. at 843).  Here, there is absolutely nothing whatsoever in the record which would even remotely suggest that Defendants acted with the subjective intent to cause harm to Christians.  Based on the information that was available to them at the time, Defendants could have reasonably believed that, despite Christians' assertions to the contrary, the meals provided at the SDSP were nutritionally adequate.

**ALLEGED LOSS OF STRENGTH**

The same is true for the alleged loss of muscle and strength by Christians. Defendants would, once again, assert that there is no verifying medical evidence in the record to support the assertion by Christians that he "suffered and is suffering from muscle and strength loss" due to the alleged "prolonged caloric deficit and inadequate nutrition."  Doc. 104, pp. 22-23, ¶84.  The Court acknowledged the fact the Christians' medical records "indicated good muscle tone and strength at several visits to Health Services from 2017 to 2020."  Doc. 147, p. 30.  In denying

Defendants' earlier Motion for Summary Judgment, the Court seemingly relied on Christians having "reported a 150-pound reduction in the amount he could bench press."  Doc. 147, p. 30. According to Christians, when seen by Health Services on January 7, 2019, he "used to be able to bench press 400 pounds but now could only bench press 250 pounds."  Doc. 147, p. 12.  In regards thereto, the Court found that Defendants "offer no other explanation for Christians' muscle and strength loss except to note that one instance of left-side weakness was caused by a neck injury."  Doc. 147, p. 30.

With all due respect to the Court, however, the record will reflect that the muscle and strength loss complained of by Christians was "limited to his left side."  Doc. 104, p. 23, ¶87. When seen by Health Services on July 2, 2019, Christians complained only of "weakness throughout arm and in chest and trap on the L [left side] only."  Doc. 104, p. 23, ¶87; Doc. 99-27-28.  It was later noted that his "left arm atrophied due to an injury in his neck."  Doc. 27, p. 911; Doc. 104, p. 23, ¶88.  Christians does not deny the same but alleges instead that "This fact is pointless."  Doc. 120, p. 10, ¶87.

Defendants, obviously, take strong exception to the assertion that "This fact is pointless." Despite Christians' apparent beliefs to the contrary, "poor nutrition would cause global weakness and not just weakness limited to one part of the body."  Haynes Affidavit, ¶34.  His alleged poor nutrition, therefore, would not account for the fact that he could "only lift 10 pounds for several reps on the L arm and could do probably 100 on the R."  Haynes Affidavit, ¶35; Doc. 99-28.  It also does not explain why "his bicep circumference [was] 32 cm on the L and 36 on the R." Haynes Affidavit, ¶35; Doc. 99-28.  A review of Christians' medical records will show that the weakness/atrophy was focal to the left side.  Haynes Affidavit, ¶36; Doc. 99-28.  Focal atrophy,

30

as is present in the instant case, "is not caused by poor nutrition but was instead attributable to his cervical pathology." Haynes Affidavit, ¶36.

Any argument by Christians that his loss of muscle and strength was due to inadequate nutrition also ignores the statement he made, when seen by Health Services on July 2, 2019, that "his legs feel pretty strong and he can still do heavy lifting with them." Haynes Affidavit, ¶37; Doc. 99-28. In response thereto, he now merely contends that "feeling 'pretty strong' is relative to the exact time of the question." Doc. 120, pp. 10-11, ¶89. Christians, however, has not and cannot dispute the fact that he was able to "still do heavy lifting" with his legs. Said statements by Christians serve to clearly refute any assertion that his alleged loss of strength/muscle was due to poor nutrition. Haynes Affidavit, ¶37. Once again, "poor nutrition would cause global weakness and not just weakness limited to one part of the body." Haynes Affidavit, ¶37.

Moreover, despite his alleged lack of a nutritionally adequate diet while incarcerated, a review of Christians' medical records will reveal that his strength increased significantly during the period of January 4, 2018 to January 7, 2019. Haynes Affidavit, ¶11. When seen by Health Services on January 4, 2018, he reported that he "had stopped working out five (5) months ago and was now so weak he could 'barely do a push up.'" Haynes Affidavit, ¶11; Exhibit 20. Christians, however, when later seen by Health Services on January 7, 2019, reported that he could now bench press 250 pounds. Haynes Affidavit, ¶12; Exhibit 22. According to Christians, he had been "lifting weights." Haynes Affidavit, ¶12; Exhibit 21. This increase in strength has been described as "truly impressive." Haynes Affidavit, ¶12. Such an impressive gain in strength "would not have been possible without adequate nutrition and dedicated training." Haynes Affidavit, ¶12. It therefore seems relatively clear that any weight loss experienced by

31

Christians during this time-period was due to his increased physical activity along with his change in psychiatric medication.  Haynes Affidavit, ¶12.

As noted above, Christians, in a Kite-Request Slip dated November 28, 2022, complained of "loseing [sic] muscle mass and strength" as an alleged result of his "snack [being] cancelled due to a fabrication by Steven Swygert."  Haynes Affidavit, ¶38; Exhibits 4-6.  As for any purported concerns by Christians that he was losing muscle mass and strength, the Affidavit attached hereto will reflect that there is again no basis for the same in his medical records.  In reviewing his medical records, Dr. Haynes was unable to find anything which would have suggested that Christians was continuing to lift weights at the time.  Haynes Affidavit, ¶39.  In fact, when seen by Health Services on October 5, 2022, Christians "denies any regular exercise." Haynes Affidavit, ¶39; Exhibit 1.  Any alleged loss of muscle mass and strength complained of by Christians in his Kite would therefore have been more likely the result of any "regular exercise" on Christians' part as opposed to having discontinued the "extra protein snack". Haynes Affidavit, ¶39.

Once again, Defendants, based on the information available to them at the time, had no reason whatsoever to believe that the loss of muscle/strength complained of by Christians was due to inadequate nutrition.  As repeatedly argued by Defendants above, the sole question is "Whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law."  *Langford,* 614 F.3d at 461 (citing *Miller,* 75 F.3d at 1308).  *See also McCaster,* 684 F.3d at 746; *Livers,* 700 F.3d at 362.  Defendants do not "lose their qualified immunity because of a mistaken yet reasonable belief, nor do [they] lose their immunity because of a reasonable mistake as to the legality of their actions."  *King*, 2009 WL 10704974, at *1 (citing *Forrester*, 397 F.3d at 1054).  The doctrine of qualified immunity

32

gives Defendants "breathing room to make reasonable but mistaken judgments." *Stanton*, 571 U.S. at 5 (quoting *Ashcroft*, 563 U.S. at 743). *See also Harp*, 2013 WL 1896930, at *3 (quoting *Hunter*, 502 U.S. at 229). Such immunity clearly allowed Defendants to make "reasonable errors." *Habiger*, 80 F.3d at 295 (citing *Hunter*, 502 U.S. at 229). *See also Borgman*, 646 F.3d at 522; *Clayborn*, 734 F.3d at 808.

## ALLEGED RETALIATION

As noted by the Court, in its Order dated September 28, 2022, Christians is also attempting to bring a First Amendment retaliation claim against Young, Christensen and Stratman, "all of whom [were] currently Defendants to this lawsuit." Doc. 147, p. 54; Doc. 83, pp. 49-50, 61-62, ¶¶127(CC), 127(FF), 140-42. According to Christians, Young, along with A.W. Cook, "stopped by cell #89 at approximately 9:45 AM where Young threatened to move Christians out of State to a much harsher and more violent prison." Doc. 83, p. 49, ¶127(CC). It is also alleged that, on April 30, 2021, Young "again reiterated moving Christians to a different State such as New Jersey, South Carolina, Wisconsin, New Mexico or Kansas where guys get stabbed over cookies." Doc. 83, p. 50, ¶127(FF).

The alleged retaliation on the part of Stratman and Christensen stem from a supposed incident on September 19, 2019, where he "left [his] room with paperwork, including a State contract between the DOC and CBM/Summit Food Service, [he] entered Unit Coordinator Stratman's Office attempting to gain copies of . . . the contract for a civil suit." Doc. 83, p. 60, ¶140. Rather than provide Christians with a copy of the contract, Stratman allegedly told him that he "needed to turn it over." It was at that point that Stratman was to have "called Unit Manager Nancy Christensen into her office" who also instructed Christians that he "could not possess the food contract." Doc. 83, p. 60, ¶140. According to Christians, he "expressed he

33

would turn over the contract at a minimum in front of a camera located at the officer's desk next to Stratman's office so as to provide some proof that the contract was being taken from him." When he "moved toward the door," UM Christensen "stepped in front of the door." In response thereto, Christians "began yelling for 'help.'" Doc. 83, p. 60, ¶140. When Christians continued to scream for "help," Stratman "place an emergency call." Once the door was opened, Christians "ran to the officer's desk" and "positioned himself in front of the camera." Doc. 83, pp. 60-61, ¶140. It was then that he was to have been "duffed up" and later "received an H-4 Major violation for assault on staff." Christians alleged that he was "given such a severe violation because it would send him to a max security prison from the minimum-medium he was being housed at." Doc. 83, p. 61, ¶140.

In support of his alleged retaliation claim, Christians also contends that "On April 25, 2020, [he] was served a disciplinary report charging him with an H-7 in which he was accused of planning and orchestrating a group hunger strike." Doc. 83, p. 61, ¶141. During a purported "investigative interview" with Cathy Wynia, he was "accused of filing a lot of grievances on food issues and filing a lawsuit about the food service at the prison." Wynia, allegedly, also "accused Christians of attending a group meeting in the rec yard that apparently was videotaped." He "denied any involvement in the meeting as he didn't attend night rec and would in no way possible be on camera conspiring with anyone involved in planning such an event." Doc. 83, p. 61, ¶141. According to Christians, he "did not participate in the group hunger strike as he never stopped eating." Young and Cook, however, supposedly told Christians that he was "filing too many grievances of the food issues not to be involved." Doc. 83, p. 61, ¶141. The Court, taking the above allegations as true, found that Christians had "clearly satisfied the first

34

prong of a First Amendment retaliation claim because '[t]he filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity.'"  Doc. 147, pp. 55-56.

### DEFENDANT YOUNG

Defendants, however, would assert that any claim by Christians regarding alleged retaliation on the part of Young must be dismissed due to his failure to properly exhaust his administrative remedies.  As noted in *Bell v. Young*, 2018 WL 3148385, at *30 (D.S.D.), "Exhaustion under § 1997e(a) is mandatory, requires prisoners to exhaust all 'available' remedies, and is required even where the relief sought (i.e., money damages) is not available through administrative avenues."  That section of the Prison Litigation Reform Act (PLRA) provides that: No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.  42 U.S.C. § 1997e(a).  *See Bell*, 2018 WL 3148385, at *30; *Maday v. Dooley*, 2019 WL 4935705, at *19 (D.S.D.).  It has been said, on repeated occasions, that "[i]f exhaustion was not completed at the time of filing, dismissal is mandatory."  *Broome v. Peed*, 2006 WL 1084115, at *1 (D.S.D.) (citing *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003)).  *See also Whiting v. Bear*, 2016 WL 297435, at *4 (D.S.D.); *Brakeall v. Stanwick-Klimek*, 2017 WL 6278872, at *7 (D.S.D.).

The "SDDOC administrative remedy procedure for inmates (Policy 1.3.E.2)" is, as indicated in *Bell*, 2018 WL 3148385, at *30, "familiar to this court."  There is, as recognized in *Sisney v. Reisch*, 2007 WL 951858, at *2 (D.S.D.), "a two-step process for exhausting administrative remedies under the DOC's Policy 1.3.E.2.  First, an inmate must attempt to informally resolve his complaint.  If the inmate is unable to resolve the complaint verbally, he is to submit an Informal Resolution Request form . . . ."  *Id.*  "If the inmate is not satisfied with the

response to the Informal Resolution Request, within ten days of receiving that response, he is required to complete and turn in a Request for Administrative Remedy . . . .” *Id.  See also Harp v. Sec'y of Corr.*, 2013 WL 416645, at *1 (D.S.D.); *Bauer v. Glaser*, 2017 WL 435755, at *2 (D.S.D.); *Kader v. Dooley*, 2019 WL 4227361, at *4 (D.S.D.); *Maday*, 2019 WL 4935705, at *19.

To properly exhaust his administrative remedies, Christians must have “complete[d] the administrative review process in accordance with the applicable rules.”  *Kader*, 2019 WL 4227361, at *4 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)).  It has been said that “whether a prisoner has properly exhausted must be determined from the prison regulations themselves.” “Those regulations, not the PLRA, ‘define the boundaries of proper exhaustion.’”  *Maday*, 2019 WL 4935705, at *18 (citing Jones, 549 U.S. at 218).  Christians, therefore, was “required to take advantage of each step the prison holds out for resolving the claim internally and by following the critical procedural rules of the prison’s grievance process.”  *Whiting*, 2016 WL 297435, at *4; *Brakeall*, 2017 WL 6278872, at *7; *Kader*, 2019 WL 4227361, at *5.  He must have “pursue[d] the grievance process to its ‘final stage’ to ‘an adverse decision on the merits.’”  *Id*. (quoting *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014)).

In reviewing the Comprehensive Offender Management System (COMS) maintained and in place at the SDSP, it appears that Inmate Christians did not properly exhaust his administrative remedies in connection with the above-referenced incidents.  Maturan Affidavit, ¶4.  Ms. Maturan was unable, in reviewing COMS, to find anything to indicate that Inmate Christians, as required by SDDOC Policy, filed a grievance within the thirty (30) day-time-period allowed following either of the above-referenced incidents in April 2021. Maturan Affidavit, ¶4.  Although a review of COMS reveals that Inmate Christians did file a number of

36

Informal Resolution Requests, along with Requests for Administrative Remedy, during the time period in question, none of said grievances involved or pertained to the alleged threats supposedly made by then-Warden Young. Maturan Affidavit, ¶8.

This Court has previously recognized that "It is reversible error for the district court to proceed to the merits of a prison condition claim if the prisoner has not exhausted all his available remedies." *Kader*, 2019 WL 4227361, at *4 (citing *Benjamin v. Ward Cty.* 632 F. App'x 301 (8th Cir. 2016) (per curiam)). Because Christians failed to properly exhaust his administrative remedies, Defendants are entitled to summary judgment in connection with any alleged claim of retaliation. *Id*. at *5; *Maday*, 2019 WL 4935705, at *20. The alleged retaliation claim regarding Young should therefore be dismissed as unexhausted.

Even assuming, for sake of argument, that this claim has been properly exhausted, Defendants would assert that Christians has failed to state a claim upon which relief can be granted. As indicated by the Court, "In order for a plaintiff to allege a First Amendment retaliation claim, he must show that '(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'" Doc. 147, p. 55. *Spencer v. Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). Doc. 8, p. 389. Here, Christians has not and cannot show that Young took any "adverse action" against him.

The fact remains, however, that Christians is still being housed in the SDSP. Moreover, Young is no longer the Warden at the SDSP. He was relieved of his duties on or about July 15, 2021. There is nothing in the record to suggest that Young ever (1) attempted to carry out the alleged threat or (2) took any affirmative action to even remotely suggest that he would act on

37

the alleged threat. *Sanchez v. Shanley*, 2021 WL 365912, at *3 (N.D.N.Y.) (citing *Keitt v. N.Y.S. Dep't of Corrs. & Cmty. Supervision*, 2017 WL 9471826, at *10 (W.D.N.Y.)); *Wellington v. Langendorf*, 2013 WL 3753978, at *11 (N.D.N.Y.). Christians, therefore, has not and cannot show that he was "adversely affected" by the alleged threats. *McKinney v. Rutenbar*, 2016 WL 4144253, at *1 (W.D. Mich.). Although the courts have indicated that "some threats can rise to the level of an adverse action in some circumstances, [they have] not held, and it is not clearly established, that a threat of prison transfer, standing alone, is sufficiently adverse to constitute prohibited retaliation." *Id*. at *2.

While noting that "Defendants cite to several cases from other district courts not in the Eighth Circuit for the proposition that an isolated threat, without more, does not adversely affect an inmate," the Court indicated that "the exceptions described by the *McKinney* court suggest that threats of transfer for the purpose of worsening an inmate's circumstances or living conditions may adversely affect an inmate." Doc. 147, pp. 56-57. Here, Christians alleges that Young "threatened to transfer him to a more violent prison." Doc. 147, p. 57; Doc. 83, pp. 49-50, 61-62, ¶¶127(CC), 127(FF). Merely alleging that an act was retaliatory, however, is insufficient." *Cabrera Ascencio v. Young*, 2018 WL 5314937, at *3 (D.S.D.) (citing *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985)). *See also Thompson v. Young*, 2019 WL 2058728, at *2 (D.S.D.). As noted in *Gard v. Dooley*, 2016 WL 5376236, at *31 (D.S.D.), "Mere conclusory allegations of retaliation will not withstand a summary judgment challenge. The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." Christians, therefore, "must identify affirmative evidence from which a jury could find that he has carried his burden to prove the pertinent motive." *Cody v. Loen*, 2011 WL 13190201, at *22 (D.S.D.).

While Defendants acknowledge that Young did engage in a conversation with Christians regarding a possible transfer to another prison, there were certainly no threats of moving him to a "much harsher and more violent prison." Young Affidavit, ¶5; Hughes Affidavit, ¶4; Cook Affidavit, ¶6. Although there may have been reference made to certain states it was only because those were the states that, at the time, Warden Young could arrange a transfer to under the terms of the Interstate Compact. Young Affidavit, ¶6; Cook Affidavit, ¶7. Regarding a possible transfer, the options were limited at the time and there were only a handful of other states available. Young, Affidavit, ¶6. There was certainly no reference made to "inmates getting stabbed over cookies" for the purpose of threatening Inmate Christians. Young Affidavit, ¶8; Cook Affidavit, ¶8.

The Affidavits attached hereto reflect that the conversation in question between Young and Christians pertained to his hunger strike. Young simply undertook to explain to Christians that if he was that unhappy or upset with the conditions of confinement at the SDSP, including the nutritional adequacy of the meals being served, a transfer under the Interstate Compact could be a possible solution. Young Affidavit, ¶7; Hughes Affidavit, ¶6; Cook Affidavit, ¶6. These comments were not intended or perceived to be threats but simply more as an avenue to find a possible resolution to the issues/concerns that Christians was having. Young Affidavit, ¶11; Cook Affidavit, ¶8.

Defendants, therefore, would further assert that Christians has not and cannot demonstrate that they took "adverse action" against him. Moreover, Christians has not shown that the alleged "would chill a person of ordinary firmness from continuing in the activity." *Spencer*, 738 F.3d at 911 (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). As was noted by the Court, in its Order dated September 28, 2022, "Christians, to satisfy the second

39

prong of a First Amendment retaliation claim, must demonstrate both that Young, Christensen, and Stratman took an adverse action toward him and that the alleged adverse action 'would chill a person of ordinary firmness from continuing in the activity.'" Doc. 147, p. 56. *See Spencer,* 738 F.3d at 911 (quoting *Revels,* 382 F.3d at 876). According to the Court, "The ordinary-firmness test is well established in the case law and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." Doc. 147, p. 56. *See Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003)).

A review of the record will readily reflect that the alleged threat to transfer him to a different prison clearly did not "chill" Christians from "continuing in the activity." Despite the alleged threats that were supposedly made by Young, in April 2021, a review of COMS reflects that Christians has continued to submit repeated grievances while at the SDSP. Maturan Affidavit, ¶13. Defendants are aware that "this is an objective test" and "the question is not whether the plaintiff himself was deterred." It has been said, however, on repeated occasions, that "how plaintiff acted might be evidence of what a reasonable person would have done." *Clendening v. Roberson*, 2022 WL 304704, at *4 (W.D. Ark.) (citing *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014)). *See also Guirlando v. Union Cty. Jail*, 2021 WL 4823478, at *10 (W.D. Ark). That principle has also been recognized in this District. *Taylor v. Haugaard,* 360 F.Supp.3d 923, 931 (D.S.D. 2019); *Danielson v. Huether*, 355 F.Supp.3d 849, 861 (D.S.D. 2018).

In a similar case, the court in *Turner v. Burnside*, 541 F.3d 1077, 1086 (11th Cir. 2008), refused to "adopt a rule categorically precluding the factfinder from considering the fact that the inmate did file a lawsuit in spite of the alleged threat." Defendants would assert that "it does not

40

follow that evidence of how the plaintiff himself acted in the face of the alleged retaliation is irrelevant to how a person of ordinary firmness would have acted in a similar situation." *Starr v. Moore*, 849 F.Supp.2d 205, 209 (N.H. 2012). According to the court, "To the contrary, a number of courts have recognized that, in assessing retaliation claims, 'how a plaintiff acted might be evidence of what a reasonable person would have done.'" *Id.* (citing *Garcia*, 348 F.3d at 729).

That same rationale was also adopted in *Woods v. Hays*, 2018 WL 1378721, at *5 (E.D. Mo.), where the court found that "While the question is not whether Woods himself was deterred but what a prisoner of ordinary firmness would have done in reaction to the threat," one could "nevertheless consider how Woods himself reacted as evidence of what a reasonable prisoner would do." The court then went on to note that "regardless of the threat," Woods "continued to file and pursue other grievances against various prison officials." *Id*. It was thus said that "Woods was therefore not deterred by [defendant's] conduct. Nor would a reasonable prisoner be deterred in the circumstances of this case." *Id*.

The same result was again also reached in *Humphrey v. White*, 2018 WL 1177940, at *6 (E.D. Ark.). In finding that plaintiff "does not show that defendants took any adverse action that chilled his use of the grievance process," the court noted that plaintiff "continued to file grievances up until the time he filed this lawsuit." *Id*. Here, as in *Jackson v. Carter*, 813 F. App'x 820, 824 (3d Cir. 2020), the "undisputed evidence shows that [Christians] continued to litigate his various grievances even after being threatened, including filing complaints about officers' retaliatory conduct." Defendants, therefore, would assert that Christians has not and cannot satisfy the second prong of a First Amendment retaliation claim by showing that the alleged adverse action would have served to "chill a person of ordinary firmness from continuing

41

in the activity." Doc. 147, p. 56. *See Spencer,* 738 F.3d at 911 (quoting *Revels,* 382 F.3d at 876).

## DEFENDANTS STRATMAN AND CHRISTENSEN

Equally without merit are the assertions by Christians that he was written up for various rule infractions in "obvious retaliation . . . due to his filing of grievances." Doc. 83, p. 1524, ¶141. According to Christians, the reason for said write-ups was "because he was filing grievances on food issues" and prison officials "retaliated against him for doing so." Doc. 83, p. 1523, ¶140. In connection with the incident, at the MDSP in September 2019, involving Defendants Stratman and Christensen, the Exhibits attached hereto will show that Christians has again failed to properly exhaust his administrative remedies. While the issues that an inmate may address through the Administrative Remedy Process included "disciplinary actions that affect the inmate personally," SDDOC Policy 1.3.E.2 expressly provided that "A copy of the Disciplinary Report and Disciplinary Hearing Officer's Findings and Disposition must accompany the request." Pursuant to SDDOC Policy 1.3.E.2, "Each inmate [was] responsible for obtaining their own copies of original document(s) submitted with his/her request for remedy." As further provided therein, "Inmates seeking remedy, who do not substantially comply with the requirements and procedures of the Administrative Remedy Process, will have their request for remedy and all accompanying forms returned."

That is precisely what happened in the instant case. Inmate Christians, in an Informal Resolution Request dated October 13, 2019, alleged that he had been wrongfully written up for an H-4 violation at the MDSP. Exhibit 25. In response thereto, in an Informal Resolution Response dated October 25, 2019, Christians was informed that "Upon review, [he] provided no evidence to suggest that [he] did not commit the prohibited act." Exhibit 26. Subsequent

42

thereto, on October 31, 2019, Christians submitted a Request for Administrative Remedy indicating that his "version of events from an incident on 9-19-19 [were] briefed in Informal Resolution #29870." Exhibit 27. As indicated, however, in the Administrative Remedy Response dated November 7, 2019, Christians "did not include the required disciplinary report and DHO findings and disposition." Exhibit 28. The Request for Administrative Remedy was, pursuant to SDDOC Policy 1.3.E.2, returned to Christians.

To properly exhaust his administrative remedies, Christians had to comply with the procedures put in place by the SDDOC. *Thares v. Wallinga*, 2023 WL 3389030, at *9 (D.S.D.) (citing *Woodford v. Ngo*, 548 U.S. 81, 102 (2006)). As noted in *Thares*, "proper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures. It has been said that "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* (citing *Jones*, 549 U.S. at 218). *See also Bauer*, 2017 WL 435755, at *2. Having neglected to "include the required disciplinary report and DHO findings and disposition," Christians failed to comply with the prison's deadlines and procedures set out in SDDOC Policy 1.3.E.2. This claim, therefore, has not been properly exhausted.

Even if it could be said, again for sake of argument, that the claim of alleged retaliation against Stratman and Christensen had been properly exhausted, Christians has still failed to state a viable claim. It is well established that "claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008) (citing *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990)). *See also Santiago v. Blair*, 707 F.3d 984, 993 (8th Cir. 2013). "Thus, a defendant may

43

successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Hartsfield,* 511 F.3d at 829 (citing *Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993)). *See also Santiago*, 707 F.3d at 993. Under this standard, "a report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decision maker." *Id*. (citing *Hartsfield,* 511 F.3d at 831).

This approach was adopted by this Court in *Brakeall v. Stanwick-Klemik*, 2020 WL 1180727, at *19 (D.S.D.), where it was noted that "The Eighth Circuit has held that a retaliation claim fails 'if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule,'" and the Defendant shows "'some evidence the inmate actually committed a rule violation.'" *See Sanders v. Hobbs,* 773 F.3d 186, 190 (8th Cir. 2014) (quoting *Hartsfield,* 511 F.3d at 829). It was said that the "some evidence" standard involves: "'Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Brakeall*, 2020 WL 1180727, at *19 (quoting *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)). "'[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as some evidence upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker.'" *Id*. (quoting *Hartsfield*, 511 F.3d at 831). Therefore, "the 'critical inquiry is not whether the prisoner alleges that prison officials retaliated against him for participating in constitutionally protected activity, but instead is whether the prison disciplinary committee ultimately found

44

based upon some evidence that the prisoner committed the charged violation of the prison regulations.'" *Id*. (quoting *Cornell v. Woods*, 69 F.3d 1383, 1389 (8th Cir. 1995)).

Here, it is undisputed that a Disciplinary Report was filed, on September 19, 2019, detailing the incident in question. Exhibit 29. As indicated therein, UM Christensen "stepped into UC Stratman's office to speak with Inmate Mark Christians #35285 about some paperwork UC Stratman had." According to the Report, "Inmate Christians was very agitated about not being allowed to have the paperwork." Exhibit 29. When UM Christensen "informed Inmate Christians twice that he was not getting the paperwork," he "then grabbed the paperwork off of UC Stratman's desk and tried to leave the office." UM Christensen "directed Inmate Christians to give the paperwork back" and she "stepped in front of the door to stop him from leaving the office." It was at that point that Christians "grabbed [her] arm and tried pushing [her] away from the door." Exhibit 29. Unable to leave the office, Christians then "sat in the chair next to the door and started to yell 'Help officer. Help me officer.'" UM Christensen then "opened the door and asked the officer to cuff him up." Exhibit 29.

The above account is consistent with the information provided by UC Stratman in an Informational Report prepared on that same date. Exhibit 30. As stated therein, Inmate Christians entered Stratman's office and "grabbed paperwork off [her] desk and tried leaving the office." To prevent him from leaving, UM Christensen "stepped in front of the door and told him to give it back." Exhibit 30. It was then that Christians "grabbed her arm and tried pushing her out of the way." Unable to leave the office, Christians "sat in the chair and started yelling 'Hel, Hel, Help Officer' repeatedly." Exhibit 30. As indicated in the Disciplinary Hearing Officer's Findings, dated September 23, 2019, Christians was based on the write-up and the testimony presented, found guilty of having committed the H-4 violation. Exhibit 31. He was

45

therefore sentenced to fifteen (15) days in disciplinary segregation but was given credit for the four (4) days spent in Administrative Detention pending investigation.  Exhibit 31.  Christians' allegations, that he was subjected to  retaliatory discipline, therefore fails as a matter of law and Stratman and Christensen are entitled to qualified immunity with respect thereto.  *Santiago,* 707 F.3d at 993.

## APRIL 25, 2020 – PROHIBITED ACT H-7

Finally, it appears that Christians again failed to exhaust his available administrative remedies in connection with the Disciplinary Report he was served with on April 25, 2020.  According to Christians, he was "charged with an H-7 in which he was accused of planning and orchestrating a group hunger strike."  Doc. 83, p. 61, ¶141.  It is alleged that Cathy Wynia, following an "investigative interview" with Christians, stated that she "did not think [he] was involved in the planning of this event."  Doc. 83, pp. 61-62, ¶141.  Christians contends that, while being held in the SHU, Warden Young told him that he was "filing too many grievances of the food issues not to be involved."  Doc. 83, p. 62, ¶141.

Although the issues that an inmate may address through the Administrative Remedy Process included "disciplinary actions that affect the inmate personally," Inmate Christians never availed himself of that opportunity in connection with the above-mentioned "H-7" write-up.  Maturan Affidavit, ¶15.  While a review of COMS reveals that Inmate Christians did file a number of Informal Resolution Requests, along with Requests for Administrative Remedy, during the thirty (30) day-time-period following April 25, 2020, none of said grievances involved or pertained to the above write-up.  Maturan Affidavit, ¶16.  As already argued elsewhere herein, to properly exhaust his administrative remedies, Christians had to comply with the procedures put in place by the SDDOC.  *Thares*, 2023 WL 3389030, at *9 (citing *Woodford*,

46

548 U.S. at 102). As noted in *Thares*, "proper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures. *Id*. It would be reversible error for the Court to proceed to the merits of Christian's retaliation claim since he has not exhausted all his available remedies. *Kader*, 2019 WL 4227361, at *4 (citing *Benjamin*, 632 F. App'x at 301).

Defendants would, once again, assert that if this Court were to find that Christians somehow properly exhausted his administrative remedies, his allegations still fail to state a cognizable First Amendment retaliation claim. It is rather absurd for Christians to now suggest that he "would in no way . . . conspire with anyone involved in planning [a hunger strike]." Doc. 83, p. 61, ¶141. A review of the Exhibits attached hereto will reflect that Christians, on or about April 27, 2020, plead guilty to the charge that he committed Prohibited Act H-7. Exhibit 32. As indicated above, "claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Hartsfield*, 511 F.3d at 829 (citing *Orebaugh*, 910 F.2d at 528). *See also Santiago*, 707 F.3d at 993. *Brakeall*, 2020 WL 1180727, at *19 (quoting *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)). The "critical inquiry is not whether the prisoner alleges that prison officials retaliated against him for participating in constitutionally protected activity, but instead is whether the prison disciplinary committee ultimately found based upon some evidence that the prisoner committed the charged violation of the prison regulations." *Brakeall*, 2020 WL 1180727, at *19 (quoting *Cornell*, 69 F.3d at 1389). Here, there was not only "some evidence" that Christians committed the charged violation of prison rules, but he also readily admitted to the violation by pleading guilty.

47

## INJUNCTIVE RELIEF

Finally, Defendants would assert that Christians is not entitled to the injunctive relief now being requested.[7]  It is well established that the burden of proving that an injunction should be issued rests entirely with the movant.  *Woodward v. Dooley*, 2007 WL 316453, at \*2 (D.S.D.) (citing *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995)).  As was said in *Brooks*, 881 F.Supp.2d at 1049, "injunctive relief is an extraordinary remedy, and the movant has the burden of establishing the propriety of an injunction."  *Roudachevski v. All Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011).  Where, as here, Plaintiff is seeking injunctive relief from an alleged constitutional violation, the court "must first determine whether he has, in fact, established such a violation."  *Heartland Acad. Cmty. Church v. Waddle*, 317 F.Supp.2d 980, 1107 (Mo. 2004).

The PLRA, as recognized in *Native Am. Council of Tribes v. Weber*, 750 F.3d 742, 753 (8th Cir. 2014), "limits remedies to those necessary to remedy the proven violation of federal rights." *Tyler v. Murphy*, 135 F.3d 594, 596 (8th Cir. 1998).  As provided therein, "prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the federal right of a particular plaintiff."  Pursuant thereto, "the court shall not grant or approve any prospective relief unless the court finds that such relief . . . extends no further than necessary to correct the violation of the federal right."  18 U.S.C. § 3626(a)(1)(A).  *See also Native Am. Council of Tribes*, 750 F.3d at 752.

Defendants would submit that "Because control of the administrative details of a prison remains exclusively in the hands of prison officials, control of [Christians'] diet is within their discretion assuming that it is adequate."  *Burgin*, 899 F.2d at 734.  As already argued elsewhere

---

[7] To the extent that Christians is asking the Court for a preliminary and permanent injunction ordering Defendants to "adhere to and enforce the 2020 SDDOC/Summit food contract, his claim is moot.  As noted elsewhere herein, the SDDOC no longer contracts with Summit to provide food services at any of its institutions.

herein, Christians has not and cannot show that his weight loss was due to the alleged lack of a nutritionally adequate diet. The argument by Christians that he lost weight because his meals were insufficiently nutritious ignores the fact that, if that were the case, one would expect to see his weight loss continue while incarcerated. Haynes Affidavit, ¶31. Here, the record will reflect that there was not any steady or continued decline in weight that one would expect to see if the meals provided were nutritionally inadequate. Haynes Affidavit, ¶31. One would certainly not expect to see the significant increases in weight that were reported above since the filing of the present lawsuit. Haynes Affidavit, ¶31.

The same is also true for the alleged loss of strength/muscle complained of by Christians. The muscle and strength loss complained of by Christians was "limited to his left side." Doc. 104, p. 23, ¶87. When seen by Health Services on July 2, 2019, Christians complained only of "weakness throughout arm and in chest and trap on the L [left side] only." Doc. 104, p. 23, ¶87; Doc. 99-27 - 28. Despite Christians' apparent beliefs to the contrary, "poor nutrition would cause global weakness and not just weakness limited to one part of the body." Haynes Affidavit, ¶34. As indicated above, a review of Christians' medical records will show that the weakness/atrophy was focal to the left side. Haynes Affidavit, ¶36; Doc. 99-28. Focal atrophy, as is present in the instant case, "is not caused by poor nutrition but was instead attributable to his cervical pathology." Haynes Affidavit, ¶36. Any argument by Christians that his loss of muscle and strength was due to adequate nutrition also ignores the fact that, by his own admissions, "his legs feel pretty strong and he can still do heavy lifting with them." Haynes Affidavit, ¶37; Doc. 99-28. Said statements by Christians clearly refute any assertion that his alleged loss of strength/muscle was due to poor nutrition. Haynes Affidavit, ¶37. The record

49

will reflect that "poor nutrition would cause global weakness and not just weakness limited to one part of the body."  Haynes Affidavit, ¶37.

Defendants would thus submit that, as in *Lane v. Lay*, 2023 WL 2609072, at *6 (E.D. Ark.), Christians has not and cannot make any showing that he "suffered any detrimental health effects *as a result of an inadequate diet.*"  Where, as here, there is no constitutional violation, there is simply no need for injunctive relief.  *Oldham v. Chandler-Halford*, 877 F.Supp. 1340, 1348 (Iowa 1995) (citing *Falls v. Nesbitt*, 966 F.2d 375, 380 (8th Cir. 1992)).

WHEREFORE, Defendants would respectfully request that their Motion for Summary Judgment be granted and that Christians' Second Amended Complaint be dismissed on the ground that he has not made out a violation of his constitutional rights and that they are therefore entitled to qualified immunity.

Dated this 2nd day of February 2024.

> */s/ Frank Geaghan*
> Frank Geaghan
> Assistant Attorney General
> 1302 East Highway 14, Suite 1
> Pierre, SD 57501-8501
> Telephone: (605) 773-3215
> Frank.Geaghan@state.sd.us

CERTIFICATE OF COMPLIANCE

I certify that, although the Brief in Support of Motion for Summary Judgment Regarding Newly Added Claims and Defendants is in excess of the page limitation provided for in D.S.D Civ. LR 7.1(B)(1), a Motion to Exceed Page Limitations was filed with this Court on January 23, 2024.  Doc. 230.  As indicated therein, Defendants requested permission from the Court to "file a Brief in support of their Motion for Summary Judgment which exceeds the 30-page limit contained therein, but which will not exceed 55 pages in length."  Doc. 230.  The Court, in an Order filed on January 24, 2024, granted Defendants' motion.  Pursuant thereto, Defendants were authorized to submit a brief, in support of their motion for summary judgment, which is not to exceed fifty-five (55) pages in length.  Doc. 231.  In compliance therewith, Defendants' Brief in Support of Motion for Summary Judgment Regarding Newly Added Claims and Defendants contains 52 pages, including the Certificate of Compliance and Certificate of Service.  It is within the rule using Times New Roman typeface in 12-point type.  I further certify reliance on the page count of the word processing software used to prepare this brief, which is Microsoft Word 2016.

Dated this 2nd day of February 2024.

/s/ Frank Geaghan
Frank Geaghan
Assistant Attorney General

51

CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of February 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Southern Division by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users.  I have mailed the foregoing document by First-Class mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

Mark Christians #35285
South Dakota State Penitentiary
P.O. Box 5911
Sioux Falls, SD 57117-5911


/s/ Frank Geaghan
Frank Geaghan
Assistant Attorney General

usdc_fg – Mark Christians – Brief in Support of Motion for Summary Judgment Regarding Newly Added Claims and Defendants (mn)